# UNITED STATES DISTRICT COURT

### for the

## MIDDLE DISTRICT OF FLORIDA

## TAMPA DIVISION

| | | |
|---|---|---|
| **PETRO GATE, INC.** | ) | Case No. 8:20-cv-961-T-36CPT-MLS |
| Plaintiff | ) | |
| | ) | |
| -v- | ) | |
| | ) | |
| **CIRCLE K STORES, INC.** | ) | Jury Trial:  Yes |
| Defendant | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT FOR
## DAMAGES AND INJUNCTIVE RELIEF

COMES NOW, Plaintiff, PETRO GATE, INC. (hereinafter "Plaintiff"), by and through
its undersigned Counsel and pursuant to Federal Rules of Civil Procedure 15(b),
hereby for its First Amended Complaint for Damages and Injunctive Relief against
Defendant, CIRCLE K STORES, INC. (hereinafter "Circle K"), a Texas corporation,
does state as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff was and is an independent fuel service station operator of Defendant
pursuant to a series of contracts entered into between the Parties.

2.      The contracts between the Parties govern the relationship between the
Parties and cover such matters as fuel purchasing quantity requirements, fuel
purchase pricing, station rent, Shell-branded station operations and credit card
purchasing and payments. A copy of those operative contracts and ancillary

1

documents are attached as composite Exhibit A hereto and are incorporated by reference as though set forth at length herein.

3.      Circle K entered into an intentional and premeditated business plan for the purpose of taking over attractive independent operator locations or, in the alternative, putting the same out of business for the purpose of Circle K either inexpensively replacing the independent operator or competitively benefitting from the complete elimination of the same.

4.      As one element of Circle K's predatory and self-serving business plan, independent station operators were charged fuel prices higher than prices charged by Circle K to Circle K-owned stations, and Circle K sold fuel to its own directly owned stations at prices often less even than Circle K's costs for the fuel.

5.      Despite what Plaintiff on information believes to be virtually identical contractual fuel pricing provisions in Defendant's contracts with its other independent station operators, Plaintiff also on information believes that other independent station operators, not desired by take over or the target of Defendant's business plan, paid materially less for fuel from Defendant than the prices paid to Defendant by Plaintiff.

6.      As part of Circle K's business plan to take over lucrative and attractive independent service station locations or to put competitor independent station operators such as Plaintiff out of business, Circle K unilaterally increased gas station rents to independent operators at locations targeted by the Defendant's business plan to unfair and exorbitant levels that were not otherwise economically justifiable and that Circle K knew such independent operator revenues would not support.

7.    As part of Circle K's business plan to take over lucrative and attractive independent service station locations or to put competitor independent station operators such as Plaintiff out of business, Circle K unilaterally contractually controlled all processing of credit card receipts at such independent operator locations. Circle K wrongfully used that control to intentionally and wrongfully delay payment of credit card receipt proceeds to independent operators such as Plaintiff and to create a "float" that was used by Circle K for its own benefit rather than promptly and reasonably paying credit card receipts to such independent operators. That failure to properly pay independent operators such as Plaintiff caused those operators great harm in starving them for the much needed cash to fund their ongoing operations.

## GENERAL ALLEGATIONS

### Plaintiff

8.    Plaintiff, **PETRO GATE, INC**, is a Florida corporation that previously operated a gasoline service station in Naples, Collier County, Florida through an operating agreement with the Defendant.

### Defendant

9.    Defendant, **CIRCLE K STORES, INC.**, is a Texas corporation authorized to do business in the State of Florida and that operates internationally in providing fuel and related services to gas stations owned both directly by Defendant and independently by operators, such as Plaintiff.

3

**Reservation to Name Additional Defendants**

10.     In addition to the Defendant named herein, there may be parties who may also be liable to Plaintiff but Plaintiff currently lacks sufficient or specific facts to permit Plaintiff to name such parties as a party defendant herein. By not naming such parties at this time, Plaintiff is not waiving its right to amend this pleading and to add such parties should the facts warrant such an addition.

**Jurisdiction and Venue**

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Section 1332 because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest, costs and attorneys' fees and is an action between citizens of different states.

12.     This Court has personal jurisdiction over the Defendant because the Defendant is a foreign corporation duly authorized to do business within this jurisdiction and because Defendant's wrongful actions took place within this jurisdiction.

13.     Venue is proper in this Court pursuant to 28 U.S.C. Section 1391, as the causes of action alleged herein arose in Naples, Collier County, Florida.

**FACTUAL ALLEGATIONS AS TO ALL COUNTS**

14.     On or about March 2, 2016, Plaintiff entered into a contract entitled "Contract of Sale (Branded-Lessee)" (the "Agreement") with Defendant for the purpose of

renewing the various existing lease and fuel supply agreements between Plaintiff and Defendant for an additional three (3) year period ending on March 31, 2019 for the leased filling station located at 3825 Tollgate Boulevard, Naples, Collier County, Florida 34114. A copy of that Agreement is attached as joint Exhibit A hereto and is incorporated as though set forth at length herein.

15.     The purpose of the Agreement was to allow Plaintiff to continue to operate a Shell Oil-branded gas filling station located 3825 Tollgate Boulevard, Naples, Collier County, Florida 34114.

16.     Pursuant to the terms of the contracts between Plaintiff and Defendant and pursuant to the terms of the Agreement, Plaintiff was afforded the right by Defendant to "purchase, receive and pay for branded products under the Shell trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, insignia, image standards or other branded indemnifications (the "Proprietary Marks") and other products of the kind, in the quantities and under the terms and conditions specifically set forth in the Agreement and annexations thereto. Part of the "other products" that Plaintiff was afforded the right to purchase from Defendant included but was not limited to a minimum stated amount of motor fuel, i.e. gasoline.

17.     Pursuant to the terms of the contracts between Plaintiff and Defendant and pursuant to the Agreement, Plaintiff agreed to purchase exclusively from Defendant and Defendant agreed to supply to Plaintiff gasoline in the "contract quantity." The terms of the Renewal Agreement clearly contemplated that the price Defendant

would charge to Plaintiff for motor fuels would be fluid in nature and would change from time-to-time depending upon a number of criteria and variables.

18.    Pursuant to the terms of the prior contracts between Plaintiff and Defendant and pursuant to the Agreement, Defendant reserved "the right at any time during the life of this Contract to: (a) change or alter the quality, grade or specifications of any product(s) covered by this Contract or (b) discontinue the availability of any such product(s) if such change or discontinuation is effected by the Supplier (Defendant)" and "any such change or discontinuation shall not affect the minimum purchase requirement...."

19.    Pursuant to the terms of the prior contracts between Plaintiff and Defendant and pursuant to the Agreement, Defendant reserved the right to cancel the Agreement if, in Defendant's sole discretion governmental regulations precluded Defendant from raising its prices of any products deliverable under the Agreement by an amount sufficient in Defendant's judgment to reflect increases in either the cost of the product to Defendant or Defendant's Supplier of the fair market value of such products.

20.    In 2006, Defendant purchased Shell Oil's service station properties as well as Shell Oil's fuel supply agreements with independent gas station operators. Motiva assigned all of Plaintiff's agreements to Defendant. Defendant took over Plaintiff's gas station location and then also rebranded to Shell Oil's owned filling station operation that was highly proximate to the location operated by Plaintiff and which directly competed with the same. While Shell Oil and Defendant had agreements related to the pricing of motor fuel between those parties, Defendant remained free

6

to set motor fuel prices between Defendant and the filling stations such as Plaintiff to whom Defendant provided fuel.

21.    The Agreement between the Parties required Defendant to sell fuel to Plaintiff at the price charged by Shell Oil to Defendant at the price in effect at the time loading of the fuel commences at the Plant (hereinafter "rack rate") plus $.01 (hereinafter "rack plus one"). The only added cost to Plaintiff would be the cost of delivery of the fuel to the station site. This provision was a standard and uniform contract pricing provision present in all of Defendant's franchise fuel supplying agreements, both with independent station operators such as Plaintiff as well as Defendant's own directly owned stations. However, Defendant failed to abide by this contractual pricing provision and did not charge the "rack plus one" rate to all stations.

22.    Specifically, Defendant often charged fuel prices of less than "rack plus one" to its own directly owned stations and to those independent stations not targeted by the Defendant's business plan.

23.    When Defendant rebranded to Shell its directly owned filling station's that competed with the Plaintiff's own Shell-branded location, Defendant began a premeditated and wrongful business plan of selling fuel to Defendant's own locations in Plaintiff's geographic marketing area at prices lower than those prices charged by Defendant to Plaintiff and, often, at prices lower than even the costs of such fuel paid by Defendant, itself.

24.    Despite the fact that, contractually and by statute, Defendant was required to price fuel equitably among Defendant's numerous operators and between

Defendant's own directly owned stations and the stations owned by independent operators, Defendant sold fuel to its own directly owned stations and to independent operators whose locations were not the target of Defendant's business plans at prices materially less than those prices charged to Plaintiff and, often, at prices below even the Defendant's cost of fuel.

25.    Pursuant to the wide discretion provided to Defendant in Article 4 of the Retail Facility Lease and in furtherance of its business plan, Defendant also attempted to raise the Plaintiff's rent at Plaintiff's station to an amount unjustified by the application of any legitimate economic factors and that Defendant knew Plaintiff's sales would never support.

26.    Despite the fact that Paragraph 8 of the Agreement required the funds from credit card sales at Plaintiff's location be "credited to Seller's (Plaintiff's) account by the financial institution responsible for processing the Credit Card Proceeds as soon as commercially feasible", and despite Paragraph 4 to the Transaction Card Guide between the Parties that outlined a specific timetable for the crediting of credit card sales amount to the account of Plaintiff, Defendant unilaterally and wrongfully withheld credit card receipt payments otherwise due to Plaintiff for unreasonably long periods of time thereby creating a wrongful "float" of funds. A copy of the Paragraph 4 payment schedule is attached as part of composite Exhibit A hereto. The full Transaction Card Guide is not in the possession of the Plaintiff but is in the possession of the Defendant. This "float" was used by Defendant for its own directly pecuniary benefit as well as to put pressure on Plaintiff's operations by starving the same of much needed operational capital. On information and belief, such similar

"floats" of credit card receipts did not occur at stations directly owned by Defendant or operated by independent operators not the target of Defendant's business plan. The creation of this "float" of credit card receipts by Defendant starved Plaintiff and similarly targeted independent station operators of much needed operational cash, made their ability to make capital improvements to their stations problematic, increased their lending costs, made the benefit of purchase of bulk items sold inside the station at discounted prices much more difficult and generally decreased the profitability of Plaintiff's and made competing within their geographical marketing areas significantly more difficult and served merely to attempt to "squeeze" Plaintiff out of business to the benefit of Defendant. This delaying of payments of credit card revenues rightfully earned by Plaintiff was simply one of the tools used in Defendant's overall business plan to put Plaintiff out of business.

27.     As part of its business plans, Defendant also from time-to-time provided advantageous rebates, allowances and concessions to its own directly owned stations and to the stations of independent franchisees that were not the target of Defendant's business plans and intentionally and discriminatorily failed to offer any of the same to Plaintiff or to other targeted independent station operators.

28.     As the result of the business plan of Defendant including: (a) Defendant's rebranding to Shell of a station owned by Defendant directly competitive with and proximate to Plaintiff's station location, (b) Defendant's demand for an unjustifiably high monthly station rental from Plaintiff that was unsupported by either Plaintiff's own station production or any other economic factors, (c) Defendant's selling of fuel to its own directly owned stations at prices materially lower than those charged to

9

Plaintiff and often at prices even below Defendant's own cost for fuel, (d) the wrongful retention of credit card receipts legitimately earned by Plaintiff and the intentional failure to credit the same to Plaintiff for unreasonably long and otherwise unjustifiable periods of time, (e) the use of credit card receipts for the pecuniary benefit of Defendant in furtherance of a predatory and anti-competitive business plan against Plaintiff, and (f) the intentional failure of Defendant to offer attractive rebates, allowances and concessions to Plaintiff that Defendant offered to its own directly owned stations and other non-targeted independently operated stations, Plaintiff has been materially damaged and injured by Defendant.

29.     Pursuant to a First Right of Refusal Addendum to the Agreement, Plaintiff was granted a first right of refusal to purchase the real estate and the business and property related to the filling station business from Defendant upon Defendant receiving an offer to purchase any portion or fall of Defendant's right, title or interest in and to the real estate and/or filling station business or property from a third party.

30.     Upon information and belief, Defendant has received an offer from Cross America Partners ("CAP") to purchase the real estate related to Plaintiff's location and an offer from CAP to benefit from an assignment of Defendant's rights related to Plaintiff's location and business operations and has accepted the same. However, to date, Defendant has failed to both provide Plaintiff notice of said intended transaction between Defendant and CAP nor has Plaintiff performed any of those acts required of Defendant to allow Plaintiff to exercise the first right of refusal

enjoyed by Plaintiff under the terms of the First Right of Refusal Addendum-Lessee

contract.

## COUNT I-INJUNCTIVE RELIEF TO TEMPORARILY RESTRAIN DEFENDANT FROM ENTERING INTO THE PURCHASE, SALE AND ASSIGNMENT TRANSACTION INTENDED BETWEEN DEFENDANT AND CAP

31.     Plaintiff restates and realleges the allegations as contained in Paragraphs 1

through and including 30 above as though the same were set forth at length herein.

32.     In Florida, a party seeking an injunction must demonstrate: (a) irreparable

harm, (b) a clear legal right to such relief, (c) an inadequate remedy at law, and (d)

consideration of the public interest. *Gomez v. Fradin*, 41 So.3d 1068, 1071 (Fla. 4th

DCA 2010).

33.     In the present case, Plaintiff will clearly suffer irreparable harm if Defendant

is allowed to sell the real estate and business and property related to Plaintiff's

business to CAP without notice of said intended transaction to Plaintiff and in total

disregard of the rights enjoyed by Plaintiff under the First Right of Refusal

Addendum-Lessee between Plaintiff and Defendant.

34.     Because of the terms of the First Right of Refusal Addendum-Lessee, and the

rights of Plaintiff and obligations of Defendant flowing directly from the same,

Plaintiff's legal right to such injunctive relief is clearly ascertainable.

35.     It is also clear that since we are dealing with real estate at the very heart of

Plaintiff's filling station location's operations and its unique nature and quality,

Plaintiff has no adequate remedy at law that would remotely replace the right of

Plaintiff to purchase said real estate from Defendant.

36.     The interests of the public are also served by providing Plaintiff with this injunctive relief as doing so would clearly support the proposition in the public interest that the terms of valid contracts should be honored and enforced and that contracting parties can rely upon the courts of the State of Florida to uphold such contractual rights.

37.     In the present case, it is clear that the equities that exist between Plaintiff and Defendant support the issuance of the injunctive relief prayed for herein by Plaintiff and that Plaintiff possesses a clear and imposing chance of success in challenging any attempted sale without regard to Plaintiff's rights of first refusal herein.

**COUNT II-DEFENDANT HAS BREACHED ITS CONTRACT WITH PLAINTIFF FOR THE SALE OF GOODS UNDER FLORIDA UNIFORM COMMERCIAL CODE FLA. STAT. 671.101, ET SEQ.**

38.     Plaintiff realleges and adopts by reference herein, Paragraphs 1-30 above and further alleges

**<u>Bad Faith Pricing</u>**

39.     The various agreements pursuant to which Defendant sold fuel to Plaintiff and which governed Plaintiff's station operations constituted contracts for the sale of goods, i.e. motor fuels, which is governed by the Florida Uniform Commercial Code ("UCC") (Chapters 670-680, Fla. Stat.), and Defendant is a "merchant" for the purposes of said UCC. As such, the UCC imposes an obligation of good faith on Defendant in performance of the terms of the operative contracts between the Parties.

40.    The price to be paid by Plaintiff to Defendant for products (including motor fuel) from time-to-time under the operative agreements between the Parties constituted an "open price term" under the UCC which the UCC requires to be set in good faith. (Section 672.305(2), Fla. Stat.)("A price to be fixed by the seller or by the buyer means a price for her or him to fix in good faith.").

41.    Under the UCC, "good faith" is defined in the case of such a purchase and sale of motor fuels to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." (Section 672.103(1)(b), Fla. Stat.). The wrongful pricing actions of Defendant fall far short of even remotely meeting the definition of "good faith.

42,    Where one party to a contract accuses the other of exercising its contract rights in bad faith, it is claiming that the other party has dishonestly invoked a contract provision "to achieve a purpose contrary to that for which the contract had been made." *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies. Ltd.*, 970 F.2d 273 (7th Cir. 1992). In other words, bad faith involves a subterfuge or evasion of contractual duties.  *Nat'l Franchisee Ass'n v. Burger King Corp.*, CASE NO. 09-23435-CIV (S.D. Fla. 2010)

43.    During the term of the various operative agreements between the Parties, Defendant has sought to set its prices to Plaintiff for motor fuels in bad faith and in violation of the UCC. Specifically, Defendant has engaged in a wrongful, intentional, systematic and premeditated business plan of charging higher fuel prices to Plaintiff than the prices Defendant charged to the filling stations that are directly owned by Defendant and which operate within the same geographical marketing area as

13

Plaintiff's station. This wrongful pricing has been carried out by Defendant for the purpose of intentionally putting Plaintiff out of business, thereby allowing Defendant to take over Plaintiff's location to Defendant's own benefit or to eliminate Plaintiff entirely as a competitor in the marketplace.

44,    The price of motor fuels charged by Defendant to Plaintiff have not met the requirement of being either honest in fact or consistent with the observance of reasonable commercial standards of fair dealing in the trade, nor have they been reasonably related to any legitimate economic or competitive factors related to the Parties, to the competitive motor fuel marketing business in Plaintiff's geographical marketing area. The Defendant's prices to the Plaintiff were, by their very design and intention, discriminatory and predatory in nature.

45.    The prices charged by Defendant to Plaintiff were charged in bad faith for the purpose of destroying Plaintiff's business, thereby allowing Defendant to either take over Plaintiff's location inexpensively or eliminate Plaintiff entirely as a competitor. as such, Defendant has violated the UCC and has caused material damage and injury to the Plaintiff.

**Credit Card Fraud**

46.    Defendant was also obligated to handle the processing of credit card transactions and revenue funds at Plaintiff's location, and Defendant was obligated by Paragraph 8 of the Agreement and by Paragraph 4 of the Transaction Card Guide between the Parties to process those transactions and to pay the Plaintiff with reasonable commercial regularity.

14

47.    Contrary to the duty of good faith required of Defendant in the processing of credit card transactions, Defendant systematically and unreasonably diverted and delayed payments to Plaintiff of credit card revenues.

48.    Defendant engaged in the creation of a credit card revenue "float." Instead of paying Plaintiff the credit card revenues rightfully generated at Plaintiff's station location with reasonable regularity, Defendant retained those funds for unreasonable and unduly lengthy periods of time in order to allow Defendant to utilize this "float" for Defendant's own pecuniary benefit and at the expense of Defendant.

49.    The creation of the "float" and use by Defendant of those funds resulted in the starving of Plaintiff for much needed operational cash flow for its operations and, in part, precluded Plaintiff from being able to take advantage of discounted or bulk sale savings offered from time-to-time by Plaintiff's vendors of food, beverage and other products sold at Plaintiff's location. Plaintiff was required to borrow funds from third parties to fund Plaintiff's operations and incur those additional borrowing costs simply because Defendant opted to retain Plaintiff's revenue that Plaintiff had already legitimately earned.

50.    The creation of the "float" on credit card charges generated by Plaintiff, on information and belief, was not suffered by stations directly owned by Defendant or upon non-targeted independent station operators.  Plaintiff's inability to use its own funds hampered its ability to make capital improvements at its location, increased lending costs, decreased profitability and increased difficulties in competing in its geographical marketing area. This wrongful "squeezing" of Plaintiff by Defendant

ultimately resulted in material damages and injuries to Plaintiff and, ultimately, to Defendant achieving the goal of its business plan, i.e. Plaintiff being put out of business.

## COUNT III-DEFENDANT HAS BREACHED ITS IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING WITH PLAINTIFF

51     Plaintiff realleges and adopts by reference herein, Paragraphs 1-30 above and further alleges:

52.     The implied covenant of good faith and fair dealing is to protect the reasonable expectations of the contracting parties. *Anthony Distribs. v. Miller Brewing Co.*, 941 F.Supp. 1567, 1574 (M.D. Fla. 1996); *Barnes v. Burger King Corp.*, 923 F.Supp. 1420, 1438 (S.D. Fla. 1996); *First Nationwide Bank v. Florida Software Services, Inc.*, 770 F.Supp. 1537 (M.D. Fla 1991); see also *Dunkin' Donuts of America, Inc. v. Minerva, Inc.*, 956 F.2d 1566 (11th Cir. 1992) (applying Massachusetts law). "Where the terms of a contract afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits a party's ability to act capriciously to contravene the reasonable expectations of the other party. *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1082 (Fla. Dist. Ct. App. 1999).

53.     The breach of the implied covenant of good faith and fair dealing is recognized as a "gap filling" role that comes into play when a question is not resolved by the terms of the contract or when one party has the power to make discretionary decisions without defined standards. *Speedway Superamerica, LLC v. Tropic Enterprises, Inc.*, 966 So.2d 1 (Fla. Dist. Ct. App. 2007).

54.    Paragraph 8 of the Agreement, Paragraph 4 of the Transaction Card Guide and the related terms of the operative agreements between the Parties and the provisions of the Credit Card Guide make it clear that, while Defendant possessed obligations to the Plaintiff as to how credit card revenues were processed and when the same were to be credited to Plaintiff, Defendant reserved for itself a wide range of discretion on matters related to credit card processing and revenue payment and that Defendant acted in bad faith in breaching those obligations that Defendant owed to Plaintiff in this regard in furtherance of its business plan to put Plaintiff out of business.

55.    Where a contract affords a party such substantial discretion to act in its own interest without being obliged to follow any standards and a party such as Defendant reserves the power to make discretionary decisions without defined standards, the covenant comes into play. *Publix Super Markets, Inc. v. Wilder Corp. of Del.*, 876 So.2d 652 (Fla. Dist. Ct. App. 2004) (citing *Sepe v. City of Safety Harbor*, 761 So.2d 1092, 1097-98 (Fla. 1st DCA 1999).

56.    Defendant abused its discretion afforded to Defendant in the operative agreements between the Parties and, in furtherance of its business plan of seeking to put Plaintiff out of business, Defendant breached Paragraph 8 of the Agreement and Paragraph 4 of the Transaction Card Guide by creating a "float" of Plaintiff's earned credit card receipts and then delaying the payment of the same to the Plaintiff. This abuse of discretion by Defendant negated the very heart of Plaintiff's reasonable expectations when Plaintiff entered into the various agreements with Defendant that Plaintiff could expect to be paid on credit card transactions with

17

reasonable commercial regularity. Bad faith encompasses conscious wrongful acts done for a dishonest purpose such as the acts of Defendant herein.  See *Mims Invs., LLC v. Mosaic Fertilizer, LLC*, (M.D. Fla. Case No. 8:11-cv-1093-T-17TBM, December 12, 2011) (citing *Espirito Santo Bank v. Agronomics Fin. Corp.*, 591 So.2d 1078, 1080 (Fla. 3d DCA 1991). In failing to obey its contractual obligations, Defendant engaged in the conscious and deliberate act trying to destroy Plaintiff's business and, thereby, frustrated the very purpose and reasonable expectations for which Plaintiff entered into its contracts with Defendant. Such actions by Defendant constitute a breach of the implied covenant of good faith and fair dealing owed to Plaintiff. See *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000).

57.     Defendant also acted in bad faith and violated the implied covenant of good faith and fair dealing in furtherance of its predatory goal of putting Plaintiff out of business by using its wide range of discretion provided to Defendant in Article 4 of the Retail Facility Lease to raise station rents to levels that were unjustified by any legitimate economic factors and which, by design, Defendant knew could not be supported by Plaintiff's operations and revenues.

58.     Further, Defendant also acted in bad faith and in violated the implied covenant of good faith and fair dealing in furtherance of its goal of putting Plaintiff out of business by breaching the pricing provisions of Paragraph 3(a) of the Retail Sales Agreement and by engaging in the discriminatory practice of extending attractive rebates, allowances and concessions to Defendant's own directly owned stations and to non-targeted independent station operators in Plaintiff's geographic marketing area and not providing similar advantages to Plaintiff.

59.     As the result of Defendant's bad faith actions in violation of the implied covenant of good faith and fair dealing, Plaintiff was materially injured and damaged and was, ultimately, put out of business.

### COUNT IV-DEFENDANT HAS VIOLATED THE FLORIDA MOTOR FUELS MARKETING PRACTICES ACT ("FMFMPA"), SECTIONS 526.301-526.3135. FLA. STAT.

60.     Plaintiff realleges and adopts by reference herein, Paragraphs 1-30 above and further alleges:

61.     FMFMPA was enacted in Florida to encourage competition in the marketing of motor fuels by prohibiting "certain predatory marketing practices and, under certain conditions, discriminatory practices." (Section 526.302, Fla. Stat.).

62.     Under FMFMPA, it is unlawful for any person engaged in commerce in Florida "to sell for resale any grade of motor fuel at a price lower than the price at which the seller contemporaneously sells motor fuel of a like grade and quality to another person on the same level of distributions, in the same class of trade and within the same relevant geographic market as the purchaser...where the effect is to injure competition." (Section 526.305(1)(b), Fla. Stat.).

63.     During the term of the various operative agreements with Plaintiff, Defendant has intentionally charged a materially lower price for motor fuel of the same grade and quality as that supplied by Defendant to Plaintiff to Defendant's own directly owned and operated filling stations that are on the identical level of distribution as Plaintiff and that are directly located in Plaintiff's geographical marketing area. Such prices were often even lower than Defendant's own prices

19

paid for fuel. Defendant has, on information and belief, also sold fuel at materially lower prices to independent station operators whose locations were not desired by Defendant or targets of Defendant's business plans.

64.    The fuel prices charged by Defendant to Plaintiff were charged as the part of a specific, pre-meditated business plan of Defendant and specifically for the anti-competitive, predatory and injurious purpose of putting Plaintiff out of business, thereby allowing Defendant to cheaply take over Plaintiff's location for Defendant's own benefit by eliminating competition where Defendant operated its own directly owned stations in the same geographic marketplace.

65.    The charging of motor fuel prices to Defendant's own directly owned locations in Plaintiff's geographical marketing area that are less than those prices even paid for fuel by Defendant were in violation of Sections 526.304 and 526.305, Fla. Stat.

66.    The wrongful pricing by Defendant to Plaintiff in violation of the FMFMPA has resulted in material injury and damage to Plaintiff and to competition in general in Plaintiff's geographical marketing area and is contrary to the intent of the Florida Legislature in enacting the FMFMPA and the goal of promoting and protecting healthy competition in the marketing of motor fuels, increasing the economic benefit to Florida consumers and evening the playing field as to the relative power held by refiners verses independent motor fuel dealers.

67.    Section 525.312(2)(b), Fla. Stat., authorizes the issuance of a temporary injunction to enforce FMFMPA if "the court determines, on balance, the hardships imposed on the defendant and the public interest by issuance of such preliminary

injunctive relief will be less than the hardship which would be imposed on the plaintiff if such preliminary injunctive relief were granted."

68.    In the present case, any hardship imposed by such injunctive relief on the Defendant is clearly outweighed by the hardship that the Plaintiff and the consuming public would suffer if such relief is not granted.

69.    During the term of the operative agreements between the Parties, Defendant consistently provided more advantageous rebates, allowances and concessions to Defendant's own directly owned stations and to independent franchisees not the target of Defendant's business plans located in Plaintiff's geographical marketing area than those extended to Plaintiff. Said discriminatory treatment further violates Section 526.308, Fla. Stat. and has resulted in additional material injury and damage to Plaintiff.

70.    Section 526.33(3), Fla. Stat., provides that a court may make an award of treble actual damages and must award attorneys' fees to a plaintiff prevailing in an action brought under FMFMPA.

**WHEREFORE**, Plaintiff respectfully prays Plaintiff be granted the following relief against Defendant:

A.    Three (3) times the actual damages suffered by Plaintiff pertaining to Defendant's violation of FMFMPA as alleged by Plaintiff in Count IV above;

B.    Damages in favor of Plaintiff and against Defendant for Defendant's commission of the wrongful acts and omissions as alleged by Plaintiff in Counts I, II and III above;

C.      The issuance by this Court of a temporary injunction against Defendant as prayed for by Plaintiff in Count I above prohibiting: (i) Defendant from transferring or alienating any portion or all of Defendant's right, title or interest in or to the real estate or property of any kind or nature related to Plaintiff's filling station business to CAP in violation and derogation of Plaintiff's contractual rights of first refusal to purchase any portion or all of the same, and (ii) Defendant from further violations of FMFMPA as alleged in Court IV above;

D.      Plaintiff's reasonable attorneys' fees and costs; and

E.      Such other and further relief as this Court may deem appropriate and as might be further available to Plaintiff in the premises.

## PLAINTIFF'S DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

## RESERVATION OF RIGHTS

Plaintiff reserves its right to further amend this Amended Complaint, upon completion of its investigation and discovery, to assert any additional claims for relief against Defendant or against other parties as may be warranted under the circumstances and as allowed by law.

Dated: June 18, 2020

Respectfully submitted,

James C. Patterson, esq.
Fla. Bar No. 211842
George Harder, esq.
Fla. Bar No. 88649
Harder Law Group-Attorneys for Plaintiff
23110 State Road 54-#157
Lutz, FL 33549
Phone: 813.455.4551
Fax: 813.464.7846
Email: jpatterson@HarderLawGroup.com
       gharder@HarderLawGroup.com
       pleadings@HarderLawGroup.com

COMPOSITE

EXHIBIT

A



**NATIONAL WHOLESALE FUELS**
*The Energy to Succeed*
*A part of Alimentation Couche-Tard*

P.O. Box 347 Columbus, IN 47202
NationalWholesaleFuels.com
Phone: 812-379-9227

April 5, 2016

Enclosed is your copy of the fully executed documents for your site.

We thank you for your business.

Sincerely,

*Stacy Ward*

Stacy Ward
National Wholesale Fuels
Circle K Stores

**Site # 2211031**
**Dealer**



**NATIONAL WHOLESALE FUELS**
*The Energy to Succeed*
A part of Alimentation Couche-Tard

Circle K Stores, Inc.
Lessee Agreements

| NO. | DESCRIPTION |
|-----|-------------|
| 1. | Summary of Real Estate Value |
| 2. | Contract of Sale – Lessee Branded |
| 3. | Revised Summary of Title I of the Petroleum Marketing Practices Act (PMPA) |
| 4. | Schedule of Seller's Equipment – Lessee |
| 5. | Commodity Schedule |
| 6. | First Right of Refusal Addendum - Lessee |
| 7. | Key Person Rider |
| 8. | Station Lease – Lessee Branded |
| 9. | Attachment A to Station Lease - Equipment |
| 10. | Attachment B to Station Lease – Maintenance |
| 11. | Personal Guaranty - Lessee |
| 12. | Security Agreement – Lessee |

## SUMMARY OF REAL ESTATE VALUE

Facility #: 2211031

3825 Tollgate Blvd
Naples, FL 34114

**The Real Estate Value (land and improvements) used in determining your rent is: $1,630,000.**

EXPLANATION:

The amount of rent in year one of the renewal term of your Station Lease to commence on April 1, 2016 was calculated using the Real Estate Value (land and improvements) of the marketing premises as shown above.

If you wish to challenge the Real Estate Value, please forward the Property Appraisal Request Notice Form, enclosed, to Circle K Stores, Inc. in accordance with its instruction.

The process for initiating the Voluntary Appraisal Option is contained in the Renewal Notice of Contract of Sale and Station Lease, also enclosed.

The process and instruction for initiating a voluntary appraisal is contained in the Property Appraisal Request Notice Form, enclosed. You will also find a listing of appraisal companies and their contact information and a form letter that can be used in the retention of an appraisal company of your choice. It is highly recommended that you make personal phone contact with the appraisal company prior to sending the Appraisal Company Retention Letter.

Thank you.

National Wholesale Fuels

Facility # 2211031

## FIRST RIGHT OF REFUSAL ADDENDUM

This First Right Of Refusal Addendum ("**Addendum**") is attached to and is part of that certain Contract of Sale, dated April 1, 2016 ("**Contract**") by and between Petro Gate, Inc., a Florida corporation ("**Dealer**"), and Circle K Stores Inc., a Texas Corporation ("**Marketer**"). Any undefined term used herein shall have the meaning as set forth in the Contract to which this Addendum is attached.

1.    <u>Grant of First Right of Refusal</u>.  Dealer hereby grants to Marketer, and its successors and assigns, a right of first refusal ("**Right of First Refusal**") to purchase the Property (as defined below) on the terms and conditions set forth in this Addendum.  For purposes of this Addendum, "**Property**" means any and all assets of Dealer, in whatever form, tangible or intangible, that now or in the future constitute, or that Dealer uses now or in the future in the operation of, Dealer's Station, including without limitation, all of Dealer's right, title and interest, whenever or however acquired, whether fee title, a leasehold, or other interest or right, in and to the real property located in the County of Collier, State of Florida, as more particularly described in <u>Exhibit 1</u> hereto, all improvements, including buildings, structures, and fixtures, now or in the future on, in or under such real property, and all of Dealer's right, title and interest in and to all equipment, fixtures, and personal property at Dealer's Station.  As used in this Addendum, Dealer's personal property includes all contracts and leases to which Dealer is a party that relate to the Dealer's Station, including without limitation the Contract and names, goodwill, business operations and other intangibles use in or related to Dealer's Station.

2.    <u>Rights Period</u>.  All rights granted to Marketer and all obligations of Dealer in this Addendum are binding on any successors or assigns of Dealer, run with the land, are not personal to either Dealer or Marketer, and shall survive any future transfer of the Property to any party, entity, or person other than Marketer, or any future assignment of the Agreement by Marketer.  The rights granted in this Addendum shall continue until the later of the expiration of the Contract to which this Addendum is attached, or the expiration of any renewal or extension thereof (the "**Rights Period**").

3.    <u>Offer to Purchase or Transfer Interest; Notice</u>.  The Right of First Refusal shall not apply to sales of Products, merchandise, and other inventory at the Dealer's Station and disposal/sale of obsolete equipment in the normal course of business.  Subject to the preceding sentence, Marketer's rights hereunder are triggered by any Offer (as defined below) for any of the Property, whether the Offer is for some or all of the real property only, some or all of the equipment, fixtures, and personal property only, or some combination thereof.  If at any time within the Rights Period, Dealer receives from a third party ("**Offeror**") a bona fide written offer ("**Offer**") to purchase or otherwise transfer all or any portion of Dealer's right, title and interest in the Property (the "**Interest**") that Dealer wants to accept, then Dealer shall immediately notify Marketer in writing (the "**Offer Notice**") of the terms of the Offer.  The Offer Notice shall include a complete copy of the proposed or executed written agreement or other documents embodying the Offer that contain all of the terms and conditions between the Dealer and Offeror, with no material terms yet to be negotiated, together with copies of all information regarding the Property and the Interest that Dealer has supplied to Offeror.  Dealer shall represent and warrant the accuracy and completeness of the information set forth in the Offer Notice and other documents submitted to Marketer.  The term "transfer" includes a sale, lease, gift, or other transfer of possession, ownership, or control.

4.    <u>Exercise of Right; Completion of Transaction</u>.  Marketer may exercise its Right of First Refusal and acquire the Interest at the price and on the terms contained in the Offer, as such terms may be adjusted as set forth in Section 5 below, by providing written notice to Dealer of Marketer's exercise ("**Exercise Notice**") by no later than forty five (45) days after Marketer's receipt of the Offer Notice required in Section 3 above.  If Marketer exercises its Right of First Refusal, the closing shall be completed within sixty (60) days after Marketer's delivery of its Exercise Notice, or at such later date as

**FIRST RIGHT OF REFUSAL ADDENDUM**
**(Mobil - Rev. 11/2011)**

may be specified in the Offer, and otherwise in accordance with the terms of the Offer. Regardless of the terms of the Offer, Dealer shall deliver to Marketer title to the Interest free from all encumbrances and claims of creditors and with lease payments under any real or personal property lease paid in full through the date of closing. Dealer shall cooperate and promptly undertake such action as may be requested by Marketer to transfer any applicable permits, leases, or other rights to Marketer. In the absence of anything to the contrary contained in the Offer, (i) Dealer represents and warrants to Marketer that the transfer of the Interest does not include any of the liabilities associated therewith, and (ii) Dealer shall indemnify, defend and hold harmless Marketer from and against all claims resulting from or relating to the operations at the Property prior to closing, including but not limited to environmental contamination on the Property prior to the conveyance of the Interest to Marketer.

5.     Terms.  If the terms of the Offer provide for consideration for the purchase or transfer of the Interest other than the payment of cash at closing/acquisition, and/or the purchase of real or personal property other than the Property ("**Unrelated Property**"), then the provisions of this Section 5 shall apply to all such terms in the Offer for the purposes of determining the consideration Marketer shall pay to Dealer for the Interest should Marketer exercise its Right of First Refusal.

a.     Marketer shall have no obligation to purchase any Unrelated Property included in the Offer, and, regardless of any allocation in the Offer of the purchase price or other consideration to the Unrelated Property, the fair market value of any Unrelated Property included in the Offer shall be disregarded when determining the consideration Marketer shall pay Dealer for the Interest. Dealer shall bear all costs and expenses required to determine the fair market value of any Unrelated Property included in the Offer.

b.     If the consideration payable to Dealer under the Offer includes any post-transfer consulting, non-compete, or employment agreement for Dealer or any of Dealer's owners, directors, officers, or employees, those agreements and any value thereof shall be disregarded when determining the consideration Marketer shall pay Dealer for the Interest. Dealer shall bear all costs and expenses required to determine the fair market value of any agreement noted herein and included in the Offer.

c.     If the Offer provides for payment of the purchase price or any portion thereof over any period of time after the transfer, then Marketer may pay in cash at closing the full present value of such post-transfer payments, using the interest rate specified in the Offer as the discount rate for computing the present value of such payments, or, if no interest rate is specified therein, then using a discount rate equal to the then-current prime rate of Bank of America, N.T. & S.A., at San Francisco, California.

d.     If the Offer includes as consideration for the Interest an exchange of other real or personal property interests of Offeror, this shall be deemed to constitute an offer to purchase the Interest for a price equal to the fair market value of the real or personal property offered in exchange (the "**Exchange Property**") (plus any other consideration provided for in the Offer). Marketer is not obligated to accept the Dealer's and Offeror's agreed-upon value of any Exchange Property as may be specified in the Offer and may demand a determination by a neutral third party appraiser of the fair market value of the Exchange Property. Dealer shall bear all costs and expenses required to determine the fair market value of any Exchange Property included in the Offer.

6.     Assessment of Property Condition.  During the forty five (45) day period following Marketer's receipt of the Offer Notice, Marketer may enter the Property to inspect, test, and otherwise make an assessment of the condition of the Property, including without limitation the environmental and/or geological condition thereof and Dealer hereby grants Marketer a limited license to enter the Property for such purposes; provided that any such inspection, testing, and assessment shall be made in a manner so as to minimize interference with normal operations on the Property. Marketer's rights under

this Section 6 include the right to undertake any testing, surveying, drilling or other analysis, including subsurface testing of the Property. Marketer shall indemnify, defend and hold harmless Dealer against any personal injury or property damage caused by Marketer or its contractors or employees in making any such inspections, testing, or assessment; provided, however, that in no event shall Marketer have any liability to Dealer as a result of any condition of the Property discovered by Marketer during its inspections, testing and assessments, or as a result of any statement in any report or other written statement or oral communication regarding the Property; and provided further that in no event shall Marketer have any liability to Dealer for any lost profits or business interruption suffered by Dealer during, or as result of, any inspection, testing, or other assessment of the Property conducted by Marketer.

7. **Completion of Transfer.** If Marketer does not exercise its Right of First Refusal, then Dealer may, at any time within six (6) months after the expiration of such 45-day period, transfer the Interest that was the subject of the Offer, but only to the original Offeror and only upon the terms in the Offer Notice. If, after the delivery to Marketer of the Offer Notice, there are any changes in the Offer, or if the transfer is not consummated in the time period provided in this Section 7, and, under any circumstances, with respect to any portion of the Property that is not included in the Offer, Marketer's Right of First Refusal shall continue in existence and Dealer must comply fully and anew with its notice and other obligations as set forth in this Addendum with respect to any changes in the Offer, any transfer not timely consummated, and any transfer of any portion of the Property not included in the Offer.

Executed this 2ᵗᵈ day of MArch, 2016

MARKETER:

Circle K Stores Inc.

By: _M. McL_
    Matt McClure

Title: Vice President

Witness: _____

DEALER:

Petro Gate, Inc.

By: _____
    Benham Bagheri

Title: President

Witness: _____

Site # 2211031

## EXHIBIT A

## SCHEDULE OF COLLATERAL AFFIXED TO REAL ESTATE

Collateral Description

Equipment

Fixtures

Gasoline and Petroleum Products in Inventory

Gasoline and Petroleum Accounts Receivable

After Acquired Inventory

Accounts Owned By Secured Party and
Consigned To Dealer

_____

Location of Collateral or Description of Real Estate to Which Affixed:

3825 Tollgate Boulevard, Naples, Florida 34114

**SECURITY AGREEMENT**                                     5
**(Rev. Feb 2016)**

## EXHIBIT 1

Legal Description of Real Property Component of the Property

3825 Tollgate Boulevard, Naples, Florida 34114

**FIRST RIGHT OF REFUSAL ADDENDUM**          **4**
Rev 3/17/14

Facility # 2211031

## CONTRACT OF SALE (BRANDED-LESSEE)

This Contract of Sale (Branded) (the "Contract") is made and entered into between Circle K Stores Inc., a Texas Corporation, with a business address of 1130 West Warner Road, Tempe, Arizona 85284, hereinafter called "Seller" and Petro Gate, Inc., with a business address of 3825 Tollgate Boulevard, Naples, Florida 34114, hereinafter called "Purchaser".

### WITNESSETH:

In consideration of the mutual promises herein contained, Seller shall sell and deliver to Purchaser at the premises located at 3825 Tollgate Boulevard, Naples, Florida 34114, (the "Premises"), and Purchaser shall purchase, receive and pay for, branded product(s) under certain Shell trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image standards or other brand identifications that Seller allows Purchaser to use (the "Proprietary Marks"), and other products, of the kind and in the quantities and under the terms and conditions specifically set forth in Commodity Schedule(s) annexed hereto and made a part hereof. Seller's supplier of such branded products under the Proprietary Marks is Shell, and such supplier and its successor(s) and assigns are referred to hereinafter as the "Supplier".

1.    Duration. (a) This Contract shall be for a term of three (3) years (the "Term"), subject to Seller's termination rights under paragraph 24 herein. The Term of the Contract shall commence on the 1st day of April, 2016 and expire on the 31st day of March, 2019.

(b)    Seller shall have the right to grant temporary extensions of this Contract of up to 180 days. Any such extension shall not be considered a renewal of this Contract.

(c)    In the event this Contract expires and the parties do not extend or renew by written instrument, but Seller continues to accept orders from Purchaser for motor fuel products, such sales shall be upon all of the terms and conditions hereof, provided that such sales shall not be construed as evidence of a renewal of this Contract by operation of law or otherwise, but shall imply only a Contract for a month-to-month term, which Seller may terminate at any time subject to any valid requirements of any applicable statute.

2.    Products. Purchaser agrees that Seller shall be the exclusive supplier of all Purchaser's motor fuel product requirements at the Premises at all times during the Term hereof. The following Commodity Schedule(s) forming a part of this Contract were affixed at or before the signing hereof.

| COMMODITY SCHEDULE(S) | DATE |
|---|---|
| Gasoline and Diesel | April 1, 2016 |

By mutual agreement, this Contract may be amended from time to time by adding other or additional schedules, substituting revised schedules or by deleting one or more items or provisions from any Commodity Schedule(s) listed hereinabove. Additional and revised schedules shall be so marked and initialed by an authorized representative of Seller and by Purchaser and shall be affixed to and become a part of this Contract from and after the date appearing on such additional or revised schedule(s). Deletions shall be by notice given as provided herein and effective when accepted.

3.    Quantity. (a) Seller shall sell to Purchaser and Purchaser shall purchase from Seller all Purchaser's requirements for the product(s) covered by this Contract in no less than the quantities shown on the

CONTRACT OF SALE (BRANDED-LESSEE)
(Rev. 02/2015)

KSA/  BB

applicable Commodity Schedule(s). Purchaser shall sell such product(s) only to end users for their personal use in volumes not exceeding the capacity of each customer's motor vehicle fuel tank, any auxiliary fuel tank directly linked to the customer's motor vehicle engine, and/or an approved properly label emergency container capable of holding ten gallons or less. However, during any period of this Contract for which the amount of any such product(s) that Seller is required to deliver to Purchaser is prescribed by government rules, regulations or orders, or becomes subject to an allocation by Supplier, the quantity of such product(s) covered by this Contract shall be the quantity so prescribed or allocated instead of the quantity shown on the applicable Commodity Schedule(s). For purposes of the Commodity Schedule(s), the "contract quantity" for any period shall be the quantity of product(s) which Seller is obligated to sell and Purchaser is obligated to buy under this Contract during that period whether prescribed by the attached Commodity Schedule(s) or by government rules, regulations or orders. If Supplier reduces its allocation of products to Seller, then Seller may restrict deliveries of products to Purchaser without liability and may allocate Seller's supply of products among Seller's other customers and classes of customers, including Seller's affiliates and Seller itself for its own use, on any basis which in Seller's sole judgment is fair and reasonable under the circumstances, allowing for such priorities as Seller deems appropriate. Any purchase or sale in excess of the volumes described above shall not in any way be considered to modify this Contract as regards quantities to be delivered.

(b)    Seller reserves the right to use, and require Purchaser to use, such Automatic Tank Gauge motor fuel inventory monitoring and ordering system ("ATG") via a broadband/internet connection on the Premises as Seller may require. The installation of the ATG will be at Seller's own expense. Purchaser shall pay any fees incurred by or assessed to Seller for providing broadband/internet connectivity (through a third-party provider); provided, however, that if Purchaser currently subscribes to broadband/internet services at the Premises, at Seller's option, Purchaser may elect to use its current broadband/internet services for the ATG in lieu of those arranged or provided by Seller, and in such circumstances Purchaser shall not be responsible for any broadband/internet connectivity fees incurred by Seller. Purchaser shall order the products for delivery using such ATG as Seller may designate. Purchaser shall comply with such reasonable rules and regulations as Seller may from time to time establish regarding deliveries.

4.    Price/Method of Payment. (a) The price of the product(s) covered by this Contract shall be as stated in the applicable Commodity Schedule(s). Purchaser shall pay Seller for all goods delivered to Purchaser by Seller at or before the time of delivery of the goods ("Payment Date") as further set forth below. Purchaser hereby assigns to Seller all of Purchaser's right, title and interest in the proceeds from the sale of goods delivered by Seller that are effectuated through credit card transactions ("Credit Card Proceeds") and otherwise. These assignments of rights are effective immediately when Purchaser's customers purchase goods from Purchaser; however, the funds shall be credited to Seller's account by the financial institution responsible for processing the Credit Card Proceeds ("Card Bank"), as soon as commercially feasible. The assignment of Credit Card Proceeds is a form of payment for goods sold and shall be the property of Seller immediately upon the foregoing assignments. If the Credit Card Proceeds exceed the balance on Purchaser's account with Seller for the sale of any goods as of the Payment Date, Seller shall at its option either (i) pay such excess amount to Purchaser within a commercially reasonable time, or (ii) treat such excess amount as a credit in favor of Purchaser. Any payment by Seller to Purchaser shall be made after deducting any processing fee in effect under Supplier's then current Card Guide (defined below), by: (i) check to Purchaser; or (ii) a credit to Purchaser's bank account by EFT (defined below). Title to any funds paid by Seller to Purchaser shall not pass to Purchaser unless and until such funds are actually transferred to Purchaser's account or until a check is delivered to Purchaser.

b) If, as of the Payment Date, the Credit Card Proceeds received by Seller are insufficient to pay for the goods delivered to Purchaser as of the Purchase Date, Seller may at its option demand that Purchaser pay for such goods via electronic funds transfer ("EFT"), cash, certified or cashier's check, money order, Automated Direct Debit System, or other means approved by Seller. Purchases made and not paid for on

delivery shall be payable at Seller's principal office unless otherwise specified by Seller.  Where Seller requires payment via EFT, Purchaser will establish a commercial account with a financial institution that provides EFT services and will authorize Seller to initiate transfers of funds between Purchaser's account and Seller's accounts for payment of all amounts due to Seller under this Contract.  Purchaser shall not use, or permit to be used, said commercial account for personal, family, or household purposes.  Purchaser will provide Seller with all information and authorization necessary to debit and credit Purchaser's account.  Purchaser shall maintain at all times funds in its account sufficient to make payments to Seller at the time of the EFT transaction.  Should any EFT transaction be rejected by Purchaser's financial institution for Purchaser's failure to maintain sufficient funds in Purchaser's account, in addition to any rights Seller may have under this Contract or the law, Seller may collect a service charge for each occurrence of such rejection by the financial institution, whether or not payment is subsequently paid by Purchaser.  Seller may, at its sole discretion, require that subsequent payments be made by means of cash, certified or cashier's check, money order, or other means satisfactory to Seller.  Purchaser shall indemnify, defend and hold Seller harmless for any losses, costs, or damages arising out of any breach or violation of this subparagraph 4(b).

(c)     If at any time the financial responsibility of Purchaser shall become impaired or unsatisfactory to Seller, or should Purchaser be in arrears in his accounts with Seller, Seller may require, as a condition of making further deliveries under this Contract, payment by Purchaser of all past due accounts and cash payment prior to, or upon, all such future deliveries.

5.     Control.  Purchaser is an independent businessman with the exclusive right to direct and control the business operation at the Premises, including the establishment of the prices at which products and merchandise are sold.  Seller reserves no control over the business at the Premises.  Purchaser has no authority to employ anyone as an employee or agent of Seller for any purpose.  Purchaser accepts exclusive liability for all city, county, state and federal contributions and payroll taxes and other obligations of an employer as to all employees of Purchaser.  Purchaser shall not erect or permit any sign, insignia or other advertising device upon or near the Premises which would in any way indicate or imply that Seller or Supplier is the owner or operator of the Premises.

6.     Liability.  Neither Seller nor Supplier shall be liable to Purchaser or to any other person for any damage to or loss of property, or for injury to or death of persons, or for the violation by Purchaser or any other person, of any governmental statute, law, regulation, rule, or ordinance, arising from the operation or activities of Purchaser or any other person pursuant to this Contract.  Purchaser shall indemnify, protect, defend, and save harmless Seller and Supplier, and their respective officers, directors, employees, agents and representatives, from and against any and all losses, claims, liabilities, environmental cleanup costs, fines, penalties, suits and actions, judgments and costs, including attorneys' fees and the costs of litigation, which shall arise from, or grow out of, any injury to or death of persons, or damage to or loss of property, or violation by Purchaser or any other person of any governmental statute, law, regulation, rule, or ordinance, directly or indirectly arising out of, or resulting from, or in any way connected with (i) Purchaser's performance of this Contract or failure thereof, (ii) operation of Purchaser, or activities of any other person, at the Premises, or (iii) the condition of the Premises or of the adjoining streets, sidewalks or ways, irrespective of whether such injury, death, damage or loss is sustained by Purchaser or any other person, firm or corporation which may seek to hold Seller or Supplier liable.  Purchaser acknowledges and agrees to provide Seller written assurance within ten (10) days from Seller's request for Purchaser to accept tender of a claim and to notify and instruct Purchaser's insurance carriers that Seller is an indemnified party.  The existence or non-existence of any insurance that may be required under this Contract will not limit Purchaser's indemnity or other obligations under this Contract.  This indemnity shall survive the termination or nonrenewal of this Contract.

7.     Credit.  Nothing herein shall be construed as obligating Seller to extend any credit to Purchaser.  Upon Seller's request, Purchaser shall provide Seller with information and documents relating to Purchaser's financial condition and creditworthiness.  If Seller, in its sole determination, elects to extend credit to

**CONTRACT OF SALE (BRANDED-LESSEE)**      3
**(Rev. 02/2015)**

Purchaser, such extension of credit shall only be made in writing on such terms and conditions that Seller may require including, without limitation, the following:

(a)     If payment is not made on or before the due date, a late payment charge and an interest payment charge in such amounts established by Seller from time to time, not to exceed the maximum allowed by law, may be imposed for each month (and any part thereof) which elapses from due date to the date payment is received by Seller. Seller's right to collect a late payment charge and an interest payment charge does not operate as a waiver against Seller's right of termination of this Contract or of any other right that Seller may have at law or in equity.

(b)     Seller will furnish to Purchaser statements of Purchaser's account upon Purchaser's request, but in no event more frequently than on a monthly basis. Payment of any such bills shall not prejudice the right of Purchaser to question the correctness thereof; provided, however, all bills and statements rendered to Purchaser by Seller during any month shall conclusively be presumed to be true and correct after thirty (30) days following the end of any such month, unless within said thirty (30) day period Purchaser delivers to Seller's accounting office issuing said statement written exception thereto setting forth the item or items questioned and the basis therefor. Time is of the essence in complying with this provision.

(c)     If there are additional business transactions between Purchaser and Seller, including without limitation those relating to credit sales of products other than those identified herein, promissory notes, or real estate, unless it is clearly indicated in writing by Purchaser as to how payments received by Seller from Purchaser are to be applied, then such payments shall be applied by Seller in the following order or priority: (i) trade accounts, (ii) promissory notes, (iii) rentals or other amounts due under any other agreement or transactions.

(d)     Seller reserves the right to withdraw such credit, or modify the terms and conditions of such credit, immediately at any time on giving to Purchaser notice thereof. In the event credit is withdrawn, all amounts then due and owing shall become payable immediately, and all future sales by Seller to Purchaser shall be for cash (or at Seller's option certified or cashier's check, money order or other means approved by Seller) payable prior to, or upon, delivery.

(e)     Seller shall have the right but not the obligation to offset any indebtedness owed by Seller to Purchaser against any indebtedness owed by Purchaser to Seller, whether arising from the sale of goods or product(s) under this Contract, or from any other business transaction described in subparagraph (c) above.

(f)     In order to secure payment of all Purchaser's present and future indebtedness owed by Purchaser to Seller at any time during the Term of this Contract, including renewal periods, or upon its termination or expiration, Purchaser hereby grants to Seller a security interest and/or a purchase money security interest in (i) all of Purchaser's inventory of petroleum products and tires, batteries and accessories ("TBA") purchased from Seller, regardless of when purchased, (ii) all accounts receivable owing to Purchaser regardless of when or how incurred, (iii) all of Purchaser's equipment at the Premises, whether or not purchased from Seller, and (iv) all proceeds of Purchaser's inventory, accounts receivable and equipment. Purchaser shall sign all agreements, financing statements, and renewals as necessary to perfect, memorialize and provide public record of this security interest. In the event of insolvency of Purchaser, assignment for benefit of creditors, the institution of bankruptcy, insolvency, reorganization, receivership, debt adjustment, or liquidation proceedings, by or against Purchaser, or failure of Purchaser to perform any of the obligations of payment in accordance with the terms of payment established by Seller from time to time, Seller shall have the option without notice or demand upon Purchaser to declare an event of default under the Uniform Commercial Code, and upon any such default, Seller may declare all of Purchaser's indebtedness to Seller immediately due and payable. Thereafter Seller may proceed to enforce payment and may exercise any and all rights available to it. If Seller refers Purchaser's account for collection, Purchaser agrees to pay all

**CONTRACT OF SALE (BRANDED-LESSEE)**     **4**
**(Rev. 02/2015)**

collection costs permitted by applicable law, including but not limited to any and all reasonable attorneys' fees, court costs, and allowable interest necessary to secure collection, in addition to the outstanding balance. **Seller reserves the right to require from Purchaser from time to time a security deposit, letter of credit, personal guaranty and/or other forms of security acceptable to Seller to secure Purchaser's obligations under this Contract or any other contract or agreement between Seller and Purchaser.**

8.    <u>Credit Cards.</u>  (a) As long as Seller elects to accept specified credit cards, credit identifications, fleet cards, debit cards, pre-paid cards or other similar transaction authorization cards (collectively "Transaction Cards"), Purchaser shall accept and honor all Transaction Cards identified in Supplier's Transaction Card guide and other similar manuals and guidelines, whether in written or electronic form (such guide, manuals, and other guidelines referred to as the "Card Guide") for the purchase of authorized products and services, which may be revised from time to time, or discontinued in Supplier's sole discretion.  Purchaser shall account for and process all such transactions in strict compliance with the terms set forth in the Card Guide.  Purchaser shall pay any Transaction Card processing fee that may be assessed by Seller for providing such services.  Subject to applicable law, Seller may change any or all of its fees, charges or both at any time on ten (10) days' written notice to Purchaser.  In no event shall Purchaser charge or pass-through any processing fees to a customer for the extension of credit or apply a surcharge to any amounts due from any customer making a credit card purchase.

(b)    Seller shall accept from Purchaser all transactions generated as a result of purchases made with authorized Transaction Cards and shall make commercially reasonable efforts to request that Card Bank process such purchases in accordance with the terms in the Card Guide.

(c)    For each transaction not authorized, disputed by a customer, or otherwise subject to charge back under the Card Guide, Seller may either charge the amount to Purchaser's account or require Purchaser to make immediate refund to Seller, including refund by draft or EFT initiated by Seller, without any deduction for any processing fee.

(d)    Purchaser acknowledges receipt of a copy of the current Card Guide, which is incorporated by reference herein, and shall comply fully with the operating rules, terms and conditions thereof.  Without limiting any rights or remedies available to Seller, if Purchaser fails to comply with this paragraph or the Card Guide, Seller may limit or terminate Purchaser's right to participate in Supplier's Transaction Card program.  Further, Supplier or Seller may alter, modify, amend, or terminate the Transaction Card program at any time upon notice to Purchaser.

(e)    Seller and Supplier shall have the right to charge back sales transaction amounts. Purchaser shall maintain a record of each sales transaction (including the actual draft generated by the sale) for a period of no less than six (6) months from the date of the transaction.  Any credit card transactions that are charged back because of failure to comply with the then-current instructions and policies in the Card Guide or because of customer dispute will be the responsibility of the Purchaser. Purchaser shall be responsible for imprinters lent to it.  In the event an imprinter is lost, stolen or damaged beyond repair, Purchaser shall reimburse Seller in full for the cost thereof.

(f)    Purchaser and Seller agree that all Transaction Card sales at the Premises shall be made pursuant to Supplier's point of sale ("POS") system for processing Transaction Cards.  Purchaser shall comply with Supplier's POS policies and guidelines, as amended from time to time, as well as Seller's software and hardware standards, established from time to time by Seller, relating to Electronic Point of Sale ("EPOS") systems, including, but not limited to, Seller-approved compatible hardware, customer activated terminals, integrated and non-integrated EPOS systems, and other requirements necessary to electronically accept and process the Transaction Cards, including the purchase of such required equipment and software.  At Seller's option, Seller may offer Purchaser the option to lease the POS

**CONTRACT OF SALE (BRANDED-LESSEE)**          5
**(Rev. 02/2015)**

machine and other associated equipment from Seller during the initial Term and any renewal of this Contract. Purchaser shall pay to Seller (i) rent for the leased equipment, if Purchaser does not own Seller-approved POS equipment, and (ii) other fees associated with the operation of the POS, whether rented or owned. Payment shall be due and payable at the time and place designated by Seller from time to time. Seller reserves the right to increase the rental and/or fee amount charged for the POS machine. Purchaser shall be responsible for maintaining and repairing the POS machine and other associated equipment. Purchaser understands that Supplier's software or firmware may be installed in the POS machine for use at the Premises and that such software or firmware are proprietary products of Supplier. In such event, Purchaser understands and agrees that it has no right, title, or ownership interest in such software or firmware and agrees that it will not attempt to reverse engineer, decompile, disassemble or otherwise attempt to derive the source code of such software or firmware.

(g)    Except as otherwise specified, Purchaser shall not store any personally identifiable data about the cardholder-customer except to facilitate card transactions in accordance with this Contract and shall comply with the then-current Payment Card Industry Data Security Standard ("PCI Standard"), which is referred to in the Card Guide. Purchaser must protect all card transaction records retained pursuant to this Contract in accordance with these data security provisions. Purchaser agrees to use these records only for purposes of this Contract and safeguard them in accordance with the PCI Standard. Purchaser is liable for any failure of Purchaser or any or all of Purchaser's employees, agents, representatives, subcontractors, and processors to comply with this subparagraph (g). Purchaser is responsible at Purchaser's sole expense for providing any additional data security measures that Purchaser deems necessary to protect its particular data and interests. Seller does not in any way represent or warrant that the measures contained in these data security provisions are sufficient or adequate to protect Purchaser's particular data and interests. SELLER HEREBY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES, AND LIABILITIES WITH RESPECT TO THE PCI STANDARD, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(h)    Purchaser shall indemnify, defend and hold Seller harmless for any and all losses, fines, penalties, damages, costs or expenses including without limitation attorney's fees, arising out of the Purchaser's breach or violation of, or failure to comply with, the PCI Standard or the Card Guide. The indemnity provision contained in this subparagraph (h) to paragraph 8 shall survive termination of this Contract.

9.    Delivery/Title/Risk of Loss. Delivery, passage of title and risk of loss of the product(s) covered by this Contract shall be as set forth in the attached Commodity Schedule(s).

10.    Taxes. It is agreed that any duty, tax, fee or other charge which Seller may be required to collect or pay under any municipal, state, federal or other laws now in effect or hereafter enacted with respect to the production, manufacture, inspection, transportation, storage, sale, delivery or use of the product(s) covered by this Contract shall be added to the prices to be paid by Purchaser for product(s) purchased hereunder. In the event of any bona fide dispute as to the liability for taxes assessed against Purchaser, Purchaser may contest the validity or the amount of the tax in accordance with procedures of the taxing authority. In no event, however, shall Purchaser permit a tax sale or seizure by levy of execution or similar writ or warrant to occur against the Premises or any of the inventory, supplies, or equipment located thereon.

11.    Failure To Perform. (a) Any delays in or failure of performance of either party hereto shall not constitute default hereunder or give rise to any claims for damages if and to the extent that such delay or failure is caused by occurrences including, but not limited to, acts of God or the public enemy; expropriation or confiscation of facilities; compliance with any order or request of any governmental authority; acts of war, rebellion or sabotage or damage resulting therefrom; embargoes or other import or export restrictions; fires,

CONTRACT OF SALE (BRANDED-LESSEE)    · 6
(Rev. 02/2015)

floods, explosions, accidents, or breakdowns; riots; strikes or other concerted acts of workers, whether direct or indirect; or any other causes whether or not of the same class or kind as those specifically above named which are not within the control of the party affected and which, by the exercise of reasonable diligence, said party is unable to prevent or provide against. A party whose performance is affected by any of the causes set forth in the preceding sentence shall give prompt written notice thereof to the other party.

(b)     Seller shall be under no obligation to make deliveries hereunder at any time when in Seller's sole judgment it has reason to believe that the making of such delivery would be likely to cause strikes to be called against it or cause its properties to be picketed.

(c)     The Term of this Contract shall not be extended, and Seller shall not be required to make up deliveries omitted on account of any of the causes set forth in subparagraphs (a) and (b) above.

(d)     Nothing in this paragraph shall excuse Purchaser from making payment when due for deliveries made under the Contract.

12.     Excess Quantities.  In the event Seller should actually deliver to Purchaser, and Purchaser should actually accept and receive, during the Term hereof, including renewal periods, quantities of product(s) in excess of the maximum quantities herein provided, Purchaser shall pay for said product(s) at the prices and in the method herein provided. However, nothing in this paragraph shall be deemed to authorize the purchase of quantities otherwise unauthorized under monthly or annual quantity limitations.

13.     Determination of Quantity and Quality.  The quantity and quality of product(s) sold hereunder shall be for all purposes conclusively deemed to be the quantity and quality set forth in Seller's document of delivery unless, within twenty-four (24) hours of the time of delivery, Purchaser delivers to Seller written notice of any claimed shortage in quantity or claimed deviation in quality, or where discovery of any such shortage or deviation could not reasonably have been discovered by careful inspection at the time of delivery, within three (3) days after discovery. Time is of the essence in complying with this provision. Purchaser's written notice, or the absence thereof, shall be conclusive with respect to the fact of and the time and date of notice under this paragraph.

14.     Trademarks.  (a) Subject to the approval of Seller and Supplier, Seller grants to Purchaser the non-exclusive right to use certain Proprietary Marks designated by Seller at the Premises in connection with the advertising, marketing, and resale of the petroleum products purchased from Seller under this Contract. Purchaser agrees that petroleum products of others will not be sold by Purchaser under the Proprietary Marks. Purchaser shall not sell any motor fuel that is not branded under any location that displays Proprietary Marks including, without limitation, under any canopy or fueling island where Purchaser is selling motor fuel and that is identified under any Proprietary Mark.  Purchaser understands and agrees that Supplier retains the right, subject to requirements of law, to withdraw the right to use such Proprietary Marks from Purchaser at any time, notwithstanding any request or demand by Seller to the contrary and any such withdrawal shall be without Seller's liability to Purchaser.  Purchaser understands, acknowledges, and agrees that Supplier may promulgate from time to time standards, policies, guidelines, procedures, programs, requirements, specifications, standards, strategies, and instructions ("Image and Operations Guidelines") regarding image, appearance, station operations, promotions, advertising, the size and location of signs, the wearing of uniforms, and other matters related to the sale of motor fuels under the Proprietary Marks.  Purchaser agrees that such Image and Operations Guidelines may be promulgated by any means, including without limitation Seller's and/or Supplier's marketing website, email or other electronic means.  Irrespective of the means in which such Image and Operations Guidelines are promulgated, Purchaser shall comply fully with the Image and Operations Guidelines as they exist or may be modified from time to time and cause its employees to do the same.  Failure on the part of Purchaser or Purchaser's employees to comply fully with the requirements set forth in the Image and Operations Guidelines shall be grounds for termination of this Contract.

**CONTRACT OF SALE (BRANDED-LESSEE)**          7
**(Rev. 02/2015)**

(b)    It is further expressly understood and agreed that Seller shall have the right to substitute the trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image standards and/or other brand identifications owned or controlled by a supplier other than Supplier for the Proprietary Marks. In the event of such substitution, all references to the Supplier in this Contract shall be deemed to refer to the substituted supplier and all references to the Proprietary Marks in this Contract shall be deemed to refer to the trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image standards and/or other brand identifications of said substituted supplier.

(c)    Upon termination, nonrenewal, or expiration of this Contract or prior thereto upon demand by Seller or Supplier, Purchaser shall discontinue the posting, mounting, display or other use of said Proprietary Marks except only to the extent they appear as labels or identification of products manufactured or sold by Seller or Supplier and are still in the containers or packages designed or furnished by Seller or Supplier. In the event that Purchaser fails to do so to the satisfaction of Seller or Supplier, subject to applicable law, Seller and Supplier (i) shall have the right to cause any and all signage, placards, and other displays bearing the Proprietary Marks to be removed from the Premises; and (ii) shall have the right to use any means necessary to remove, cover or obliterate the Proprietary Marks, including entry to the Premises, to do so. In the event the Seller or Supplier take any such action hereunder, Purchaser shall bear all costs and expenses thereof, including without limitation the costs of removing, obliterating, or covering the Proprietary Marks, attorney fees, and other legal costs and expenses. Purchaser shall promptly provide, upon Seller's request, a list of all signage bearing the Proprietary Marks at the Premises. Under no circumstances will Purchaser display signage bearing the Proprietary Marks at the Premises without the prior written approval of Seller. In addition to the terms contained in this subparagraph 14(c), Purchaser shall comply with any other brand de-identification requirements required by applicable law, ordinance, or regulation regarding the labeling of petroleum products.

(d)    Purchaser acknowledges and understands that it is not Supplier's licensee of the Proprietary Marks. Purchaser shall not shall not mix, commingle, blend, adulterate, or otherwise change the composition of any of the product(s) purchased hereunder and resold by Purchaser under said Proprietary Marks with other products or substances in any manner.

(e)    Seller and Supplier are hereby given the right to enter the station Premises and to examine at any time, and from time to time, the contents of Purchaser's tanks or containers in which said product(s) purchased hereunder are stored and to take samples therefrom and, if in the opinion of Seller or Supplier, any samples thus taken are not said product(s) and in the condition in which delivered by Seller to Purchaser then Seller may at its option cancel and terminate this Contract.

(f)    If there shall be posted, mounted, or otherwise displayed on or in connection with the Premises any Proprietary Marks or any other sign, poster, placard, plate, device or form of advertising matter whether or not received from Seller, consisting in whole or in part of the name of Supplier or Seller owned or used by Supplier or Seller in its business, Purchaser agrees at all times to display same in compliance with the standards, guidelines and instructions of Supplier and Seller and to discontinue the posting, mounting or display of same immediately upon Purchaser's ceasing to sell motor fuels (or other products of Seller or Supplier) under the Proprietary Marks or, in any event, upon demand by Seller or Supplier. Purchaser shall take no action, or otherwise do anything or fail to do anything that will diminish, reduce, injure, dilute, or otherwise damage the value of the Proprietary Marks or other trademarks or identifications of Supplier.

(g)    While using the Proprietary Marks, Purchaser shall: (i) operate the Premises responsibly, with due care, prudence, good judgment, and skill; (ii) not engage in dishonest, fraudulent, or scare-selling practices; (iii) diligently promote the sale of motor fuel from the Premises; (iv) perform all services in a good,

**CONTRACT OF SALE (BRANDED-LESSEE)**    8
(Rev. 02/2015)

workmanlike manner; (v) keep the Premises neat and clean and in good repair and the driveways, parking spaces, and sidewalks free of ice and snow, and in good repair; (vi) keep the yards, lawns, shrubs and other plantings neat and clean and free from weeds, debris, snow, ice, and rubbish; and (vii) comply with all laws, ordinances, rules and regulations of constituted public authority governing the use and occupancy of the Premises and the conduct of Purchaser's business at the Premises.

(h)     Purchaser understands that Supplier may require retail service station dealers operating under the Proprietary Marks and their employees to attend and complete Supplier conducted or sponsored training programs from time to time. Purchaser shall attend and complete such training, or where Purchaser is not an individual, cause its Key Person (as defined in the attached Key Person Rider) and employees to attend and complete such training as may be required by Seller or Supplier. Seller shall be under no obligation to bear any costs or expenses associated with the attendance of Purchaser or Purchaser's Key Person and employees at such training.

(i)     Purchaser shall participate in Supplier's image evaluation program, any "mystery" or shop audit program, or any other similar program, conducted or sponsored by Supplier. Purchaser shall pay any fee that may be assessed by Seller for arranging for such audit and evaluation services. Purchaser shall promptly take corrective action as required by Supplier to bring the Premises into compliance with the Image and Operations Guidelines. Purchaser understands and agrees that Purchaser's failure to comply with any such program shall be a material breach of this Contract.

(j)     Purchaser understands and acknowledges that Seller may install, or has installed, certain signage at the Premises for the purpose of displaying the Proprietary Marks. Unless the parties hereto have agreed otherwise, Purchaser agrees that said signage shall remain the property of Seller, or the Supplier as the case may be, and that said signage may not be removed, transferred, sold, or otherwise disposed of without the prior written consent of Seller or Supplier, as applicable.

(k)     While using the Proprietary Marks at the Premises, Purchaser shall conduct only such businesses or activities at the Premises that are approved in writing by Seller. Except as otherwise permitted, Purchaser shall not use the Proprietary Marks or Supplier's name as part of Purchaser's corporate name or other name.

(l)     At no time may Purchaser use any trademarks, trade dress, logo types, or names confusingly similar to the Proprietary Marks.

(m)     If Purchaser (i) violates any Supplier image or appearance standard; or (ii) receives a substandard score with respect to any standard or criterion on any Supplier image evaluation program, "mystery shopper" or inspection program, or any other similar program conducted or sponsored by Supplier (any such violation or deficiency referred to hereinafter as the "Deficiency"), Purchaser shall pay to Seller a reasonable penalty fee not to exceed Not Applicable Dollars ($N/A) for any Deficiency and immediately correct each Deficiency to bring the Premises into full compliance with Supplier's standards or programs. If Purchaser fails to correct any Deficiency within ten (10) days after Purchaser's receipt of written notice of such Deficiency, Seller shall have the option, in Seller's sole discretion, to correct any such Deficiency. If Seller exercises its option hereunder, Purchaser shall immediately pay unto Seller, upon demand, all reasonable expenses incurred by Seller to correct each such Deficiency. Nothing contained in this subparagraph (m) shall be understood or deemed to waive or modify any of Seller's rights, or any of Purchaser's obligations, under this Contract.

(n)     Purchaser shall comply with all applicable federal, state, and local laws, statutes, and regulations pertaining to the sale of alcohol and/or tobacco products at the Premises. Purchaser shall not sell, or permit the sale, of tobacco or alcohol products to underage customers as may be prohibited by such

CONTRACT OF SALE (BRANDED-LESSEE)        9
(Rev. 02/2015)

applicable law, statute, or regulation. Purchaser shall immediately notify Seller of any citation or notification of violations received by Purchaser from any applicable governmental authority resulting from the sale of tobacco or alcohol products and the resolution of such violation. The provision in this subparagraph 14(n) is material and significant to the franchise relationship between Seller and Purchaser and will be treated as such by Seller.

(o)    Purchaser represents and warrants that it has read and understands this Contract, any attachments, and any related or supplemental agreements, that Seller has accorded Purchaser ample time and opportunity to consult with counsel of Purchaser's own choosing about the potential benefits and risks of entering this Contract, and that Purchaser is not relying upon any representation as to profits or earnings which Purchaser in particular might be expected to realize, nor has Seller or any of its agents or representatives made any other representation which is not expressly set forth herein to induce Purchaser to accept and execute this Contract. Purchaser represents and warrants that Purchaser understands and agrees with the Core Values, attached hereto and made a part hereof, and shall operate Purchaser's businesses at the Premises, and the Premises, in a manner so as to meet the commitments contained in the Core Values.

15.    <u>Inspection of Records; Audit</u>.  Purchaser shall maintain permanent and complete records of all sales of motor fuels as required by law and/or this Contract. Purchaser acknowledges and agrees that Seller and Supplier have a right to inspect Purchaser's operation of the businesses conducted at the Premises, and in particular have a right to verify that Purchaser is complying with (a) all its contractual obligations contained in this Contract, including but not limited to Purchaser's use of the Proprietary Marks, and (b) all federal, state and local laws and regulations pertaining to environmental protection and trademark use. In order that they may exercise the aforementioned rights, Seller and Supplier shall have the right, and Purchaser shall permit Seller and Supplier, to enter the Premises unimpeded to review and audit all station records including, but not limited to, all records of deliveries, sales and inventory reconciliation, to take samples of motor fuels stored at the Premises, and to inspect equipment.

16.    <u>Customer Service and Complaints</u>. While using Proprietary Marks, Purchaser agrees:  (a) to render appropriate, prompt, efficient, courteous service at the Premises to Purchaser's customers for such product(s) and to respond expeditiously to all complaints of such customers, making fair adjustment when appropriate; (b) to conduct Purchaser's business in a fair and ethical manner and maintain the Premises' facilities, all in a manner which will foster customer acceptance of and desire for the product(s) sold by Seller to Purchaser; (c) to provide sufficiently qualified and neatly dressed attendants, uniformed as appropriate, to render first-class service to customers; (d) to maintain the restrooms in a clean, orderly, sanitary, and well lighted condition and adequately provided with necessary supplies; (e) not to employ or permit any illegal, unethical, coercive, deceptive or unfair practices in the operation of the Premises; (f) not to store or sell illegal drugs or drug paraphernalia or prescription drugs or permit the same to be used or consumed at the Premises; (g) not to display, use, store, offer for sale, or rent any item of a pornographic nature at the Premises (such items shall include, without limitation, pornographic, sexually explicit, or so-called "adult": magazines, videotapes, compact disks, digital video disks, or other like items) or any other such item that Seller determines, in its sole judgment, to be offensive to the general public; (h) to prohibit the consumption of intoxicating beverages at the Premises or the sale or storage of intoxicating beverages at the Premises unless otherwise permitted by Seller, in which event, Purchaser shall keep a valid beer and wine license for the sale thereof at the Premises; (i) to offer three (3) grades of gasoline products branded under the Proprietary Marks for sale to the public; (j) to insure that all employees at the Premises are able to understand and speak the English language with sufficient fluency to communicate effectively with Purchaser's customers and emergency response personnel; (k)  to post, at all times, actual, current motor fuel prices in numbers, in price sign systems approved by Supplier, in Supplier's sole discretion, located on the Premises; and (l) to assist in maintaining a high level of customer acceptance of the Proprietary Marks by keeping the Premises open for dispensing of product(s) associated with such Proprietary Marks for such hours each day and days each week as follows, unless

prohibited by Cal. Bus. & Prof. Code §21150.1, in which event the Premises shall be kept open for the maximum number of hours each day and days each week permitted thereunder:

<u>Hours of Operation:</u>

Open 24 hours each day, 7 days each week.

These are the minimum hours of operation and they do not preclude the Purchaser from opening the facility at other times. Holiday closings shall include none. Purchaser (or where Purchaser is a business entity such as a corporation, limited liability company, or partnership, its Key Person) shall be present at the Premises no less than forty (40) hours per week.

17.    <u>Quality, Specification or Name of Product.</u>  Seller shall have the right at its sole discretion at any time during the life of this Contract to change, alter, amend or eliminate any of the trade names, trademarks or brands of petroleum product(s) covered by this Contract. Seller may also, in its discretion, either (a) change or alter the quality, grade, or specifications of any product(s) covered by this Contract or (b) discontinue the availability of any such product(s). Any such change or discontinuation shall not affect the minimum purchase requirements set forth in the Commodity Schedule(s) attached hereto. Seller shall give Purchaser written notice of discontinuance of the manufacture of any product(s) covered by this Contract. The Contract shall terminate as to such discontinued product(s) when such notice is effective.

18.    <u>Assignment.</u>  (a) This Contract is personal to Purchaser. Provided Seller elects not to exercise Seller's right of first refusal as set forth in subparagraph (e) below, Purchaser's interest in this Contract nonetheless shall not be transferred or assigned by Purchaser in whole or in part, directly or indirectly, without the prior written consent of Seller which consent shall not be unreasonably withheld. It shall be reasonable to withhold such consent if Seller notifies Purchaser, in writing, within forty-five (45) days of Seller's receipt of the application, or other documents that Seller requires a prospective assignee or transferee ("Prospective Franchisee") to provide to Seller, any of the following:

(i)    the Prospective Franchisee has less business experience and training that normally required by the Seller of prospective franchisees;

(ii)    the Prospective Franchisee has less financial resources than that normally required by the Seller of prospective franchisees;

(iii)    the Prospective Franchisee does not satisfy Seller's then current uniformly applied requirements, if any, applicable to prospective franchisees;

(iv)    the Prospective Franchisee operates a franchise under an agreement with a franchisor other than Seller to whom the transfer or assignment is proposed, if the then current uniformly applied requirements of Seller precludes the Prospective Franchisee from operating a franchise under an agreement with another franchisor; or

(v)    Purchaser has not offered in writing to transfer or assign the franchise to Seller in accordance with Seller's right of first refusal set forth in subparagraph (e) below, or has otherwise failed to comply with any and all of the terms and conditions therein.

Nothing contained in the foregoing subparagraph (a) shall limit Seller's right to impose other conditions or requirements for its consent under this paragraph. Seller may assign this Contract in whole or in part upon ten (10) days' prior written notice to Purchaser.

(b)    If Seller consents to any assignment or transfer, Purchaser shall pay to Seller an administrative fee in the amount of Six Thousand Five Hundred Dollars ($6,500) in the form of a bank

**CONTRACT OF SALE (BRANDED-LESSEE)**        **11**
**(Rev. 02/2015)**

cashiers check prior to or at the closing of any assignment or transfer. With the exception of a transfer in the event of Purchaser's death, long term disability, or sickness (six (6) months or longer) that prevents Purchaser from operating the business at the Premises, the administrative fee is applicable to all transfers, including a transfer to Seller. Purchaser acknowledges and agrees that the administrative fee is imposed by the Seller to cover all Seller's costs and expenses associated with or related to the processing of Purchaser's request including, among other things, the costs or expenses incurred in the preparation of applicable documents, the evaluation of the Prospective Franchisee, accounting services, credit checks, background checks, and court records searches, and attorney's fees and expenses.

(c)    Subparagraph (a) above applies herein if Purchaser is a corporation, limited liability company or partnership. Any change in the control of the Purchaser including, without limitation, the sale, conveyance, alienation, assignment, transfer or other change of interest in, or title to, or beneficial ownership of, any voting stock, membership interest, or partnership interest, of or in the Purchaser, whether voluntarily, involuntarily, by operation of law, merger or otherwise, shall be construed as an assignment or transfer of Purchaser's rights under this Contract. A change in the control of Purchaser shall be deemed to occur whenever a party gains the ability to influence the business and affairs of Purchaser directly or indirectly. A party who owns, or otherwise possesses, twenty-five percent (25%), or more, of the voting stock, membership interest, partnership interest, or beneficial interest shall be deemed to have such ability. Thus, by way of example only, the following, without limitation, would constitute an assignment or transfer of Purchaser's rights under subparagraph (a) herein above: (i) the assignment or transfer of 25% or more of the voting stock of, or membership, partnership, or beneficial interest in, the Purchaser; (ii) the assignment or transfer of a lesser percentage of such stock of, or membership, partnership, or beneficial interest in, the Purchaser to an existing stockholder, member, or partner who thereby would own 25% or more of the Purchaser's voting stock or possess 25% or more of membership, partnership, general partnership, or beneficial interest in the Purchaser; or (iii) the assignment or transfer of a lesser percentage of such stock, membership interest, partnership interest, or beneficial interest that, as a practical matter, results in a change in the control of Purchaser.

(d)    No assignment or transfer shall affect the continuing primary liability of Purchaser (which liability, following assignment or transfer shall be joint and several with the assignee). No consent to any of the foregoing shall operate as a waiver in any subsequent instance.

(e)    Seller may not transfer or assign any of Seller's interest in this Agreement and/or its business on the Premises without first offering, in writing, to transfer or assign the same to Seller or its designee on the same terms and conditions expressly agreed to between Purchaser and the third party, in accordance with the terms and conditions set forth in the First Right of Refusal Addendum to this Contract.

19.    Waiver. No waiver by Seller of any breach of any of the covenants or conditions herein contained to be performed by Purchaser shall be construed as a waiver of any succeeding breach of the same or any other covenant or condition.

20.    Environmental Compliance. (a) Purchaser shall become informed about and comply with all local, state and federal laws, statutes, regulations and ordinances related to environmental protection or compliance relevant to Purchaser's operations at the Premises, whether currently in effect or which may come into effect in the future, including where applicable, obligations imposed on the "owner" and "operator" of an underground storage tank system ("UST").

(b)    Purchaser shall comply with all applicable local, state and federal UST compliance requirements, whether currently in effect or which may come into effect in the future, including, but not limited to: (i) required inspections of any release detection equipment for USTs and product lines; (ii) required inspections of any automatic tank gauging equipment; and (iii) maintenance and required inspections

CONTRACT OF SALE (BRANDED-LESSEE)    12
(Rev. 02/2015)

of any vapor recovery equipment. Purchaser shall maintain written records of all maintenance and inspections of UST equipment. Purchaser will maintain such records at the Premises for at least thirty-six (36) months, or longer, if required by law. Purchaser understands and agrees that raising, removing, by-passing or disabling UST monitoring or release detection probes, alarms and systems, or falsification of records of such systems is a violation of law and could result in the assessment of civil or criminal penalties by the appropriate government agency.

(c)    Purchaser shall make accurate daily physical measurement of all products stored in USTs and perform accurate daily and monthly reconciliation of such measurements with metered sales and product deliveries in accordance with Seller, state, local and federal requirements. Purchaser shall develop and maintain accurate written records of the daily physical product measurements and daily and monthly reconciliation. Purchaser will maintain such records at the Premises for at least thirty-six (36) months or longer if required by law. Purchaser shall immediately notify Seller and any appropriate local, state or federal governmental agency after discovery of any inventory loss or other condition which may be the result of a leaking UST or other equipment failure. Purchaser shall immediately investigate and undertake all appropriate initial abatement and other emergency measures to contain, treat, mitigate and/or remediate a discharge, spill, or release of motor fuels or other petroleum products at the Premises. Purchaser shall cooperate at all times with Seller during any such investigation or remedial activity.

(d)    Purchaser shall become informed about and comply with all applicable local, state and federal requirements related to the generation, handling, transportation, treatment, storage and/or disposal of solid or hazardous wastes. Purchaser also shall implement appropriate recycling, waste management and waste minimization practices and procedures as necessary to remain in compliance with all applicable local, state and federal environmental protection and compliance requirements.

(e)    Purchaser agrees that representatives of Seller and /or Supplier shall be permitted to enter upon the Premises from time to time to perform physical measurements and reconciliation of product stored in USTs and to inspect and/or test any equipment and records used for complying with any local, state, or federal environmental protection or environmental compliance requirements, including, but not limited to, Purchaser's reconciliation and inspection records. However, Seller is not obligated to make any such inspections or tests.

(f)    Purchaser shall, if requested by Seller, cooperate in all current and future environmental protection programs established by Seller and/or Supplier.

(g)    As used herein, "DO Program" means the program provided by Seller for a third-party to act as the "designated UST operator" on behalf of Purchaser to perform monthly visual inspections of each UST, maintain records, and perform facility employee training. Purchaser shall participate in the DO Program and shall, at Seller's option, pay any fees incurred by or assessed to Seller for providing the DO Program.

(h)    Purchaser shall properly maintain all USTs, hoses, connections, and associated equipment at the Premises. Seller may, without liability to Purchaser, refuse to make delivery of products covered under this Contract if Seller believes any UST, hose, connection, or associated equipment is not safely maintained or in compliance with applicable safety standards. Purchaser shall not use the UST at the Premises including, without limitation, the associated product lines, hoses, and motor fuel dispensing equipment, during the Term of this Contract for any purpose other than the storage, handling, marketing, and distribution of the Seller's petroleum products.

(i)    Purchaser shall indemnify, defend, protect and hold Seller, its employees, officers, members, directors, shareholders, agents and affiliates harmless from and against any and all liabilities, losses, obligations, claims, damages (consequential or otherwise), penalties, suits, actions, judgments, costs and

expenses (including attorneys' fees) of whatever nature for personal injury (including death) of persons (including, without limitation, agents and employees of Seller or Purchaser) or property damage (including, without limitation, damage to the property of Seller or Purchaser), which may be imposed on, incurred by or asserted against Seller directly or indirectly, (i) caused in whole or in part by Purchaser's failure to comply with the terms of this paragraph 20 or with any local, state or federal law, statute, regulation or ordinance, whether currently in effect or which may come into effect, related to environmental protection or environmental compliance or (ii) for any releases or discharges of hazardous substances (including but not limited to petroleum products) into the environment caused, in whole or in part, by the acts or omissions of Purchaser, its employees, agents, contractors, customers, licensees, or invitees. This indemnity in no way limits and is intended to be within the scope of the general indemnity set forth in paragraph 6 hereof. The terms and provisions of this paragraph 20 shall survive the expiration, nonrenewal or termination of this Contract.

21.     Price Regulation.  (a) If at any time Seller determines that due to governmental regulations, it is unable to increase the price of any of the product(s) deliverable under this Contract by an amount which is sufficient in Seller's judgment to reflect increases in either (i) the cost of such product(s) to Seller or Seller's supplier or (ii) the fair market value of such product(s), which have occurred since the date of this Contract or the date of the last increase in the price of such product(s) whichever is later, Seller may cancel this Contract upon thirty (30) days' written notice to Purchaser, or may suspend this Contract while such limitation is in effect. The Term of this Contract shall not be extended, and Seller shall not be required to make up deliveries omitted, on account of Seller's suspension of this Contract as provided in this paragraph 21.

        (b)     Notwithstanding any other provision of this Contract, if any state or local law, rule, regulation, or order (i) regulating the price at which a product(s) to be delivered hereunder may be sold, or (ii) limiting the discretion of Seller to determine to whom they will sell such product(s), becomes effective during the Term of this Contract in any state in which such product(s) is to be delivered hereunder, Seller shall have the right to terminate this Contract immediately.

22.     Notices.  All written notices required or permitted to be given by this Contract shall be deemed to be duly given if delivered personally or sent by certified or a reputable, national overnight mail service to Seller or to Purchaser, as the case may be, at the address set forth above or to such other address as may be furnished by either party to the other in writing in accordance with the provisions of this paragraph. The date of mailing shall be deemed the date of giving such notice, except for notice of change of address, which must be received to be effective.

23.     Equipment/Trade Fixtures.  (a) Purchaser shall provide all necessary buildings, improvements, equipment, tools, and like appliances, except for equipment and/or trade fixtures listed on the Schedule of Seller's Equipment attached hereto and made a part hereof. It is expressly understood and agreed that title to all equipment and/or trade fixtures listed in Schedule of Seller's Equipment shall at all times remain with Seller. Purchaser shall be responsible for maintaining and repairing all equipment and/or trade fixtures listed in Schedule of Seller's Equipment. In no event shall such equipment and/or trade fixtures be considered a part of the real estate, nor shall the same be levied upon or sold as the property of Purchaser. Should any such equipment and/or trade fixtures be levied upon, Purchaser shall immediately notify both the levying creditor, disclaiming ownership and the Seller, in order that the Seller may protect its rights. Purchaser shall not encumber or remove the equipment and/or trade fixtures or do or cause to be done anything which results in said equipment and/or trade fixtures or any part thereof being seized, taken in execution, attached, destroyed or damaged or otherwise disturbing or damaging Seller's title to the equipment and/or trade fixtures.

        (b)     If damage to or destruction of any equipment or trade fixtures provided by Seller occurs in connection with Purchaser's operations at the Premises, Purchaser shall pay Seller the cost of repair or

**CONTRACT OF SALE (BRANDED-LESSEE)     14**
**(Rev. 02/2015)**

replacement.

24.    Termination.  (a) The parties may terminate this Contract by mutual written agreement in the form and manner permitted by the PMPA.

(b) ·    This Contract may be terminated by Seller: (i) if Purchaser makes any material false or misleading statement or representation which induces Seller to enter into this Contract, or which is relevant to the relationship between the parties hereto; (ii) if Purchaser becomes insolvent or commits an act of bankruptcy or takes advantage of any law for the benefit of debtors or Purchaser's creditors, or if a receiver is appointed for Purchaser; (iii) if possession of the business location(s) of the Purchaser is interrupted by act of any government or agency thereof; (iv) if Purchaser fails to pay in a timely manner any sums when due hereunder; (v) if Purchaser defaults in any of its obligations under this Contract; (vi) if Purchaser is declared incompetent to manage his property or affairs by any court, or if Purchaser is mentally or physically disabled for three (3) months or more to the extent that Purchaser is unable to provide for the continued proper operation of the business of the Purchaser; (vii) under the circumstances described as causes for termination by Seller elsewhere in this Contract; (viii) if Purchaser dies or if the sole owner of Purchaser dies; (ix) if Purchaser engages in fraud or criminal misconduct relevant to the operation of the business of the Purchaser; (x) if Purchaser is convicted of a felony or of misdemeanor involving fraud, moral turpitude or commercial dishonesty, whether or not the crime arose from the operation of the business of the Purchaser; (xi) if Purchaser fails to purchase at least 75% of the minimum volume requirements contained in the attached Commodity Schedule(s); (xii) if Purchaser fails to maintain an inventory of any one or more grades of motor fuel covered by this Contract in an amount adequate to meet customer demand; (xiii) any grounds under which termination of a franchise is permitted under the provisions of the Petroleum Marketing Practices Act (P.L. 95-297), as amended from time to time; (xiv) Purchaser's material breach of the accompanying Station Lease; or (xv) upon assignment of this Contract by Purchaser contrary to the terms of this Contract.

(c)    Upon loss of Seller's right to grant the use of the Supplier's Proprietary Marks, Seller may terminate this Contract. Seller will not be liable for the consequences of such loss unless they result from an act by Seller taken in bad faith for the purpose of causing the loss of Seller's right to grant the right to use the Proprietary Marks.

(d)    Purchaser agrees not to engage in or permit any illegal or improper act or conduct, on or about the Premises, which act or conduct is detrimental to Seller or any member of the public. Subject to any other requirements of law, at the option of Seller, this Contract may be terminated without further notice (i) upon the failure of Purchaser to desist from any such further acts or conduct after written notice from Seller to do so, or (ii) upon Purchaser's failure to pay any amount when and as due, and no forbearance, course of dealing, or prior payment shall affect these rights of termination.

(e)    Upon the expiration of the Term hereof or upon termination hereof, Seller shall have the right, at its option, to enter upon the Premises and to remove, paint out, or obliterate any signs, symbols or colors on said Premises or on the buildings or equipment thereof which in Seller's opinion would lead a patron to believe that Seller's products are being offered for sale at the Premises. Purchaser shall reimburse Seller for all expenses incurred by Seller under this subparagraph 24(e).

(f)    Termination of this Contract by either party for any reason shall not relieve the parties of any obligation theretofore accrued under this Contract.

(g)    If the accompanying Station Lease is terminated or non-renewed for any lawful reason, then this Contract shall terminate or non-renew concurrently with the termination or non-renewal of the accompanying Station Lease.

**CONTRACT OF SALE (BRANDED-LESSEE)**      15
**(Rev. 02/2015)**

25.   Accord.  The parties to this Contract have discussed the provisions herein and find them fair and mutually satisfactory and further agree that in all respects the provisions are reasonable and of material significance to the relationship of the parties hereunder, and that any breach of a provision by either party hereto or a failure to carry out said provisions in good faith shall conclusively be deemed to be substantial.

26.   Purchaser's Insurance Requirements. (a)  Purchaser shall, at its sole expense, obtain insurance from a reputable insurance carrier authorized to do business in the State in which the Premises is located providing full and continuous coverage for the full Term and all renewal periods thereof equivalent to the following: (i) Comprehensive General Liability Insurance covering the Premises, all operations at the Premises, complete operations liability, products liability, contractual liability, fire, explosion and collapse liability, as well as coverage on all contractor's equipment (other than motor vehicles licensed for highway use) owned, hired, or used in performance of this Contract, bodily injury, and property damage, with minimum limits of One Million Dollars ($1,000,000) each occurrence, One Million Dollars ($1,000,000) and an aggregate coverage of no less than One Million Dollars ($1,000,000); (ii) if Purchaser operates, or permits the operation of, a service bay and/or car wash on the Premises, Garagekeeper's Legal Liability Insurance covering fire, theft or collision, with a minimum limit of One Million Dollars ($1,000,000) each occurrence and coverage in the general aggregate amount of no less than One Million Dollars ($1,000,000); (iii) Comprehensive Automobile Liability Insurance, covering all owned, hired or otherwise operated non-owned automobiles, for death of or injury to any one person and liabilities for loss of or damage to property resulting from any one accident with a combined single limit of not less than One Million Dollars ($1,000,000) each person, One Million Dollars ($1,000,000) per occurrence, including MCS 90 endorsement or other acceptable evidence of financial responsibility as required by the Motor Carrier Act of 1980 and the Pollution Liability Broadened Coverage endorsement; (iv) if alcoholic beverages are permitted to be sold at the Premises, Liquor Liability Insurance with policy coverage of at least One Million Dollars ($1,000,000) for liabilities arising out of the dispensing or selling of alcoholic beverages, including without limitation any liabilities imposed by any applicable dram shop or alcoholic beverage control act; (v) Workers Compensation Insurance as required by law; (vi) Employer's Liability Insurance against common law liability, in the absence of statutory liability, for employee bodily injury arising out of the master-servant relationship with a coverage limit of the greater of such amount required by law or One Million Dollars ($1,000,000) for any one occurrence; and (vii) environmental pollution/impairment insurance coverage in an amount of at least One Million Dollars ($1,000,000) on a continuous and uninterrupted basis insuring Purchaser for all environmental liabilities arising out of, but not limited to, the storage, handling, dispensing, and/or sale of motor fuel products and lubricants at the Premises, and/or the ownership and operation of Purchaser's business(es) at the Premises.  Such environmental/pollution impairment coverage shall extend at least two (2) years beyond the expiration, termination, or nonrenewal of this Contract.  Purchaser may meet the requirement for environmental pollution/impairment coverage for underground storage tanks by participating in the federal Environmental Protection Agency ("EPA") approved state financial assurance fund or other EPA approved method to demonstrate financial responsibility or by satisfying any of the other financial assurance test requirements of the EPA's Financial Responsibility Regulations (40 CFR Part 280).

(b)   Purchaser understands and agrees that any insurance coverage purchased by Seller shall not contribute to the Purchaser's coverage requirements under subparagraph (a) above.  All insurance policies covered by subparagraph (a) will name Seller and the Supplier as additional insureds and will be primary as to any other existing, valid and collectible insurance.  All such insurance shall contain provisions whereby the insurer releases all rights of subrogation against Seller.  The foregoing requirements are minimum insurance requirements only and may or may not adequately meet the entire insurance needs of Purchaser.  Seller may require Purchaser to carry additional types and amounts of insurance coverage, including modifications to any existing insurance required under subparagraph (a) above.  Seller may reject any Purchaser insurance policy that contains deductibility clauses, self-insured retentions, conditions or exclusions, or that are underwritten by insurance companies that are unacceptable to Seller, in Seller's sole discretion.  Each policy

CONTRACT OF SALE (BRANDED-LESSEE)   16
(Rev. 02/2015)

or policies shall provide that the liability coverage afforded applies separately to each insured against whom a claim is brought as though a separate policy had been issued to each insured. If Seller so requires, Purchaser shall furnish Seller with certificates of such insurance that provide that coverage will not be canceled or materially changed prior to 30 days' advance written notice to Seller. The insurance required hereunder in no way limits or restricts Purchaser's obligations under the law or this Contract as to indemnification of Seller.

(c)  If Purchaser fails, for any reason, to procure or maintain, insurance coverage satisfactory to Seller, Seller may, in Seller's sole discretion and upon notice to Purchaser, procure the required insurance. In such event, upon Seller's request, Purchaser shall promptly furnish Seller with all information relating to the Purchaser or Purchaser's business requested by Seller in connection with the procurement of such insurance. Upon written demand, Purchaser shall immediately reimburse Seller for all Seller's costs incurred in procuring and maintain such insurance coverage.  Seller's election to exercise its rights under this subparagraph 26(c) does not preclude Seller from exercising any other rights it may have under this Contract, the law or in equity.  Seller's election not to exercise its rights under this subparagraph 26(c) shall not be construed to be a waiver of Purchaser's obligations under this paragraph 26 or otherwise limit Seller's rights under this Contract, the law or in equity.

27.   Nature of Agreement/ No Third Party Beneficiary.  (a)  In consideration of the granting and execution of this Contract, it is understood and agreed that there shall be no contractual obligation to extend or renew the period or terms of this Contract in any way, and the parties agree that this Contract shall not be considered or deemed to be any form of "joint venture" or "partnership" at the Premises of Purchaser or elsewhere. This Contract shall bind the executors, administrators, personal representatives, assigns, and successors of the respective parties.

(b)      This Contract is personal to the Purchaser and is intended for the sole use and benefit of Seller and Purchaser. Nothing contained herein shall be deemed, interpreted, or construed to create, or express any intent to create, third party beneficiary rights in favor of any person or entity, except for any indemnified party (or other person entitled to be indemnified pursuant to this Contract), and Seller and Purchaser specifically state and agree that no such intent exists.

28.   Compliance with Laws.  (a) Purchaser shall comply with all laws, statutes, regulations, ordinances, and rules of all applicable governmental authorities with respect to the operation of its business at the Premises, including without limitation all applicable laws and regulations regarding weights and measures.

(b)      In addition to the foregoing, Purchaser shall comply with the Americans with Disabilities Act of 1990, 42 U.S.C. Section 12101, et seq., and regulations promulgated pursuant thereto, as well as all analogous and applicable state laws.

(c)      Both parties expressly agree that it is the intention of neither party to violate statutory or common law and that if any section, sentence, paragraph, clause or combination of same is in violation of any law, such sentences, paragraphs, clauses or combination of same shall be inoperative and the remainder of this Contract shall remain binding upon the parties hereto.

29.   Express Warranties. Seller warrants that the product(s) supplied hereunder will conform to the promises and affirmations of fact made in Seller's current technical literature and printed advertisements, if any, related specifically to such product(s); that it will convey good title to the product(s) supplied hereunder, free of all liens, and that the product(s) supplied hereunder meet such specifications as have been expressly made a part of this Contract. THE FOREGOING WARRANTIES ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, ORAL OR IMPLIED. THE WARRANTY OF MERCHANTABILITY, IN OTHER RESPECTS THAN EXPRESSLY SET FORTH HEREIN, AND

WARRANTY OF FITNESS FOR PARTICULAR PURPOSE, IN OTHER RESPECTS THAN EXPRESSLY SET FORTH HEREIN, ARE EXPRESSLY EXCLUDED AND DISCLAIMED.

30.    Non-Exclusive Territory.    Nothing in this Contract grants Purchaser an exclusive territory to market or resell any petroleum products purchased from Seller hereunder. Seller reserves the right to market or sell, and authorize others to market or sell, petroleum products in any manner Seller chooses, including through its own retail outlets or through designated wholesalers or other retailers.

31.    Confidential Information.    (a) Purchaser acknowledges that Seller and/or Supplier may be disclosing and transmitting to it certain confidential and proprietary information of Seller and/or Supplier, including without limitation guidelines, manuals, methods, policies, procedures, programs, software, firmware, specifications, standards (both operational and visual), strategies, and other related information ("Confidential Information") in connection with Purchaser's performance of this Contract. Such Confidential Information may be in written, oral or electronic (that is, transmitted or stored via Supplier or Seller's web site, or via email, IM, CD, DVD, or other similar electronic means) form. Except where otherwise required by law, Purchaser shall: (i) treat and maintain Confidential Information as confidential; (ii) use Confidential Information only for the operation of the Premises under this Contract; and (iii) restrict disclosure of Confidential Information only to Purchaser and its officers, directors, employees, contractors or agents who are directly connected with the performance of work and require knowledge of the Confidential Information for Purchaser's performance of its obligations hereunder.

(b)    Purchaser may not use, or cause or permit to be used by, or disclose to, or cause or permit to be disclosed to, third parties any Confidential Information for purposes other than operating the Premises under this Contract.

(c)    Purchaser acknowledges that any failure to comply with the requirements of this paragraph 31, including but not limited to the breach of the permitted use of Confidential Information, will cause Seller or Supplier irreparable injury. The provisions of paragraph 31 will survive the termination or expiration of this Contract and apply to all Confidential Information disclosed or transmitted to Purchaser during the franchise relationship, whether prior to, during or after the expiration, termination, or nonrenewal of this Contract.

32.    Entire Agreement; Modifications.    (a) This Contract, including any Attachments (defined below) cancels and supersedes all prior written and unwritten agreements, attachments, schedules, appendices, amendments, promises, and understandings between the parties pertaining to the matters covered under this Contract, except any indebtedness owed to Seller by Purchaser, and is a final, complete and exclusive statement of the agreement between Seller and Purchaser. THERE ARE NO ORAL UNDERSTANDINGS, REPRESENTATIONS OR WARRANTIES AFFECTING IT. Except as otherwise provided in this Contract, no amendment, deletion, modification, or alteration to this Contract shall have any effect unless and until made in writing and signed by an authorized representative of Seller and by Purchaser. EXECUTION OF THIS CONTRACT BY PURCHASER IS AN ACKNOWLEDGEMENT THAT NO REPRESENTATIONS NOT SET FORTH IN WRITING HEREIN HAVE BEEN MADE OR RELIED UPON BY PURCHASER.

(b)    Purchaser shall provide Seller no less than sixty (60) days prior written notice of any change in the name or legal form of Purchaser.

33.    Damages.    NO CLAIM SHALL BE MADE UNDER THIS CONTRACT FOR SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, EXCEPT AS PROVIDED OTHERWISE BY LAW.

CONTRACT OF SALE (BRANDED-LESSEE)    18
(Rev. 02/2015)

34.    Commencement.  This Contract or any modification thereof shall not be binding upon Seller until signed on its behalf by an authorized representative of Seller.  Commencement of performance hereunder prior to signing as above stipulated in no case shall be construed as a waiver by Seller of this requirement.

35.    Key Person Rider.  If Purchaser is any form of business entity other than a sole proprietor, upon Seller's request, Purchaser shall execute a "Key Person Rider" in the form attached hereto, which executed Key Person Rider shall then be annexed hereto and made a part hereof.

36.    Survivorship.  To the extent, but only to the extent, that any provision of state law requires Seller to permit the succession of the rights and obligations hereunder to a designated family member of Purchaser upon Purchaser's death, such provision is incorporated herein by reference.  In the absence of such provision, this Contract shall terminate upon the death of the Purchaser, if the Purchaser is a natural person, or upon the death of the person who is the sole owner of the Purchaser, if Purchaser is a business entity.

37.    Joint and Several Obligations.  All acknowledgments, representations, warranties, debts, and obligations of performance of Purchaser under this Contract are made, and binding on, all those signing this Contract jointly and severally as the Purchaser.  Notwithstanding the foregoing, if Purchaser is an entity, each Owner (as defined in the Key Person Rider) and Key Person's liability under this Contract shall be joint and several.

38.    Seller's Equitable Remedies/Attorneys' Fees.

        (a)    Purchaser agrees that money damages may not be a sufficient remedy for the breach of this Contract and that, therefore, in addition to all remedies available at law, Seller shall be entitled to specific performance, injunctive relief, declaratory judgment and/or other equitable remedies, as appropriate. Purchaser shall waive any requirement for the posting of bond in conjunction with Seller's effort to seek equitable remedies.

        (b)    To the fullest extent permitted by law, the prevailing party shall be entitled to all attorneys' fees, costs of suit and reasonable expenses incurred in order to secure, defend or protect the rights inuring to the prevailing party under this Contract, or to enforce the terms thereof, in addition to any other relief to which the prevailing party may be entitled.

        (c)    Seller's termination of this Contract shall not prejudice Seller's right to seek monetary damages or equitable relief against Purchaser.  All powers and remedies available at law and in equity, including the right to terminate this Contract under the PMPA, shall be cumulative and not exclusive of any other powers and remedies available by virtue of this Contract, and no delay or omission of Seller in exercising any right or power accruing upon any breach of, or default under any provision of this Contract shall impair any other or subsequent breach or impair any rights or remedies consequent thereto.

39.    Miscellaneous.

        (a)    Neither Purchaser, nor its employees, agents, or representatives shall make, receive, provide or offer substantial gifts, entertainment, payments, loans or other consideration to employees, agents, or representatives of Seller or Supplier for the purpose of influencing those persons to act contrary to the best interests of Seller or Supplier, and Purchaser shall establish and maintain precautions to prevent the same. This obligation shall apply to Purchaser's activities in its relations with the employees of Seller and Supplier and their families and/or third parties arising from this Contract.  Purchaser shall notify Seller promptly upon the discovery of any instance where Purchaser or Purchaser's employees, agents, or representatives have failed to comply with this subparagraph (a).

CONTRACT OF SALE (BRANDED-LESSEE)        19
(Rev. 02/2015)

(b)     Nothing in this Contract is to be construed as preventing Seller upon expiration of this Contract and any renewal of the franchise relationship, from offering Purchaser differing terms, in good faith and in the normal course of business, which differ from or are in addition to those in this Contract, including terms and conditions relating the other businesses that may be operated by Purchaser at the Premises.

(c)     By their signatures below, each of the following represent that they have authority to execute this Contract and to bind the party on whose behalf their execution is made.

40.   **Further Assurances**.  Purchaser shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of its obligations hereunder and to carry out the intent of this Contract.

41.   **Governing Law**.  This Contract shall be governed by and construed in accordance with the laws of the State of Florida and controlling U.S. federal law, except for any rule of court or law of said state which would make the law of any other jurisdiction applicable.

42.   **Attachments**.  All exhibits, schedules, riders, and documents attached hereto, including the Card Guide (collectively, "Attachments"), are hereby incorporated herein and made a part of this Contract.

Executed this ⟨2⟩ day of ⟨MARCH⟩, 20 ⟨16⟩

**SELLER:**                                    **PURCHASER:**

**Circle K Stores Inc.**                        **Petro Gate, Inc.**

By: ⟨signature⟩                                By: ⟨signature⟩
    ⟨Matt McClure⟩                                Benham Bagheri

Title: Vice President                          Title: President

Witness: ⟨signature⟩                           Witness: ⟨signature⟩

**CONTRACT OF SALE (BRANDED-LESSEE)**       20
**(Rev. 02/2015)**

DEPARTMENT OF ENERGY

**Revised Summary of Title I of the Petroleum Marketing Practices Act**
(Extracted from the Federal Register, Vol. 61, No. 123, Tuesday, June 25, 1996, 32786-32790)
AGENCY: Department of Energy.

ACTION: Notice.

SUMMARY: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

FOR FURTHER INFORMATION CONTACT: Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

SUPPLEMENTARY INFORMATION: Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. Secs. 2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780.

Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. Sections 2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act. Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.   Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. Secs. 2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier If the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. Sec. 2802(b)(E).

E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

  (1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.
  (2) You declare bankruptcy or a court determines that you are insolvent.
  (3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.
  (4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.
  (5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.
  (6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.
  (7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.
  (8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.
  (9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.
  (10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

2                              KSD/    B.B

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:

(1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;

(2) The date the termination or non-renewal takes effect; and

(3) A copy of this summary.

IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

B. Interim Franchises

3

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. Sections 2801-2806.

VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I--Definitions and Legal Remedies

I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

A. Franchise

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.  The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

G. Fail to Renew and Nonrenewal

4

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action is brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

C. Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

D. Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

E. Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:
   (1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
   (2) To materially alter, add to, or replace such premises;
   (3) To sell such premises;
   (4) To withdraw from marketing activities in the geographic area in which such premises are located; or
   (5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.
Marc W. Chupka,
Acting Assistant Secretary for Policy.
[FR Doc. 96-16124 Filed 6-24-96; 8:45 am]

13.7 Summary Statement of PMPA Rights/BMA Contract Package 5.0

5

## 2007 PMPA AMENDMENT

15 U.S.C. § 2807.    Prohibition on restriction of installation of renewable fuel pumps.

**(a) Definition**
In this section:

(1) Renewable fuel
The term "renewable fuel" means any fuel-

(A) at least 85 percent of the volume of which consists of ethanol; or

(B) any mixture of biodiesel and diesel or renewable diesel (as defined in regulations adopted pursuant to section 7545(o) of Title 42 (40 CFR, part 80)), determined without regard to any use of kerosene and containing at least 20 percent biodiesel or renewable diesel

(2) Franchise-related document
The term "franchise-related document" means-

(A) a franchise under this Chapter; and

(B) any other contract or directive of a franchisor relating to terms or conditions of the sale of fuel by a franchisee

**(b) Prohibitions**

(1) In general

No franchise-related document entered into or renewed on or after December 19, 2007, shall contain any provision allowing a franchisor to restrict the franchisee or any affiliate of the franchisee from-

(A) installing on the marketing premises of the franchisee a renewable fuel pump or tank, except that the franchisee's franchisor may restrict the installation of a tank on leased marketing premises of such franchisor;

(B) converting an existing tank or pump on the marketing premises of the franchisee for renewable fuel use, no long as such tank or pump and the piping connecting them are either warranted by the manufacturer or certified by a recognized standards setting organization to be suitable for use with such renewable fuel;

(C) advertising (including through the use of signage) the sale of any renewable fuel;

(D) selling renewable fuel in any specified area on the marketing premises of the franchisee (including any area in which a name or logo of a franchisor or any other entity appears);

(E) purchasing renewable fuel from sources other than the franchisor if the franchisor does not offer its own renewable fuel for sale by the franchisee;

(F) listing renewable fuel availability or prices, including on service station signs, fuel dispensers, or light poles; or

(G) allowing for payment of renewable fuel with a credit card,

so long as such activities described in subparagraphs (A) through (G) do not constitute mislabeling, misbranding, willful adulteration, or other trademark violations by the franchisee

(2) Effect of provision

Nothing in this section shall be construed to preclude a franchisor from requiring the franchisee to obtain reasonable indemnification and insurance policies

**(c) Exception to 3-grade requirement**

No franchise-related document that requires that 3 grades of gasoline be sold by the applicable franchisee shall prevent the franchisee from selling a renewable fuel in lieu of 1, and only 1, grade of gasoline.

Revised Summary of Title I of the Petroleum Marketing Practices Act (PMPA)

6

Site# 2211031

## ATTACHMENT A
## TO COMPLETE CONTRACT OF SALE
## SELLER'S EQUIPMENT

The following items are property of the Seller and are subject to the rights and limitations set forth in the Complete Contract of Sale:

All Shell image
High Rise sign faces
Shell MID, sign faces, and goal posts
Canopy sign faces and Channel Letters
Building Mounted Legends
Communication equipment required for monitoring inventory via the ATG
Card Processing Equipment

Title to such items shall at all times remain with Seller. This Attachment is not to be deemed exclusive per se and may be amended by mutual acknowledgement of the parties.

**COMMODITY SCHEDULE (MOTOR FUEL SALES TO PURCHASER)**

PURCHASER: Petro Gate, Inc.                          FACILITY # 2211031
DELIVERY POINT: 3825 Tollgate Boulevard, Naples, Florida 34114
PRODUCT: Gasoline and Diesel                         GRADE:  87, 89, 91

     This Commodity Schedule is attached to, and made a part of, a certain Contract of Sale (Branded-Lessee) (the "Contract") between Purchaser and Seller dated April 1, 2016. Unless otherwise indicated, the capitalized terms used in this Commodity Schedule shall have the same meaning used in the Contract.

1.  Quantity.  Except as otherwise provided in the Contract, the quantity of gasoline and Diesel covered by this Commodity Schedule shall be all Purchaser's requirements, but in no case less than a minimum of 3,561,825 gallons from April 1, 2016 to March 31, 2019, in calendar monthly (January through December) and annual minimum and maximum quantities hereinafter specified.

     Monthly Quantity:  Minimum 98,940 gallons and Maximum 148,409 gallons.

     Annual Quantity:  Minimum 1,187,275 gallons and Maximum 1,780,913 gallons.

2.     Delivery.  Where delivery is made to Purchaser's business location, delivery shall be complete on unloading of the tank wagon or transport truck.  Where delivery is made into equipment furnished by Purchaser, delivery shall be complete at the point of loading of such equipment.

3.     Title.  Title to product covered under the Contract shall pass to Purchaser upon delivery of product.

4.     Risk of Loss.  Risk of loss of product shall pass to Purchaser upon delivery of product.

5.     Inspection.  Purchaser shall have the right, at its expense, to have an inspection made at delivery point, provided such inspection shall not delay shipment.  Should Purchaser fail to make inspection, it shall accept Seller's inspection and measurement.

6.     Price.  The Seller's price per gallon to be paid by Purchaser shall be the Supplier's posted per gallon terminal price in effect at the time loading commences, plus all applicable taxes and all fees, plus State loading and environmental fees, if any, plus the cost of transportation, plus $0.01 per gallon.  The Seller's price per gallon is based upon the delivery of a full transport truckload of product.  Delivery of a quantity of product less than a full transport truckload shall be subject to an additional delivery charge. All prices charged by Seller are subject to the provisions of applicable law.

**ACCEPTED:**                              **ACCEPTED:**

**SELLER:**                                **PURCHASER:**

Circle K Stores Inc.                       Petro Gate, Inc.

By: _____                        By: _____
      Matt McLure                               Benham Bagheri

Title: <u>Vice President</u>               Title: <u>President</u>

Witness: _____                   Witness: _____

Facility # 2211031

## KEY PERSON RIDER
### (The "Key Person Rider")

1.  Purchaser states that the following named person, Benham Bagheri (such person referred to as the "Owner"), has an ownership interest in Purchaser. The parties hereto agree that, should Owner, or any one of the Owners, relinquish, convey, or otherwise transfer, directly or indirectly, in whole or in part, his or her ownership interest in the Purchaser, the Contract of Sale ("Contract") between Purchaser and Seller, to which this Key Person Rider is attached and incorporated into, may be terminated or nonrenewed by Seller.

2.  (a)  It is understood and agreed that Benham Bagheri is designated the "Key Person," which designation is deemed by the parties hereto to be a reasonable and material provision of the Contract. The Key Person shall personally operate on a daily basis the business of Purchaser at the Premises covered by the Contract. The phrase "to operate on a daily basis the business of Purchaser at the Premises covered by the Contract" shall mean that the Key Person must (i) manage the business in accordance with the Contract and (ii) have authority to make all business decisions that an unincorporated retail service station dealer normally makes concerning operations of a retail service station business. Purchaser represents that the Key Person has the authority to buy and sell motor fuel, to enter into financing agreements on behalf of Purchaser, and to authorize merchandising and/or cooperative advertising programs.

(b)  Notwithstanding anything contained to the contrary in this Key Person Rider, nothing in the Key Person Rider releases, transfers, or otherwise modifies the obligations or duties of Purchaser under the Contract. The parties hereto agree that failure of the Key Person to operate on a daily basis the business of Purchaser at the Premises covered by the Contract in compliance with the terms and conditions contained in the Contract shall be grounds for the termination or nonrenewal, as applicable, of the Contract by the Seller.

3.  Purchaser may seek Seller's consent to add, modify, or delete, by amendment, one or more of the names listed above in paragraph 1 or 2(a) by making a written request at least thirty (30) days prior to any change. Such request shall include such information as Seller may designate as necessary to determine the qualifications of the new person. Seller will consider and respond to Purchaser's request within thirty (30) days following receipt of Purchaser's written request. Such request for amendment may be denied at Seller's reasonable discretion.

4.  These covenants are attached to and incorporated into the Contract between Purchaser and Seller and may be enforced as if set forth in said Contract. This Key Person Rider cancels and supersedes any pre-existing Key Person Rider of said Contract.

**ACCEPTED:**                                              **ACCEPTED:**

**SELLER:**                                                **PURCHASER:**

**Circle K Stores Inc.**                                   **Petro Gate, Inc.**

By: _M. McL_                                               By: _____
        _Matt McCure_                                           Benham Bagheri

Title: _Vice President_                                    Title: _President_

Witness: _____                                Witness: _____

Date: _3/24/16_                                            Date: _March 2, 2016_

**KEY PERSON RIDER**
**(Rev. Feb 2016)**

**Facility # 2211031**

## STATION LEASE (LESSEE BRANDED)
### (Retail Service Station and Convenience Store)

This Station Lease (Branded) (Retail Service Station and Convenience Store) (the "Lease") is made and entered into between Circle K Stores Inc., a Texas Corporation, with a business address of 1130 West Warner Road, Tempe, Arizona 85284,, hereinafter called "Lessor" and Petro Gate, Inc., with a business address of 3825 Tollgate Boulevard, Naples, Florida 34114, hereinafter called "Lessee".

### WITNESSETH:

1. Lease of Premises.  Pursuant to the terms and conditions of this Lease, Lessor hereby leases to Lessee, and Lessee leases from Lessor, the premises located at 3825 Tollgate Boulevard, in the City (or Town) of Naples, in the County (or Parish) of Collier, in the State of Florida (referred to hereinafter as the "Premises"), which Premises are to be employed in connection with the sale, consignment or distribution of motor fuel under certain Shell trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image standards or other brand identifications that Lessor allows Lessee to use (the "Proprietary Marks"), as more fully set forth in the accompanying Contract of Sale (Branded-Lessee) between the parties hereto (the "Contract of Sale"), and the operation of Lessee's convenience store business.  It is understood and agreed that Lessor neither owns nor controls the Proprietary Marks, but that Lessor may grant Lessee the right to use said Proprietary Marks only with the authorization of Lessor's supplier of motor fuel branded under said Proprietary Marks (said supplier referred to as the "Supplier"), and Supplier retains the right, subject to requirements of law, to withdraw the right to use such Proprietary Marks from Lessee at any time notwithstanding any request or demand by Lessor to the contrary and any such withdrawal shall be without Lessor's liability to Lessee.  Lessor owns all equipment on the Premises with the exception of items enumerated in Attachment "A", attached hereto and incorporated herein.

2. Term.  The term of this Lease shall be three (3) years (the "Term"), subject to Lessor's termination rights under paragraph 17 below, commencing on the 1st day of April, 2016 and expiring on the 31st day of March, 2019.  In the ABSENCE OF A NEW lease agreement, subject to the provisions of paragraph 17 below, this Lease shall not extend beyond a month-to-month tenancy, which Lessor may terminate at any time subject to any valid requirements of any applicable statute.  Nothing in this Lease is to be construed as preventing Lessor upon expiration of this Lease and any renewal of the franchise relationship, from offering Lessee differing terms, in good faith and in the normal course of business, which differ from or are in addition to those in this Lease, including terms and conditions relating the other businesses that may be operated by Lessee at the Premises.

3. Rent.  (a) Total rent, excluding property tax and maintenance fee, for the Term of this Lease is $525,762.  Such rent shall be payable, without setoff, deduction, notice, or demand. In addition, Lessee shall pay to Lessor property taxes and maintenance fee on a pro-rata monthly basis. Such property tax and maintenance shall be payable, without setoff, deduction, notice, or demand. Rent, Maintenance Fee and property tax shall be paid in accordance with the monthly schedule and amounts as follows:

| Period | Monthly Rent | Maintenance Fee | Monthly Property Tax |
|---|---|---|---|
| 4/1/2016 to 3/31/2017 | $14,175 | $1,851.17 | $695.05 |
| 4/1/2017 to 3/31/2018 | $14,600 | $1,906.70 | adjusted annually |
| 4/1/2018 to 3/31/2019 | $15,038 | $1,963.90 | adjusted annually |

STATION LEASE (LESSEE BRANDED)
(Mobil - Rev. 11/2011)

Facility # 2211031

### STATION LEASE (LESSEE BRANDED)
(Retail Service Station and Convenience Store)

This Station Lease (Branded) (Retail Service Station and Convenience Store) (the "Lease") is made and entered into between Circle K Stores Inc., a Texas Corporation, with a business address of 1130 West Warner Road, Tempe, Arizona 85284,, hereinafter called "Lessor" and Petro Gate, Inc., with a business address of 3825 Tollgate Boulevard, Naples, Florida 34114, hereinafter called "Lessee".

### WITNESSETH:

1. Lease of Premises. Pursuant to the terms and conditions of this Lease, Lessor hereby leases to Lessee, and Lessee leases from Lessor, the premises located at 3825 Tollgate Boulevard, in the City (or Town) of Naples, in the County (or Parish) of Collier, in the State of Florida (referred to hereinafter as the "Premises"), which Premises are to be employed in connection with the sale, consignment or distribution of motor fuel under certain Shell trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image standards or other brand identifications that Lessor allows Lessee to use (the "Proprietary Marks"), as more fully set forth in the accompanying Contract of Sale (Branded-Lessee) between the parties hereto (the "Contract of Sale"), and the operation of Lessee's convenience store business. It is understood and agreed that Lessor neither owns nor controls the Proprietary Marks, but that Lessor may grant Lessee the right to use said Proprietary Marks only with the authorization of Lessor's supplier of motor fuel branded under said Proprietary Marks (said supplier referred to as the "Supplier"), and Supplier retains the right, subject to requirements of law, to withdraw the right to use such Proprietary Marks from Lessee at any time notwithstanding any request or demand by Lessor to the contrary and any such withdrawal shall be without Lessor's liability to Lessee. Lessor owns all equipment on the Premises with the exception of items enumerated in Attachment "A", attached hereto and incorporated herein.

2. Term. The term of this Lease shall be three (3) years (the "Term"), subject to Lessor's termination rights under paragraph 17 below, commencing on the 1st day of April, 2016 and expiring on the 31st day of March, 2019. In the ABSENCE OF A NEW lease agreement, subject to the provisions of paragraph 17 below, this Lease shall not extend beyond a month-to-month tenancy, which Lessor may terminate at any time subject to any valid requirements of any applicable statute. Nothing in this Lease is to be construed as preventing Lessor upon expiration of this Lease and any renewal of the franchise relationship, from offering Lessee differing terms, in good faith and in the normal course of business, which differ from or are in addition to those in this Lease, including terms and conditions relating the other businesses that may be operated by Lessee at the Premises.

3. Rent. (a) Total rent, excluding property tax and maintenance fee, for the Term of this Lease is $525,762. Such rent shall be payable, without setoff, deduction, notice, or demand. In addition, Lessee shall pay to Lessor property taxes and maintenance fee on a pro-rata monthly basis. Such property tax and maintenance shall be payable, without setoff, deduction, notice, or demand. Rent, Maintenance Fee and property tax shall be paid in accordance with the monthly schedule and amounts as follows:

| Period | Monthly Rent | Maintenance Fee | Monthly Property Tax |
|---|---|---|---|
| 4/1/2016 to 3/31/2017 | $14,175 | $1,851.17 | $695.05 |
| 4/1/2017 to 3/31/2018 | $14,600 | $1,906.70 | adjusted annually |
| 4/1/2018 to 3/31/2019 | $15,038 | $1,963.90 | adjusted annually |

STATION LEASE (LESSEE BRANDED)
(Mobil - Rev. 11/2011)

Notwithstanding the foregoing, the parties acknowledge the amount of property tax owed will be adjusted from time to time by the applicable municipal tax authority and accordingly, upon Lessor's written notification to Lessee, the amount of property tax payable hereunder shall equal the amount set forth in Lessor's notice, pro-rated on a monthly basis. In addition, the Lessee shall pay to Lessor the branded fuels network fee in the amount of $79 per month. Said payments for rent, taxes and fees shall be payable on the 1st day of each and every calendar month during the effective life of this Lease, or any other day that Lessor may require from time to time.

(b)     To secure timely payment of rent, and other sums due under this Lease or any accompanying contract, Lessee shall, upon execution of this Lease, provide Lessor with a security deposit in the amount of $20,000 or other security interest acceptable to Lessor, at Lessor's sole option, including without limitation a letter of credit and personal guaranty. In the event Lessor does not require a security deposit upon the execution of this Lease, Lessee shall provide a personal guaranty. Lessor reserves the right to require a security deposit at any time in the future to secure timely payment of rent and other sums due under this Lease or any accompanying contract. Should Lessee at any time be in default of Lessee's obligations under this Lease, Lessor may, at its option and without prejudice to any other right or remedy which Lessor may have at law or in equity, apply the security deposit or any portion thereof toward payment of rent or to any loss or damage sustained by Lessor due to Lessee's default. Lessor shall notify Lessee after Lessor applies all or any portion of the security deposit pursuant to this subparagraph 3(b). Within five (5) days after written demand by Lessor, Lessee shall deposit cash or other immediately available funds with Lessor in an amount sufficient to restore the security deposit to the original sum deposited, and Lessee's failure to do so shall constitute a material default under this Lease. The security deposit is not a limitation on Lessor's damages or a payment of liquidated damages. If Lessee performs all of its obligations under this Lease, the security deposit or any balance thereof then remaining shall be returned to Lessee within thirty (30) days after termination or nonrenewal of the parties' franchise relationship.

(c)     Lessee shall pay said rent in accordance with Lessor's payment terms in effect from time to time. Lessor may require that Lessee pay the rent by means of cash, cashier's check, certified check, electronic funds transfer ("EFT"), or other means acceptable to Lessor. Where Lessor requires payment via EFT, Lessee will establish a commercial account with a financial institution that provides EFT services and will authorize Lessor to initiate transfers of funds between Lessee's account and Lessor's account for payment of all amounts due to Lessor under this Lease for the entire Term thereof, including renewal periods. Lessee shall not use, or permit to be used, said commercial account for personal, family, or household purposes. Lessee will provide Lessor with all information and authorization necessary to debit and credit Lessee's account. Lessee shall maintain at all times funds in its account sufficient to make payments to Lessor at the time of the EFT transaction. Should any EFT transaction be rejected by Lessee's bank for Lessee's failure to maintain sufficient funds in Lessee's account, in addition to any rights Lessor may have under this Lease or the law, Lessor may collect a service charge for each occurrence of such rejection by the bank, whether or not payment is subsequently paid by Lessee. Lessor may, at its sole discretion, require that subsequent payments be made by means of cash, certified or cashier's check, money order, or other means satisfactory to Lessor. Lessee shall indemnify, defend and hold Lessor harmless for any losses, costs, or damages arising out of any breach or violation of this subparagraph 3(c).

(d)     Because of the dynamic nature of the motor fuel retailing industry, Lessee acknowledges and agrees that Lessor may, during the Term of this Lease, determine that the Premises should be opened to provide other goods and services preferred by customers which may include but shall not be limited to, gas only, total self serve and car wash operations. Lessor shall have the right to make these changes at any time during the Term of this Lease upon six (6) months prior written notice to Lessee and to alter the rental fees to be consistent with the arrangement then in effect, or then being placed in effect as set forth in paragraph 23(a)

STATION LEASE (LESSEE BRANDED)              2
(Rev. 02/2015)

below for all other dealers engaged in the same type of business in the marketing area in which the Premises is located. Such a change in mode of operation will not affect the Lessee's right, subject to compliance with all the terms and conditions hereof, to continue in the Premises for the full Term of this Lease.

4.  Independent Business.  (a) Lessee is an independent businessman with the exclusive right to direct and control the business operation at the above Premises, including the establishment of the prices at which products and merchandise are sold. Lessor reserves no control over the business at the above Premises. Lessee has no authority to employ anyone as an employee or agent of Lessor for any purpose. Lessee accepts exclusive liability for all city, county, state and federal contributions and payroll taxes and other obligations of an employer as to all employees of Lessee. Lessee shall not erect or permit any sign, insignia or other advertising device upon or near the Premises which would in any way indicate or imply that Lessor or Supplier is the owner or operator of the Premises.

(b)    Lessee shall furnish such equipment as is necessary to operate a first class convenience store. Such equipment shall include, without limitation shelving, counters, cash registers and refrigerators and shall be more fully set forth in Attachment "A" attached hereto and incorporated herein.

5.  Mutual Satisfaction.  The parties to this Lease have discussed the provisions herein and find them fair and mutually satisfactory and further agree that in all respects the provisions are reasonable and of material significance to the relationship of the parties hereunder.  Any breach of a provision of this Lease shall be grounds for termination or non-renewal of the relationship.

6.  Surrender of Premises.  (a) Lessee shall surrender possession of the Premises immediately upon termination, expiration, or non-renewal of this Lease.  Lessee shall leave the Premises in the same condition as it was at the commencement of this Lease or in the same condition to which it was brought by the efforts of Lessor after the commencement of this Lease, except for normal wear and tear.  Lessor shall have the right to repossess the Premises immediately upon termination, expiration, or non-renewal of this Lease.  Any surrender prior to termination, expiration, or non-renewal of this Lease shall require Lessor's prior written consent.

(b) Lessee shall remove all of Lessee's personal property upon termination, expiration, or non-renewal of the Lease and shall promptly repair any damage to the Premises resulting from the removal thereof to the reasonable satisfaction of Lessor; provided, however, if Lessee fails to remove Lessee's personal property from the Premises within thirty (30) days after the effective date of the termination, nonrenewal, or expiration, then Lessee shall be deemed to have abandoned such items of Lessee's personal property, all of which shall become the property of Lessor.  Lessor, at its sole option, may remove, store, and/or dispose of such property and Lessee shall have no claim or right against Lessor for such property or the value thereof, regardless of the disposition thereof by Lessor.  Lessee shall pay Lessor, upon demand, all expenses incurred by Lessor for the moving, storing, and/or disposal of such items of Lessee's personal property and for the repair of any damage caused or arising from such removal.  Lessee's obligations hereunder shall survive the termination, nonrenewal, or expiration of this Lease.

7.  Inspection.  Lessor retains the right to enter and inspect the Premises at reasonable times and in a reasonable manner with such employees and equipment as Lessor may deem necessary to determine if the obligations assumed by Lessee under this Lease are being fulfilled.

8.  Subordination of Lease.  Lessee acknowledges that Lessee has received notice in writing prior to the commencement of the Term that this Lease is subordinate to an underlying lease held by Lessor that may expire or terminate on N/A, on or before the end of the Term of this Lease.  Lessee further acknowledges that this underlying lease may or may not be extended or renewed on or before the date such underlying lease expires or terminates, and that Lessor is under no obligation to extend or renew such underlying lease or to

STATION LEASE (LESSEE BRANDED)                3
(Rev. 02/2015)

make a good faith or best effort to extend or renew it. If the underlying lease terminates, expires or does not renew on the aforesaid date, this Lease will also terminate or, if applicable, nonrenew at the same time. This paragraph 8 shall not be construed as a waiver of any other right of termination or non-renewal which Lessor may have.

9. <u>Indemnity</u>. Lessor shall not be liable to Lessee or to any other person for any damage to or loss of property, or for injury to or death of persons, or for the violation by Lessee or any other person of any governmental statute, law, regulation, rule, or ordinance, arising from the use of the Premises by Lessee or any other person pursuant to this Lease. Lessee shall defend, indemnify, protect and save harmless Lessor and its officers, directors, employees, agents and representatives from and against any and all losses, claims, penalties, fines, liabilities, environmental cleanup costs, suits and actions, including attorneys' fees and litigation costs, judgments and costs, which shall arise from or grow out of any injury to or death of persons, or damage to or loss of property, or violation by Lessee or any other person of any governmental statute, law, regulation, rule, or ordinance, directly or indirectly arising out of, or resulting from, or in any way connected with (i) Lessee's performance of this Lease or failure thereof, (ii) operation of Lessee, or activities of any other person, at the Premises, or (iii) the condition of the Premises or of the adjoining streets, sidewalks or ways, irrespective of whether such injury, death, damage or loss is sustained by Lessee or his agents, employees, invitees, licensees, customers, or any other person, firm or corporation which may seek to hold Lessor liable. Lessee acknowledges and agrees to provide Lessor written assurance within ten (10) days from Lessor's request for Lessee to accept tender of a claim and to notify and instruct Lessee's insurance carriers that Lessor is an indemnified party. The existence or non-existence of any insurance required under this Lease will not limit Lessee's indemnity or other obligations under this Lease. Lessee's obligations under this paragraph shall survive the termination, expiration, or nonrenewal of this Lease.

10. <u>Notice</u>. Any notice required by this Lease shall be in writing, and shall be deemed to be duly given if delivered personally or sent by certified or a reputable, national overnight mail service to Lessor or to Lessee, as the case may be, at the address set forth above or to such other address as may be furnished by either party to the other in writing in accordance with the provisions of this paragraph. The date of mailing shall be deemed the date of giving such notice, except for notice of change of address, which must be received to be effective.

11. <u>Quiet Enjoyment</u>. Lessor covenants that Lessee, upon the payment of rent and the performance of the covenants contained in this Lease, shall and may peaceably and quietly have, hold, and enjoy said Premises for the Term, subject to the provisions of hereof.

12. <u>Assignment-Subleasing</u>. (a) This Lease is personal to Lessee and Lessee will not without the prior written consent of Lessor, which consent shall not be unreasonably withheld: (i) assign, mortgage, encumber, or otherwise transfer this Lease or the interest hereby created; (ii) permit any lien or encumbrance to be placed on the Premises or Lessor's equipment thereon; (iii) sublease the Premises or any part thereof; (iv) become associated with any other person as a partner or otherwise with respect to the Premises or to this Lease; or (v) permit any other person, firm or corporation to occupy the Premises or any part thereof, except as may otherwise be required by law. If Lessee seeks Lessor's consent for any of the foregoing Lessee shall contemporaneously provide Lessor with all documents that Lessor may reasonably require to evaluate whether to grant its consent. It shall be reasonable for Lessor to withhold its consent for the grounds set forth in paragraph 18(a) of the accompanying Contract of Sale.

(b)    In the event that Lessee desires to assign Lessee's interest hereunder, in whole or in part, Lessor reserves the right, if not prohibited by applicable law, to require that such assignee enter into a mutual termination agreement terminating this Lease and execute a trial franchise lease with Lessor, as the term "trial franchise" is defined in the Petroleum Marketing Practices Act, 15 U.S.C. §2801, *et seq.*, as amended from time to time. Nothing contained in the foregoing sentence shall be construed to limit Lessor's right to impose

**STATION LEASE (LESSEE BRANDED)**    4
**(Rev. 02/2015)**

additional conditions or requirements for its consent for the assignment, transfer, or sublease of Lessee's rights hereunder.

(c)     Lessor may assign this Lease in whole or in part upon ten (10) days prior written notice to Lessee.

13. Duties of Lessee. Lessee shall:

(a)     operate its convenience store and retail service station businesses at the Premises responsibly, with due care, prudence, good judgment, and skill;

(b)     treat all customers at the Premises courteously;

(c)     not engage in dishonest, fraudulent, or scare-selling practices;

(d)     promote diligently the sale of motor fuel and convenience store products at the Premises;

(e)     perform all services in a good, workmanlike manner;

(f)     maintain the restrooms in a clean, sanitary, and well lighted condition and adequately provided with necessary supplies;

(g)     provide sufficient trained and courteous personnel, uniformed as appropriate, to serve the needs and desires of the motoring public;

(h)     keep the Premises neat and clean and in good repair and keep the driveways, parking spaces, sidewalks, yards, lawns, shrubs and other plantings free from weeds, debris, snow, ice, and rubbish;

(i)     make reasonable efforts to preserve the value of the Premises for the uses provided hereunder; and

(j)     comply with all laws, ordinances, rules and regulations of constituted public authority governing the use and occupancy of the Premises and the conduct of Lessee's business at the Premises.

14. Use/Operation of Premises.  (a) Lessee shall use the Premises solely for the operation of a first class convenience store and retail service station business, except where Lessor has given its prior written consent for other, additional uses.  If Lessor consents to Lessee's additional use, Lessor reserves the right to a portion of the fees, income or other revenue generated by such use.

(b)     Notwithstanding anything to the contrary stated herein, Lessor reserves the right to make use of the Premises for other business uses so long as any such use does not materially interfere with the authorized use of the Premises then being made by Lessee. Lessor reserves the exclusive right to any fees, income, rentals or other revenue generated by such use by Lessor.

(c)     This Lease is subject to all covenants and restrictions contained in any deed or lease conveying or leasing the Premises to Lessor and all other deed restrictions, zoning laws, easements or encumbrances affecting the Premises, now or after the effective date of this Lease.  Lessor reserves the right to grant a mortgage or security interest in the fee and leasehold interests affecting the Premises.

(d)     Lessee shall:

(i)     not use the Premises for storage of junk, disabled vehicles, used tires or batteries, other than on a temporary basis in connection with servicing customers of the Premises;

(ii)     not use the Premises, without the prior written consent of Lessor, for auto, truck or equipment rentals or as a parking lot;

(iii)     not obstruct any entrance, exit, pump island or service area so as to deny free access to the motoring public or block delivery carriers access to storage fill pipes;

(iv)     if the construction, maintenance and/or operation of the Premises is pursuant to a conditional use permit or other approval ("Permit") by a zoning board or other governmental agency, use the Premises in accordance with all requirements contained in such Permit.  If the Premises is subject to such a Permit, a copy will be delivered to Lessee and Lessee shall acknowledge receipt of the copy on a form

**STATION LEASE (LESSEE BRANDED)**          5
**(Rev. 02/2015)**

provided by Lessor;

       (v)    conduct all operations lawfully and in strict compliance with all statutes and all ordinances, regulations, and other requirements of governmental authorities;

       (vi)    except as required by law or as agreed to in writing by Lessor and Lessee, not display any signs except those usual and customary to advertise products and services offered for sale at the Premises by Lessee;

       (vii)    not place any buildings or other permanent improvements at the Premises, or remove or make any alterations or changes in or to the existing buildings and permanent improvements at the Premises without Lessor's prior written consent, which consent may be withheld in Lessor's sole discretion;

       (viii)    purchase all of its inventory for resale at any convenience store located at the Premises and keep the convenience store shelves and walk-in cooler(s) fully stocked at all times;

       (ix)    not store or sell illegal or prescription drugs or permit the same to be used or consumed at the Premises;

       (x)    not display, use, store, offer for sale, or rent any item of a pornographic nature at the Premises or any other such item that Lessor determines, in its sole judgment, to be offensive to the general public. Such items shall include, without limitation, pornographic, sexually explicit, or so-called "adult": magazines, videotapes, compact disks, digital video disks, or other like items;

       (xi)    prohibit the consumption of intoxicating beverages at the Premises or the sale or storage of intoxicating beverages at the Premises unless otherwise permitted by Lessor, in which event, Lessee shall keep a valid beer and wine license for the sale thereof at the Premises;

       (xii)    Lessee (or where Lessee is a corporation, partnership, or limited liability company, its Key Person (as defined in the Key Person Rider attached to the accompanying Contract of Sale)) shall be present at the premises at least (40) hours per week.

15.   **Obligations of Lessee/Taxes.** (a) Lessee shall, at its expense: (i) maintain the appearance standards of the Premises such that the Premises complies with Supplier's Image and Operations Guidelines (as defined in the accompanying Contract of Sale); (ii) pay all water, gas, electricity, telephone and other utility bills; (iii) pay all real estate taxes prorated to the terms of this Lease; (iv) pay all premiums and contributions required by Workmen's Compensation, Unemployment Insurance, old age benefits and other programs measured by the remuneration paid by Lessee to its employees; (v) pay all license, occupation and business fees connected with Lessee's operation of the Premises, including such fees that may be required for the operation of the underground storage tank system at the Premises; and (vi) pay all costs of the withdrawal, distributing and selling products at the Premises. If Lessee fails to fulfill the obligations set forth in (i), (ii), or (iii) above, Lessor may, in cases of urgency, without waiving any other remedy allowable under law, perform such obligations. In such event, Lessee shall reimburse Lessor upon demand all costs expended by Lessor to fulfill Lessee's obligations in (i), (ii), or (iii) above.

       (b)    Lessee shall pay all taxes levied or imposed on (i) Lessee's property located at the Premises, and (ii) Lessee's operations pursuant to this Lease including the withdrawal, distribution, sale or delivery of the products handled at the Premises. In the event of any bona fide dispute as to the liability for taxes assessed against Lessee, Lessee may contest the validity or the amount of the tax in accordance with procedures of the taxing authority. In no event, however, shall Lessee permit a tax sale or seizure by levy of execution or similar writ or warrant to occur against the Premises or any of the inventory, supplies, or equipment located thereon.

16.   **Maintenance.** As of the date of execution of this Lease set forth below, Lessee acknowledges that the Premises is in good condition and repair, and Lessee accepts the Premises in its present condition, AS IS, WITHOUT WARRANTY, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. At Lessee's own expense, Lessee shall timely perform the maintenance obligations set forth in Attachment "B" attached hereto and

incorporated herein, as may be amended by Lessor from time to time upon written notice to Lessee. Lessee shall keep Lessee's own property in good condition and repair. Lessor shall perform all other maintenance to the Premises. Notwithstanding Lessor's maintenance obligations, Lessee has the primary obligation to keep the premises safe for all persons. Accordingly, Lessee shall immediately notify Lessor if any portion of the Premises is in need of maintenance by Lessor and shall perform any necessary interim maintenance to keep the Premises in a safe condition until such time as Lessor is able to do so within a reasonable time after receipt of notice from Lessee. If Lessee fails to perform its maintenance obligations, Lessor may perform those maintenance obligations and Lessee shall, upon demand by Lessor, reimburse Lessor's actual cost in performing the same. If Lessee fails to provide Lessor with any required notice relating to the maintenance of the Premises, Lessee shall be solely responsible for any resulting injury or damage.

17. Termination. (a) Subject to any limitations imposed by law and in addition to all other rights of Lessor under this Lease, Lessor may terminate or nonrenew this Lease for any of the following grounds: (i) Lessee's breach of any material provision of this Lease; (ii) any ground permissible under the Petroleum Marketing Practices Act, 15 U.S.C. §2801, *et seq.*, as amended from time to time; (iii) Lessee's material breach of the accompanying Contract of Sale; or (iv) upon assignment of this Lease by Lessee contrary to the terms of this Lease.

(b)    If the accompanying Contract of Sale is terminated or non-renewed for any lawful reason, then this Lease shall terminate or non-renew concurrently with the termination or non-renewal of the accompanying Contract of Sale.

(c)    If this Lease terminates, nonrenews or expires and has not been extended, Lessor has a right to reenter and to take immediate possession of the Premises. If Lessee retains possession of the Premises from and after the date of such expiration or termination, then Lessor shall have the right (in addition to its other rights) to elect from the remedies available to it under this Lease and under the law. Such remedies include, but are not limited to, treating Lessee as a periodic tenant, a tenant at sufferance, or a trespasser. Lessee will be treated as a periodic tenant only upon express written consent of Lessor and acceptance of damages as provided for in subsection (d) of this paragraph below shall not be deemed written consent.

(d)    In addition to any other rights Lessor may have at law or equity or pursuant to the Lease, for each day or fraction thereof after termination, nonrenewal, or expiration of this Lease that Lessee fails or refuses to vacate the Premises, Lessee shall pay Lessor upon demand as minimum damages (i) a sum equal to one hundred twenty five percent (125%) of the monthly installment rental prescribed in paragraph three (3) above, computed on a daily basis, or (ii) a sum equal to the maximum amount of damages recoverable under the law for Lessee's holding over, whichever sum is greater. Either sum shall be payable in addition to any other special damages caused directly or indirectly by Lessee's holding over after the expiration, termination, or nonrenewal of this Lease. Lessor's acceptance of either sum shall in no way affect Lessor's right to immediate possession of the Premises and shall not afford Lessee any right of possession beyond the date of termination, expiration, or nonrenewal of the Lease.

18. Lessee's Insurance Requirements. (a) Lessee shall, at its sole expense, obtain insurance from a reputable insurance carrier authorized to do business in the State in which the Premises are located providing full and continuous coverage for the full Term of this Lease and all renewal periods thereof equivalent to the following: (i) if Lessee operates, or permits the operation of, a service bay and/or car wash on the Premises, Garagekeeper's Legal Liability Insurance covering fire, theft or an entire automobile, and collision, with a minimum limit of One Million Dollars ($1,000,000) each occurrence and coverage in the general aggregate amount of no less than One Million Dollars ($1,000,000.00); (ii) Commercial/Comprehensive General Liability Insurance covering all operations at the Premises and the

STATION LEASE (LESSEE BRANDED)              7
(Rev. 02/2015)

Premises, complete operations and products liability, fire, explosion and collapse liability, contractual liability, as well as coverage on all contractor's equipment (other than motor vehicles licensed for highway use) owned, hired or used in performance of this Lease, bodily injury and property damage minimum limits of One Million Dollars ($1,000,000) each person, One Million Dollars ($1,000,000) each occurrence, and a minimum property damage limit of One Million Dollars ($1,000,000) each occurrence; (iii) Comprehensive Automobile Liability Insurance covering all owned, hired or otherwise operated non-owned automobiles, for death or injury to any one person and liabilities for loss of or damage to property resulting from any one accident with a combined single limit of not less than One Million Dollars ($1,000,000) each person, One Million Dollars ($1,000,000) each occurrence, and a minimum property damage limit of One Million Dollars ($1,000,000) each occurrence providing for injury, death, or property damage resulting from each occurrence, including MCS 90 endorsement or other acceptable evidence of financial responsibility as required by the Motor Carrier Act of 1980 and the Pollution Liability Broadened Coverage endorsement; (iv) Liquor Liability Insurance, if alcoholic beverages are permitted to be sold at the Premises, with policy coverage of at least One Million Dollars ($1,000,000) for liabilities arising out of the dispensing or selling of alcoholic beverages, including without limitation any liabilities imposed by any applicable dram shop or alcoholic beverage control act; (v) Workers Compensation Insurance as required by law; (vi) Employer's Liability Insurance against common law liability, in the absence of statutory liability, for employee bodily injury arising out of the master-servant relationship with a coverage limit of the greater of such amount required by law or One Million Dollars ($1,000,000) for any one occurrence; and (vii) environmental pollution/impairment insurance coverage in an amount of at least One Million Dollars ($1,000,000) on a continuous and uninterrupted basis insuring Lessee for all environmental liabilities arising out of, but not limited to, the storage, handling, dispensing, and/or sale of motor fuel products and lubricants at the Premises, and/or the ownership and operation of Lessee's business(es) at the Premises. Such environmental/ pollution impairment coverage shall extend at least two (2) years beyond the expiration, termination, or nonrenewal of this Lease. Lessee may meet the requirement for environmental pollution/impairment coverage for underground storage tanks by participating in the federal Environmental Protection Agency ("EPA") approved state financial assurance fund or other EPA approved method to demonstrate financial responsibility or by satisfying any of the other financial assurance test requirements of the EPA's Financial Responsibility Regulations (40 CFR Part 280).

(b)     Lessee understands and agrees that any insurance coverage purchased by Lessor shall not contribute to the Lessee's coverage requirements under this paragraph 18. All the insurance covered by this paragraph 18 will name Lessor and Supplier as additional insureds and will be primary as to any other existing, valid and collectible insurance. All such insurance shall contain provisions whereby the insurer releases all rights of subrogation against Lessor. The foregoing requirements are minimum insurance requirements only and may or may not adequately meet the entire insurance needs of Lessee. Lessor may require Lessee to carry additional types and amounts of insurance coverage, including modifications to existing insurance under this paragraph 18. Lessor may reject any Lessee insurance policy that contains deductibility clauses, self-insured retentions, conditions or exclusions or that are underwritten by insurance companies that are unacceptable to Lessor, in Lessor's sole discretion. Each policy or policies shall provide that the liability coverage afforded applies separately to each insured against whom a claim is brought as though a separate policy had been issued to each insured. If Lessor so requires, Lessee shall furnish Lessor with certificates of such insurance that provide that coverage will not be canceled or materially changed prior to 30 days' advance written notice to Lessor. The insurance required hereunder in no way limits or restricts Lessee's obligation under the law, this Lease, or the accompanying Contract of Sale to indemnify Lessor.

(c)     If Lessee fails, for any reason, to procure or maintain, insurance coverage satisfactory to Lessor, Lessor may, in Lessor's sole discretion and upon notice to Lessee, procure the required insurance. In such event, upon Lessor's request, Lessee shall promptly furnish Lessor with all information relating to the Lessee or Lessee's business requested by Lessor in connection with the procurement of such insurance. Upon written demand, Lesee shall immediately reimburse Lessor for all Lessor's costs incurred in procuring

**STATION LEASE (LESSEE BRANDED)**     8
**(Rev. 02/2015)**

and maintain such insurance coverage. Lessor's election to exercise its rights under this subparagraph 18(c) does not preclude Lessor from exercising any other rights it may have under this Lease, the law or in equity. Lessor's election not to exercise its rights under this subparagraph 18(c) shall not be construed to be a waiver of Lessee's obligations under this paragraph 18 or otherwise limit Lessor's rights under this Lease, the law or in equity.

19. Records of Lessee: Audit. Lessee shall maintain at the Premises, in a form to permit calculation of rentals due under this or any underlying lease, accurate records, including dates, volumes and prices, of (i) all deliveries and sales of motor fuel, (ii) gross revenue from sales of all products (including motor fuel) and services, and (iii) any other records as required by law and/or this Lease, including, but not limited to, those records specified below in paragraph 20. Lessor and/or its agent may examine, copy, and audit the foregoing records at any reasonable time and Lessor shall keep the records confidential. Lessee shall, on request from Lessor, provide a verified statement of deliveries, sales and gross revenue within 5 days after the end of each calendar month, twelve-month lease period, and/or any cancellation or termination of this Lease. At Lessor's option, Lessor may prescribe a written form which Lessee shall complete in submission of such statements.

20. Environmental Compliance. (a) Lessee shall become informed about and comply with all local, state and federal laws, statutes, regulations and ordinances related to environmental protection or compliance relevant to Lessee's operations at the Premises, whether currently in effect or which may come into effect in the future, including, where applicable, obligations imposed on the "owner" and "operator" of an underground storage tank system ("UST").

(b)     Lessee shall comply with all applicable local, state and federal UST compliance requirements, whether currently in effect or which may come into effect in the future, including, but not limited to: (i) required inspections of any release detection equipment for USTs and product lines; (ii) required inspections of any automatic tank gauging equipment; and (iii) maintenance and required inspections of any vapor recovery equipment. Lessee shall maintain accurate written records of all maintenance and inspections of UST equipment. Lessee will maintain such records at the Premises for at least thirty-six (36) months, or longer, if required by law. Lessee understands and agrees that raising, removing, by-passing or disabling UST monitoring or release detection probes, alarms and systems, or falsification of records of such systems is a violation of law and could result in the assessment of civil or criminal penalties by the appropriate government agency.

(c)     Lessee shall make accurate daily physical measurement of all products stored in USTs and perform accurate daily and monthly reconciliation of such measurements with metered sales and product deliveries in accordance with Lessor, state, local and federal requirements. Lessee shall develop and maintain accurate written records of the daily physical product measurements and daily and monthly reconciliation. Lessee will maintain such records at the Premises for at least thirty-six (36) months, or longer if required by law. Lessee shall immediately notify Lessor and any appropriate local, state or federal governmental agency after discovery of any inventory loss or other condition which may be the result of a leaking UST or other equipment failure. Lessee shall immediately investigate and undertake all appropriate initial abatement and other emergency measures to contain, treat, mitigate and/or remediate a discharge, spill, or release of motor fuels or other petroleum products at the Premises. Lessee shall cooperate at all times with Lessor during any such investigation or remedial activity.

(d)     Lessee shall become informed about and comply with all applicable local, state and federal requirements related to the generation, handling, transportation, treatment, storage and/or disposal of solid or hazardous wastes. Lessee also shall implement appropriate recycling, waste management and waste minimization practices and procedures as necessary to remain in compliance with all applicable local, state and federal environmental protection and compliance requirements.

**STATION LEASE (LESSEE BRANDED)**          9
**(Rev. 02/2015)**

(e)    Lessee agrees that representatives of Lessor shall be permitted to enter upon the Premises from time to time to perform physical measurements and reconciliation of product stored in USTs and to inspect and/or test any equipment and records used for complying with any local, state, or federal environmental protection or environmental compliance requirements, including, but not limited to, Lessee's reconciliation and inspection records. However, Lessor is not obligated to make any such inspections or tests.

(f)    Lessee will, if requested by Lessor, cooperate in all current and future environmental protection programs established by Lessor and/or Supplier.

(g)    As used herein, "DO Program" means the program provided by Lessor for a third-party to act as the "designated UST operator" on behalf of Lessee to perform monthly visual inspections of each UST, maintain records, and perform facility employee training. Lessee shall participate in the DO Program and shall, at Lessor's option, pay any fees incurred by or assessed to Lessor for providing the DO Program.

(h)    Lessee shall properly maintain all USTs, hoses, connections, and associated equipment at the Premises.

(i)    Lessee shall indemnify, defend, protect and hold Lessor, its employees, officers, members, directors, shareholders, agents and affiliates harmless from and against any and all liabilities, losses, obligations, claims, damages (consequential or otherwise), penalties, suits, actions, judgments, costs and expenses (including attorneys' fees) of whatever nature for personal injury (including death) of persons (including, without limitation, agents and employees of Lessor or Lessee) or property damage (including, without limitation, damage to the property of Lessor or Lessee), which may be imposed on, incurred by or asserted against Lessor directly or indirectly, (i) caused in whole or in part by Lessee's failure to comply with the terms of this paragraph 20 or with any local, state or federal law, statute, regulation or ordinance, whether currently in effect or which may come into effect, related to environmental protection or environmental compliance or (ii) for any releases or discharges of hazardous substances (including but not limited to petroleum products) into the environment caused, in whole or in part, by the acts or omissions of Lessee, its employees, agents, contractors, customers, licensees, or invitees. This indemnity in no way limits and is intended to be within the scope of the general indemnity set forth in paragraph 9 hereof. The terms and provisions of this paragraph 20 shall survive the expiration, nonrenewal or termination of this Lease.

21.  Security Improvements.  Lessee shall be solely responsible for making all security improvements to the Premises, including but not limited to the installation of equipment and fixtures, which Lessee deems necessary to secure the Premises against unlawful intrusion, vandalism, and criminal activity or to provide for the safety of Lessee's employees, customers, licensees, or invitees (hereinafter "Security Improvements"). In the event Lessee desires to make Security Improvements, Lessee shall proceed to do so only with the written approval of Lessor, which approval shall not unreasonably be withheld. Lessor shall not be liable to any person for any claim or cause of action related to the lack of security at the Premises or the inadequacy, deficiency or malfunctioning of any security equipment at the Premises. Lessee shall protect, defend, indemnify and hold Lessor harmless from and against any suits, causes of action, judgments, costs or penalties arising out of or related in any way to the existence and/or level of security at the Premises.

22.  Compliance With Laws And Severability of Provisions.  (a) Lessee shall comply with all laws, statutes, regulations, ordinances, and rules of all applicable governmental authorities with respect to the operation of its business at the Premises, including without limitation all applicable laws and regulations regarding weights and measures.

(b) In addition to the foregoing, Purchaser shall comply with the Americans with Disabilities Act of 1990, 42 U.S.C. Section 12101, et seq., and regulations promulgated pursuant thereto, as well as all

STATION LEASE (LESSEE BRANDED)          10
(Rev. 02/2015)

analogous and applicable state laws.

(c)     Both parties expressly agree that it is not the intention of either party to violate statutory or common law and that if any sentence, paragraph, clause or combination of same is in violation of any law, such sentences, paragraphs, clauses or combination or same shall be inoperative and the remainder of this Lease shall remain binding upon the parties hereto.

23.  Alterations to the Premises.

(a)     Lessor's Alterations.
(i)     Except to the extent limited by applicable law, at any time during the Term of this Lease, Lessor may, at Lessor's sole discretion, make or implement alterations, improvements, modifications, removals, or replacements to the Premises or to any building, improvement, structure, or equipment at the Premises (the "Alterations") and other offerings that Lessor deems advisable for the purpose of enhancing the capacity of the Premises for sales of motor fuels and convenience store items. Lessor shall be authorized to make such Alterations at the Premises for the aforesaid purpose through a demolition of the existing buildings, structures, or improvements at the Premises, and a rebuilding thereof, or through alteration and/or reconfiguration of the existing improvements of the Premises, by a reduction, enlargement or re-shaping of the land constituting the Premises and a change in the means of ingress and egress to and from the Premises.    Such demolition, rebuilding, alteration and/or reconfiguration shall be at Lessor's expense.   Lessee acknowledges and understands that any demolition, rebuilding, alteration, modernization, or reconfiguration of the existing improvements and/or land and other facilities at the Premises (hereinafter the "Work") for the aforesaid purposes may require a temporary closure of the gasoline dispensing facility, convenience store and other facilities at the Premises and/or a temporary closure and/or curtailment or adjustment of Lessee's operations thereon and that such temporary closure and/or curtailment or adjustment of Lessee's operations may result in a loss of business income and business opportunities for Lessee that will not be reimbursed by Lessor.  Lessor shall not be liable for any loss to Lessee arising out of or in connection with any Work.  Lessee shall fully cooperate with Lessor in any Alterations or Work.  Lessor may reduce or suspend the rent payable during the period that the Work is being performed.  Upon completion of the Work, Lessee shall operate the gasoline dispensing facility, convenience store and other facilities at the Premises in accordance with the terms and conditions of this Lease, the Contract of Sale, and Lessor's then existing standards and procedures for convenience store operations.
(ii)     In the event that Lessor decides to proceed with the Work as outlined above during the Term of this Lease, Lessor shall provide Lessee with six (6) months advance written notice outlining the Work to be performed at the Premises and Lessor's estimate of the date of completion thereof.  Lessor shall not commence the Work until the expiration of the six (6) month period.  Upon completion of the Work, Lessor shall provide Lessee with an itemization of all costs and expenses incurred by Lessor for the Work, including without limitation all associated legal and other fees and expenses, debt service, architectural designs and engineering work, site layout, and permits.  New monthly rentals shall be paid by Lessee to Lessor commencing on the date that the Premises reopens for business (hereinafter "New Rent").  The New Rent for the Premises shall be the sum of the following: (A) the rental amount as provided in paragraph 3(a) of this Lease, plus (B) an amount equal to an appropriate return as determined by Lessor in good faith, at Lessor's option, on either (1) Lessor's investment in the reconfigured Premises or the (2) the enhanced value thereof, such return prorated over the remaining Term of the Lease.  If Lessee is not satisfied with the New Rent, Lessee may terminate the Lease.

(b)     Lessee's Alterations.
(i)     Lessee may not make any alteration or modification to the Premises without Lessor's prior written consent, which consent may be withheld in Lessor's sole discretion.  Any alteration or modification authorized by Lessor will be at Lessee's own expense, must be made in accordance with

**STATION LEASE (LESSEE BRANDED)**     11
**(Rev. 02/2015)**

plans and specifications approved by Lessor and any agreement between the parties, must be made in compliance with all applicable laws, including building codes, permit requirements and zoning, and must be performed by a contractor approved by Lessor. Lessee shall, at Lessee's expense, maintain the alteration or modification in a good and safe condition. If Lessee fails to maintain the alteration or modification, Lessor may do so and charge Lessee its reasonable expenses.

(ii)  At Lessor's election, upon termination or nonrenewal of the franchise relationship, assignment of the Lease, or as otherwise agreed to by all parties, any alteration or modification made by Lessee will become a part of the Premises and the property of Lessor, without any cost to Lessor. In the alternative, upon written notice to Lessee, Lessor may require that Lessee, at Lessee's own expense within 30 days after termination or nonrenewal of the franchise relationship, remove any alteration or modification made by Lessee and restore the Premises to the condition prior to making said alteration or modification.

24.  Waiver. The failure of Lessor to insist upon Lessee's performance of any of the terms or conditions of this Lease, or to exercise any right or privilege herein conferred, shall not be construed as then or thereafter waiving any such terms, conditions, rights or privileges, etc., but the same shall continue and remain in full force and effect. Lessor's subsequent acceptance of rent hereunder shall not be deemed to be a waiver of any breach preceding the time of acceptance of such payment.

25.  Landlord's Lien; Mechanics' Lien. (a) Lessor shall have a landlord's lien upon all fixtures, equipment and movables of Lessee upon the Premises for any sums due hereunder. To the extent permissible by law, Lessor may distrain Lessee's property for any sums due hereunder.

(b)  Lessee shall have no authority to permit or create a lien against Lessor's interest in the Premises, and Lessee shall post notices or file such documents as may be required to protect Lessor's interest in the Premises against liens. Lessee shall defend, indemnify, and hold Lessor harmless from and against any mechanics' liens against the Premises by reason of work, labor services, or materials supplied or claimed to have been supplied on or to the Premises. Lessee shall immediately remove, bond-off, or otherwise obtain the release of any mechanics' lien filed against the Premises. Lessee shall pay all expenses in connection therewith, including without limitation damages, interest, court costs, and attorneys' fees.

26.  Right of Entry. To the extent permissible by law, Lessor, its agents, and representatives may enter the Premises at all reasonable times to inspect the Premises, make Alterations (provided that the advance notice required by this Lease was duly given), and verify Lessee's compliance with this Lease.

27.  Limitation of Liability. (a) NO CLAIM SHALL BE MADE UNDER THIS LEASE FOR SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, EXCEPT AS EXPLICITLY PROVIDED IN THIS LEASE OR OTHERWISE PROVIDED BY LAW.

(b)  Lessee acknowledges and agrees that the liability of Lessor (which for purposes of this paragraph shall include all partners, both general and limited, of any partnership, all members and managers of any limited liability company and the officers, directors and shareholders of any corporation or limited liability company, and all employees, successors and assigns of each type of entity constituting Lessor) under this Lease shall be limited to its interest in the Premises, and any judgments rendered against Lessor shall be satisfied solely out of the proceeds of sale of its interest in the Premises. No member, manager, officer, director, shareholder, partner or employee of Lessor shall be named as a party in any suit or action (except as may be necessary to secure jurisdiction over Lessor) and no personal judgment shall lie against Lessor or any of its members, managers, officers, directors, shareholders, partners or employees. Lessee agrees that the foregoing covenants and limitations shall be applicable to any obligation or liability of Lessor, whether expressly contained in this Lease or imposed by statute or at common law. The foregoing provisions are not intended to relieve Lessor from the performance of any of Lessor obligations under this Lease, but only to

STATION LEASE (LESSEE BRANDED)          12
(Rev. 02/2015)

limit the personal liability of Lessor in case of recovery of a judgment against Lessor.

28. Entire Agreement. This Lease, including any Attachments (defined below) cancels and supersedes all prior written and unwritten agreements, attachments, schedules, appendices, amendments, promises, and understandings between the parties pertaining to the matters covered under this Lease, except any indebtedness owed to Lessor by Lessee, and is a final, complete and exclusive statement of the agreement between Lessor and Lessee. THERE ARE NO ORAL UNDERSTANDINGS, REPRESENTATIONS OR WARRANTIES AFFECTING IT. Except as otherwise provided in this Lease, no amendment, deletion, modification, or alteration to this Lease shall have any effect unless and until made in writing and signed by an authorized representative of Lessor and by Lessee. EXECUTION OF THIS LEASE BY LESSEE IS AN ACKNOWLEDGEMENT THAT NO REPRESENTATIONS NOT SET FORTH IN WRITING HEREIN HAVE BEEN MADE OR RELIED UPON BY LESSEE.

29. Estoppel Certificate. Within ten (10) ten days of a request from the other party, Lessor or Lessee, as applicable, shall execute and deliver to the requesting party a written instrument (i) certifying that this Lease has not been modified and is in full force and effect, or if there has been a modification, that the Lease is in full force and effect as modified, stating the modification; (ii) certifying the dates to which rent and other sums due from Lessee under this Lease have been paid; (iii) stating whether, to the best knowledge of the nonrequesting party, the requesting party is in default or breach of this Lease and, if so, the grounds of such default or breach; and (iv) stating the commencement date of the Lease.

30. Lessor's Equipment. (a) Lessor owns all equipment on the Premises with the exception of items enumerated in Attachment "A", attached hereto and incorporated herein. It is expressly understood and agreed that title to all Lessor's equipment at the Premises shall at all times remain with Lessor. In no event shall such equipment be levied upon or sold as the property of Lessee. Should any such equipment be levied upon, Lessee shall immediately notify both the levying creditor, disclaiming ownership, and Lessor, in order that Lessor may protect its rights. Lessee shall not encumber or remove Lessor's equipment or do or cause to be done anything which results in Lessor's equipment or any part thereof being seized, taken in execution, attached, destroyed or damaged or otherwise disturbing or damaging Lessor's title to the equipment.

(b)    Lessee will be responsible for all equipment provided by Lessor and used by Lessee at the Premises, including without limitation imprinters and point of sale system equipment. In the event any such equipment is lost, stolen or damaged, Lessee will reimburse Lessor in full for the cost thereof.

31. Survivorship. To the extent, but only to the extent, that any provision of state law requires Seller to permit the succession of the rights and obligations hereunder to a designated family member of Purchaser upon Purchaser's death, such provision is incorporated herein by reference. In the absence of such provision, this Contract shall terminate upon the death of the Purchaser, if the Purchaser is a natural person, or upon the death of the person who is the sole owner of the Purchaser, if Purchaser is a business entity.

32. Lessor's Equitable Remedies/Attorneys' Fees. (a) Lessee agrees that money damages may not be a sufficient remedy for the breach of this Lease and that, therefore, in addition to all remedies available at law, Lessor shall be entitled to specific performance, injunctive relief, declaratory judgment and/or other equitable remedies, as appropriate. Lessee shall waive any requirement for the posting of bond in conjunction with Lessor's effort to seek equitable remedies.

(b)    To the fullest extent permitted by law, the prevailing party shall be entitled to all attorneys' fees, costs of suit and reasonable expenses incurred in order to secure, defend or protect the rights inuring to the prevailing party under this Lease, or to enforce the terms thereof, in addition to any other relief to which the prevailing party may be entitled.

**STATION LEASE (LESSEE BRANDED)**         13
**(Rev. 02/2015)**

(c)    Lessor's termination of this Lease shall not prejudice Lessor's right to seek monetary damages or equitable relief against Lessee. All powers and remedies available at law and in equity, including the right to terminate this Lease under the PMPA, shall be cumulative and not exclusive of any other powers and remedies available by virtue of this Lease, and no delay or omission of Lessor in exercising any right or power accruing upon any breach of, or default under any provision of this Lease shall impair any other or subsequent breach or impair any rights or remedies consequent thereto.

33. Destruction of Premises. If at any time during the Term of this Lease, the Premises is materially destroyed or materially damaged by any cause, Lessor may, at its option, cancel and terminate this Lease as of the date of the occurrence of such damage. For purposes of the foregoing, a damage or destruction shall be deemed "material" if it cannot reasonably be repaired within six (6) months after the date of occurrence or if more than twenty-five percent (25%) of the Premises is damaged or destroyed. If Lessor does not elect to so terminate this Lease, Lessor shall promptly, following the date of such damage or destruction, commence the process of obtaining necessary permits and approvals, and shall commence repair of the Premises as soon as practicable and thereafter prosecute the same diligently to completion, in which event this Lease shall not be extended but will continue in full force and effect. All insurance proceeds payable from insurance supplied pursuant paragraph 18 shall be disbursed and paid to Lessor. Lessee shall be required to pay to Lessor the amount of any deductibles payable in connection with any insured casualties.

34. Condemnation. If title to all of the Premises or so much thereof is taken or appropriated for any public or quasi-public use under any statute or by right of eminent domain so that reconstruction of the Premises will not, in Lessor's reasonable judgment, result in the Premises being suitable for Lessee's continued occupancy for the uses and purposes permitted by this Lease, this Lease shall terminate as of the date that possession of the Premises or part thereof be taken. If any part of the Premises is taken and the remaining part is reasonably suitable for Lessee's continued occupancy for the purposes and uses permitted by this Lease, this Lease shall, as to the part so taken, terminate as of the date that possession of such part of the Premises is taken. If the Premises is so partially taken the rent and other sums payable hereunder shall be reduced in the same proportion that Lessee's use and occupancy of the Premises is reduced. No award for any partial or entire taking shall be apportioned. Lessee assigns to Lessor its interest in any award which may be made in such taking or condemnation, together with any and all rights of Lessee arising in or to the same or any part thereof. Notwithstanding the generality of the foregoing, Lessee shall not have the right to any bonus value of Lessee's leasehold interest in the Premises. Nothing contained herein shall be deemed to give Lessor any interest in or require Lessee to assign to Lessor any separate award made to Lessee for the taking of Lessee's property, for the interruption of Lessee's business, or its moving costs. Each party agrees to execute and deliver to the other all instruments that may be required to effectuate the provisions of this paragraph 34.

35. Force Majeure--Unavoidable Delays. If the performance of any act required by this Lease to be performed by either Lessor or Lessee is prevented or delayed by reason of an act of God, strike, lockout, labor troubles, inability to secure materials, restrictive governmental laws or regulations, or any other cause except financial inability, that is not the fault of the party required to perform the act, the time for performance of the act will be extended for a period equivalent to the period of delay, and performance of the act during the period of delay will be excused. However, nothing contained in this paragraph shall excuse the prompt payment of rent by Lessee as required by this Lease or the performance of any act rendered difficult solely because of the financial condition of the party required to perform the act.

36. Joint and Several Obligations. All acknowledgments, representations, warranties, debts, and obligations of performance of Lessee under this Lease are made, and binding on, all those signing this Lease jointly and severally as the Lessee. Notwithstanding the foregoing, if Lessee is an entity, each Owner (as defined in the Key Person Rider attached to the accompanying Contract of Sale) and Key Person's liability under this Lease shall be joint and several.

**STATION LEASE (LESSEE BRANDED)**          14
**(Rev. 02/2015)**

37. Further Assurances.  Lessee shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of its obligations hereunder and to carry out the intent of this Lease.

38. Governing Law.  This Lease shall be governed by and construed in accordance with the laws of the State of Florida and controlling U.S. federal law, except for any rule of court or law of said state which would make the law of any other jurisdiction applicable.

39. Miscellaneous.  By their signatures below, each of the following represent that they have authority to execute this Lease and to bind the party on whose behalf their execution is made.

40.  Attachments.  All exhibits, schedules, attachments, and documents attached hereto (collectively, "Attachments"), are hereby incorporated herein and made a part of this Lease.

Executed this __2__ day of ___March___, 20 __16__.

**LESSOR:**

Circle K Stores Inc.

By: _M. McL_
     Matt McClure

Title: Vice President

Witness: _____

**LESSEE:**

Petro Gate, Inc.

By: _____
     Benham Bagheri

Title: President

Witness: _____

Facility #: 2211031

STATION LEASE (LESSEE BRANDED)          15
(Rev. 02/2015)

**Facility # 2211031**

## ATTACHMENT "B"
## TO STATION LEASE
## SCHEDULE OF MAINTENANCE OBLIGATIONS (SHARED)

DEFINITIONS:

*Clean:* To rid of dirt, impurities, grease, markings, or other extraneous matter from the surface by ordinary and routine cleaning, washing, wiping, or sweeping.

*Repair & Maintain:* To keep in a properly functioning and operating state to extend the useful life of the facility or equipment by performing needed services as determined by inspection of wear and tear.

*Replace:* To install something new in place of the worn or deteriorated item which has been identified as having no foreseeable useful life or prospect for economical repair.

The following indicates which party (Lessee or Lessor) is responsible under the applicable task column ("Clean," "Repair & Maintain," or "Replace" for each item below). Where Lessee is responsible for the maintenance of equipment or facility (or any part of the Premises), Lessee will also be liable for any associated fines or penalties if the equipment or facility is found to be in regulatory violation.

| Area of Responsibility | Clean | Repair & Maintain | Replace |
|---|---|---|---|
| **SITE IMPROVEMENTS** | | | |
| RAMPS AND APPROACHES – including all ramps, curbs, culverts, headwalls, parking or safety curbs, sidewalks, highway beam areas or parkways. | LESSEE | LESSEE | LESSOR |
| **I. PRODUCT DISPENSING SYSTEM (Tanks, lines, dispensers, leak detection systems)** | | | |
| **1. Underground and above ground tanks; underground lines (fuel and waste oil)** | | | |
| A. Concrete Pad.  Lessee shall remove snow by plowing or melting product that is not harmful to concrete.  Salt may not be used to remove snow. | LESSEE | LESSEE | LESSOR |
| B. Product I.D. Tags | LESSEE | LESSEE | LESSOR |
| C. Vents, Vent Pipes, P/V Valves | LESSEE | LESSOR | LESSOR |
| D. Padlocks for Fill Caps | LESSEE | LESSEE | LESSOR |
| E. Underground Product Tanks and Piping | LESSOR | LESSOR | LESSOR |
| F. Submerged Turbine & Leak Detector/Monitoring System. (Maintenance must be accomplished by Seller/Authorized designee). | LESSOR | LESSOR | LESSOR |
| 1. Repair & replacement due to normal use. | LESSOR | LESSOR | LESSOR |
| 2. Failure of turbine due to history of product run out | LESSEE | LESSEE | LESSEE |
| 3. Repairs due to tampering/deactivation of leak-detector/monitoring system, including costs of any associated fines | LESSEE | LESSEE | LESSEE |
| 4. Mandated periodic regulatory-required monitoring system calibration | LESSOR | LESSOR | LESSOR |
| G. Vacuum or Vapor Recovery Equipment (excluding hoses and Nozzles) | LESSOR | LESSOR | LESSOR |
| H. Fill lids and fill caps | LESSEE | LESSEE | LESSEE |
| I. Fill cap gaskets, including associated fines for regulatory violations | LESSEE | LESSEE | LESSOR |
| J. Water pump out from tanks (except when due to failure of gasket) | LESSOR | LESSOR | LESSOR |

| | | | |
|---|---|---|---|
| **K. Waste Oil Tank** | | | |
| 1. Pump Out as Required, including oil in sump area | LESSOR | LESSOR | LESSOR |
| 2. Waste Oil Spill Containment Box | LESSOR | LESSOR | LESSOR |
| 3. Above ground waste oil tank, pump and lines | LESSOR | LESSOR | LESSOR |
| L. Mandated periodic vapor recovery source testing | LESSOR | LESSOR | LESSOR |
| **2. Dispensers** | | | |
| A. Damage to dispensers due to drive-offs, vandalism, Lessee neglect, Improper Lessee Maintenance | LESSEE | LESSEE | LESSEE |
| B. Hoses, swivels, breakaways, nozzles, filters, and vapor valves | LESSEE | LESSEE | LESSEE |
| C. Calibrate Pumps as Required by governmental authority | LESSOR | LESSOR | LESSOR |
| D. Glass, including plexiglass or plastic dial face panels | LESSEE | LESSEE | LESSOR |
| E. Hose retractor, spring, pulley, retractor cable, and hose clamp, whip hoses, panel skirt key and locks | LESSEE | LESSEE | LESSEE |
| F. Internal mechanical and electrical failures | LESSOR | LESSOR | LESSOR |
| **3. Consoles, terminals, and VSATs** | | | |
| A. Dispenser consoles (except where misuse occurs) | LESSOR | LESSOR | LESSOR |
| B. Printers (Non-POS: both external and console with built-in printer) | LESSEE | LESSEE | LESSOR |
| B. POS Terminals and POS ECR – Electronic Cash Register (subject to maintenance agreements) | | | |
| 1. POS Terminal and POS ECR | LESSEE | LESSOR | LESSOR |
| 2. Cash Drawer, including locks and keys | LESSEE | LESSEE | LESSOR |
| 3. VSAT (Very Small Aperture Terminals) | LESSOR | LESSOR | LESSOR |
| D. Cashier Counters(unless originally installed by lessee) | LESSEE | LESSEE | LESSOR |
| **4. Intercom systems** Initial installations, all types by Lessor) | LESSEE | LESSEE | LESSOR |
| **II. ELECTRICAL, LIGHTING, AND SIGNAGE** | | | |
| **1. Electrical and Lighting** | | | |
| A. Bulbs, tubes & starters, sockets, tips, ends, & metal halides per Lessor standard | LESSEE | LESSEE | LESSEE |
| B. Electrical/light fixtures, ballast, lens covers (Note: ballast failure due to Lessee's tube/bulb misapplication will be charged to Lessee) | LESSEE | LESSEE | LESSEE |
| C. Electrical wiring/conduits requiring excavation | LESSOR | LESSOR | LESSOR |
| D. Other above ground electrical repairs/upgrades to power box panel (fuses, circuit breakers, etc.) | LESSEE | LESSEE | LESSEE |
| E. Convenience outlets - new additions/upgrades by Lessee (non Lessor Capital project-related) | LESSEE | LESSEE | LESSEE |
| F. All electrical to Car Wash (Stub Only) Note: C/W equipment vendor installs c/w electrical wiring and related hookups) | LESSEE | LESSEE | LESSEE |
| G. Interior Car Wash Lighting | LESSEE | LESSEE | LESSEE |
| H. Illuminated Car Wash Signage with 12" Tube | LESSEE | LESSEE | LESSEE |
| I. Exterior Car Wash Lighting | LESSEE | LESSEE | LESSEE |
| J. Interior Outlet at Paypoint/Kiosk | LESSEE | LESSEE | LESSOR |
| K. Paypoint Equipment, including console and equipment | LESSEE | LESSOR | LESSOR |

| | | | |
|---|---|---|---|
| • L. C-Store/CARWASH Light Tube | LESSEE | LESSEE | LESSEE |
| M. Canopy Lighting | LESSOR | LESSOR | LESSOR |
| **2. Signage** | | | |
| A. Internally illuminated signs (higher than twelve feet) | | | |
| 1. Sign & Pole | LESSOR | LESSOR | LESSOR |
| 2. Relamping | LESSOR | LESSOR | LESSOR |
| B. Internally illuminated signs (twelve feet or lower) | | | |
| 1. Sign & Pole (Brand Image MID) | LESSOR | LESSOR | LESSOR |
| 2. Relamping (MID) | LESSOR | LESSOR | LESSOR |
| C. Miscellaneous Ground Mount Signs (MID) | LESSEE | LESSEE | LESSOR |
| 1. Directional Signs | LESSEE | LESSEE | LESSEE |
| 2. Signage (Interior & Exterior Signs and Decals) | LESSEE | LESSEE | LESSEE |
| D. Price sign numerals (Lessee responsible for lost/stolen numerals.) | LESSEE | LESSOR | LESSOR |
| E. Pump Toppers | LESSEE | LESSOR | LESSOR |
| F. Operating Hours | LESSEE | LESSEE | LESSEE |
| G. Non-illuminated service, product, or menu sign, ground, window, or wall mounted | LESSEE | LESSEE | LESSEE |
| H. Canopy Clearance Signs | LESSEE | LESSOR | LESSOR |
| I. Lessee Name Signs | LESSEE | LESSEE | LESSEE |
| J. Interior Graphics Package – oil brand image related | LESSOR | LESSOR | LESSOR |
| K. Non-regulatory agency required decals (except Lessee merchandising/promotions) | LESSEE | LESSEE | LESSEE |
| **III. FACILITY STRUCTURES AND CANOPIES** | | | |
| **1. Plumbing, sewer and water systems** | | | |
| A. Municipal supply system to building | | | |
| 1. Initial tap fee and underground inbound water lines to building excluding fees, such as tap-ins, related to Lessee elected site development (e.g. car wash, convenience store development) | LESSOR | LESSOR | LESSOR |
| 2. Backflow device repair & inspection requirements | LESSEE | LESSEE | LESSOR |
| 3. Backflow device replacement | LESSOR | LESSOR | LESSOR |
| B. Water System from Local Wells | | | |
| 1. Operating Costs and All materials | LESSOR | LESSOR | LESSOR |
| 2. Lubrication of Motors, Controls, etc. | LESSEE | LESSEE | LESSOR |
| C. Rodding of toilet and sump drain lines to main sewer line (waste outbound) | LESSEE | LESSEE | LESSOR |
| D. Floor Drain, Clarifier and Sumps (including yard sumps and clarifiers) | LESSEE | LESSEE | LESSEE |
| E. Sump Pump & Pit (including lawful disposal) | LESSEE | LESSEE | LESSOR |
| F. Lab-testing on sump drainage | LESSOR | LESSOR | LESSOR |
| G. Hard pipe supply Line to overhead air and water lines | LESSOR | LESSOR | LESSOR |
| H. Convenience store(s) floor drains, clean-outs, vent pipes, sinks and dual compartment, janitor sink (mop sink) | LESSEE | LESSEE | LESSEE |



| | | | |
|---|---|---|---|
| NOTE: Lessee agrees to be responsible for maintenance and repair of all CONVENIENCE STORE Fixtures and equipment either owned by Lessor or by the Lessee, and further agrees to maintain in operable condition any leased equipment used in the operation of the CONVENIENCE STORE. | | | |
| I. Car Wash. Refer to Carwash Lease Addendum for complete details. Lessee agrees to be responsible for maintenance and repair of all Carwash equipment either owned by Lessor or by the Lessee. Lessee Further agrees to maintain in operable condition any leased equipment used in the operation of the Carwash. | | | |
| 1. Car wash drainage (4" PVC), includes R/R's | LESSEE | LESSEE | LESSEE |
| 2. Sink with hardware | LESSEE | LESSEE | LESSEE |
| 3. Exhaust fan for equipment room (CARWASH) | LESSEE | LESSEE | LESSEE |
| 4. Window sprinkler lines and heads | LESSEE | LESSEE | LESSEE |
| 5. Reclaim tanks | LESSEE | LESSEE | LESSEE |
| NOTE: (Lessor is responsible for bringing in water and electrical to restroom. Lessee responsible for all items above unless as specified elsewhere.) | | | |
| J. Repairs/maintenance to piping requiring excavation | LESSEE | LESSEE | LESSOR |
| K. Yard drain, manholes, drainage, ditches or canals | LESSEE | LESSEE | LESSOR |
| L. Water heaters | LESSEE | LESSEE | LESSOR |
| M. Refrigeration | | | |
| 1. Chest Freezer, Reach-in-Cooler | LESSEE | LESSEE | LESSOR |
| 2. Ice Maker/Ice Dispenser | LESSEE | LESSEE | LESSOR |
| 3. Walk - in cooler/condenser | LESSEE | LESSEE | LESSOR |
| N. Store Equipment (C-Store/ Snack) | | | |
| 1. All interior equipment (except Lessor G-Site equipment) | LESSEE | LESSEE | LESSEE |
| O. Store Accessories - Coffee maker, juice/soda dispensers, ovens, hoods, ansul systems, grease interceptors, counters, shelves, etc. if owned by Lessor. | LESSEE | LESSEE | LESSOR |
| 2. Ceilings, walls, and columns | | | |
| A. Structural repairs to load bearing walls & columns due to settlement or corrosion | LESSOR | LESSOR | LESSOR |
| B. All wall and partition surfaces and non-structural repairs, including 5/8" gypsum board and vinyl base | LESSOR | LESSOR | LESSOR |
| C. Routine cleaning of surfaces | LESSEE | LESSEE | LESSEE |
| D. Drywall, metal suspended lay-in ceilings, including tile | LESSOR | LESSOR | LESSOR |
| E. Wall insulation | LESSOR | LESSOR | LESSOR |
| 3. Doors, windows, and glass | | | |
| A. Walk through doors and related hardware (knobs, pushbars, closures, kick plates) | LESSEE | LESSEE | LESSOR |
| B. Lock cores and keys (initial and replacement) | LESSEE | LESSEE | LESSEE |
| C. Overhead doors (including roll-up door 12' x 14'; CARWASH, including locks) | | | |
| 1. Complete replacement door and related hardware | LESSEE | LESSEE | LESSOR |
| 2. All other repairs to door and related hardware including glass, rollers, hardware, etc. | LESSEE | LESSEE | LESSOR |
| 3. CARWASH Interior Doors w/hardware | LESSEE | LESSEE | LESSEE |

| | | | |
|---|---|---|---|
| D. All windows and glass, including C-Store front glass and tower and clerestory glass (where applicable) | LESSEE | LESSEE | LESSEE |
| E. Bullet resistant glass at cashier.  Replacement by Lessee if originally installed by Lessee. | LESSEE | LESSEE | LESSOR |
| **4. Flooring** | | | |
| A. Flooring required to replace load bearing beams, columns, and walls due to settlement or corrosion | LESSOR | LESSOR | LESSOR |
| B. All other maintenance and repair of floors (incl. Asphalt and vinyl tile and ceramic or porcelain tile) | LESSEE | LESSEE | LESSEE |
| **5. Pump islands, canopies, island kiosks** | | | |
| A. Structural repairs to canopy due to settlement or corrosion | LESSOR | LESSOR | LESSOR |
| B. Islands | | | |
| 1. Pump island forms - curbs must be painted twice yearly except stainless;  Lessee responsible for repair/replacement of curbs damaged by salt, neglect, or vehicle. | LESSEE | LESSEE | LESSOR |
| 2. Island Merchandiser, oil display racks, canopy pole sign | LESSEE | LESSEE | LESSEE |
| C.   Structural repairs to island kiosks | LESSEE | LESSEE | LESSOR |
| **6. Painting & washing** | | | |
| A. Touch ups – Interior | LESSEE | LESSEE | LESSEE |
| B. Touch ups – Exterior (island curb painting and bumper poles done in the Fall and in the Spring; traffic lines and parking stall striping done annually | LESSEE | LESSEE | LESSEE |
| C. Paint Product Fill Areas | LESSEE | LESSEE | LESSEE |
| D. Graffiti removal | LESSEE | LESSEE | LESSEE |
| E. Routine cleaning and washing of all premises equipment and surfaces, including vinyl fabric fascias for buildings, canopies and awning systems, e.g. | LESSEE | LESSEE | LESSEE |
| **7. Sales room, security booth, office interiors** | | | |
| A. Shelving | LESSEE | LESSEE | LESSEE |
| B. Counters, including with Formica | LESSEE | LESSEE | LESSEE |
| C. Desks | LESSEE | LESSEE | LESSEE |
| D. Chairs, settees, food service tables | LESSEE | LESSEE | LESSEE |
| E. Safe (floor safe, original construction) | | | |
| 1. Lock cores and keys | LESSEE | LESSEE | LESSEE |
| 2. Original construction floor safe (including safe lids) | LESSEE | LESSEE | LESSOR |
| 3. Alterations to original safe installations | LESSEE | LESSEE | LESSOR |
| 4. Electronic safes | LESSEE | LESSEE | LESSOR |
| **8. Public or employee restrooms** | | | |
| A. Sinks, toilet fixtures, urinals | LESSEE | LESSEE | LESSEE |
| B. Faucets, flush valves, toilet seats, plumbing from walls | LESSEE | LESSEE | LESSEE |
| C. Routine Washing of Surfaces | LESSEE | LESSEE | LESSEE |
| D. Mirrors, soap, and paper product dispensers, coat hooks, grab bars, waste receptacles | LESSEE | LESSEE | LESSEE |
| E. Exhaust fans (including 110 c.f.m.) | LESSEE | LESSEE | LESSEE |
| F. Partitions | LESSEE | LESSEE | LESSEE |
| G. Handicap restroom accessories (including grab bars, mirrors, coat hooks, product dispensers, waste receptacles, toilets) | LESSEE | LESSEE | LESSEE |

| | | | |
|---|---|---|---|
| **9. Yard Paving, concrete, ramps and approaches** | | | |
| A. Asphalt seal coating | LESSEE | LESSEE | LESSOR |
| B. Asphalt – potholes (temporary patching of unsafe conditions is the Lessee's responsibility) | LESSEE | LESSEE | LESSOR |
| C. Asphalt - repaving/Skincoat | LESSEE | LESSEE | LESSOR |
| D. Concrete – Patching | LESSEE | LESSEE | LESSOR |
| E. Concrete – Replacement | LESSEE | LESSEE | LESSOR |
| F. Building Curb (CARWASH) (curb painted twice yearly, except stainless; LESSEE responsible for curb damage from salt, Lessee   neglect and vehicles) | LESSEE | LESSEE | LESSEE |
| G. Interior Building Slab (CARWASH) | LESSEE | LESSEE | LESSEE |
| H. Concrete Slabs @ entrance & exit (CARWASH) | LESSEE | LESSEE | LESSEE |
| I. Parking stall striping replacements (Lessor provides striping on complete paving jobs only) | LESSEE | LESSEE | LESSOR |
| J. Fencing (unless originally installed by Lessee) | LESSEE | LESSEE | LESSOR |
| K. Retaining Walls | LESSEE | LESSEE | LESSOR |
| L. Ramps, culverts, headwalls, sidewalks, highway beam areas | LESSEE | LESSEE | LESSOR |
| M. Drive sweepers or snow plowing equipment | LESSEE | LESSEE | LESSEE |
| N. Yard drains, drainage ditches and canals | LESSEE | LESSEE | LESSOR |
| O. Parking bumpers (Lessor provides initial install only) | LESSEE | LESSEE | LESSOR |
| **10. Gutters & Downspouts** | | | |
| A. Cleaning of waste and accumulations, including pigeon waste | LESSEE | LESSEE | LESSEE |
| B. Repair of gutters/downspouts | LESSEE | LESSOR | LESSOR |
| C. CARWASH roof, canopy, and kiosk gutters and downspouts | LESSEE | LESSEE | LESSOR |
| D. Anti-bird protection devices (e.g. netting, bird wire) | LESSEE | LESSEE | LESSEE |
| **11. Roofing - All Types** | | | |
| A. Complete roof replacement | LESSEE | LESSOR | LESSOR |
| B. Leak problems and roof sections | LESSOR | LESSOR | LESSOR |
| **12. Grass area & landscaping** | | | |
| A. Maintenance, repair, replacement of planters, shrubbery, plants and irrigation systems (including control valves, sprinkler heads & equipment) | LESSEE | LESSEE | LESSEE |
| B. Common Area Maintenance (governed by site specific agreements) | LESSEE | LESSEE | LESSEE |
| **13. Service Bays** | | | |
| A. Shelving, tire racks, work benches, cabinets | LESSEE | LESSEE | LESSEE |
| **14. Refuse - trash, garbage** | | | |
| A. Disposal of waste | LESSEE | LESSEE | LESSEE |
| B. Enclosure maintenance, including trash enclosure hinges and Closures | LESSEE | LESSEE | LESSEE |
| C. Complete replacement of enclosure | LESSEE | LESSEE | LESSEE |
| **15. Tire merchandiser and storage** | LESSEE | LESSEE | LESSEE |

| | | | |
|---|---|---|---|
| **16. Tire racks, portable** | LESSEE | LESSEE | LESSEE |
| **17. Optional Lessee revenue** (Note: Prior Lessor written approval and specific insurance coverage indemnification required) | | | |
| A. Equipment (vending machines, pay phones, ice machine, propane, etc.) | LESSEE | LESSEE | LESSEE |
| B. Any Premises alterations to accommodate optional Lessee revenue sources (e.g. bumper poles, slabs, electrical upgrades, etc.) | LESSEE | LESSEE | LESSEE |
| **IV. STATION EQUIPMENT** | | | |
| **1. Heating, air conditioning (HVAC)** | | | |
| Lessor is responsible for complete unit replacement only. Lessee is responsible for all component parts and service.  New installations, maintenance/repair, replacement of "Swamp Coolers or Heat Pumps are not covered by Lessor. | | | |
| A. Filters - Air & Oil | LESSEE | LESSEE | LESSEE |
| B. Ducts . | LESSEE | LESSEE | LESSEE |
| C. Registers & Grills | LESSEE | LESSEE | LESSEE |
| D. Heating Oil Tanks | LESSEE | LESSEE | LESSEE |
| E. Exhaust Fans, Heat Exchanger | LESSEE | LESSEE | LESSEE |
| F. Oil Burner Nozzles | LESSEE | LESSEE | LESSEE |
| G. Motors | | | |
| 1. Motor and attached components | LESSEE | LESSEE | LESSEE |
| 2. Pulleys and Belts | LESSEE | LESSEE | LESSEE |
| H. Compressors and Condensers | LESSEE | LESSEE | LESSOR |
| I. Cost of Annual Maintenance | LESSEE | LESSEE | LESSEE |
| J. Air-Conditioners | LESSEE | LESSEE | LESSOR |
| K. Swamp Coolers | LESSEE | LESSEE | LESSOR |
| L. Heat Pump and Pad | LESSEE | LESSEE | LESSEE |
| M. Balancing Heat Pump | LESSEE | LESSEE | LESSEE |
| N. Balancing Diffusers | LESSEE | LESSEE | LESSEE |
| O. Furnaces/Heater (non-HVAC System-related) | LESSEE | LESSEE | LESSEE |
| **2. Fire Extinguishers** | | | |
| A.   Recharging Fire Extinguishers | LESSEE | LESSEE | LESSEE |
| B.   Fire extinguishers | LESSEE | LESSEE | LESSEE |
| **3. Air Compressor** | | | |
| A. Maintenance, draining, oil change, belt adjustment and replacement & cost of annual maintenance (Lessor furnishes belt guards on new installations only) | LESSEE | LESSEE | LESSEE |
| B. Compressor belts, pulleys, gauges, valves, and motor | LESSEE | LESSEE | LESSEE |
| C. Complete Replacement of Compressor | LESSEE | LESSEE | LESSOR |
| **4. Hoist/Lifts** | | | |
| A. Control valves | LESSEE | LESSEE | LESSOR |
| B. Seal replacement, and other non-excavation repairs | LESSEE | LESSEE | LESSOR |
| C. Adding and complete replacement of oil as required | LESSEE | LESSEE | LESSEE |

 

| | | | |
|---|---|---|---|
| D. Repairs requiring excavation | LESSEE | LESSEE | LESSOR |
| E. Complete replacement of hoist/lift (Note: Lessor reserves right to replace with above ground hoist) | LESSEE | LESSEE | LESSOR |
| **5. Overhead Air, Water, and Lube equipment** | | | |
| A. Connecting Lines and Reels (including hose replacement and head) | LESSEE | LESSEE | LESSEE |
| B. Overhead Chassis Lube Pump | LESSEE | LESSEE | LESSEE |
| C. Hoses, gauges, nozzles (including ball chucks, springs) | LESSEE | LESSEE | LESSEE |
| **6. Remote or Underground Water & Air equipment** (all types, including, above ground above ground/ coin operated & below ground/ island mounted) | } | | |
| A. Air & water hoses, including connecting supply hose and nozzles, bibs, chucks, reels, pigtails, and spring equipment provider | LESSEE | LESSEE | LESSEE |
| **7. Drive Alarm & Hose** | LESSEE | LESSEE | LESSEE |
| **8. Security Systems** | | | |
| A. Alarms | LESSEE | LESSEE | LESSEE |
| B. Cameras | LESSEE | LESSEE | LESSEE |
| C. Safe | LESSEE | LESSEE | LESSEE |
| **9. Telephones and Lines** | LESSEE | LESSEE | LESSEE |
| **10. ATM's** | LESSEE | LESSEE | LESSEE |
| **11. Vacuum Towers** | | | |
| A. Coin operated | LESSEE | LESSEE | LESSEE |
| B. Manifold system (no tokens or coins) | LESSEE | LESSEE | LESSEE |
| **12. Lessee automated business system** (information system for business management) | LESSEE | LESSEE | LESSEE |
| **V. EXPENDABLE ITEMS** | | | |
| A. Computer, printer, and related hardware, except when superseded by separate maintenance contract | LESSEE | LESSEE | LESSEE |
| B. Software | | | |
| 1. Restroom operating supplies (paper, soap, cleaning materials) | LESSEE | LESSEE | LESSEE |
| 2. Replacement of paper, ribbons, forms and other use items for printers, POS, DABS, card reader dispensers and leak monitoring systems | LESSEE | LESSEE | LESSEE |
| 3. Buckets, wiper display cabinets, etc. | LESSEE | LESSEE | LESSEE |
| **VI. Repairs and replacement caused by accidental damage** | LESSEE | LESSEE | LESSEE |
| **VII. Other additional items, if applicable:** | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Schedule of Maintenance Obligations (Shared) CK Rev June 2013

Site# 2211031

# PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (the "Guaranty") from Benham Bagheri, an individual (hereinafter "Guarantor"), in favor of Circle K Stores Inc. a Texas corporation (hereinafter "Seller"), is made on the following terms and conditions:

## WITNESSETH:

1. The Guaranty.

(a) As an inducement for Seller to enter into the Contract (defined below) and Lease (defined below) with Petro Gate, Inc. (hereinafter "Purchaser"), and in consideration of the financial accommodations to be given, made or afforded by Seller to Purchaser therein, Guarantor hereby fully, unconditionally and irrevocably guarantees the full and prompt payment when due of the following ("Liabilities"):

   (i)  The payments to be made and other duties to be performed by Purchaser under the terms of a certain Contract of Sale dated April 1, 2016 between Seller and Purchaser (the "Contract"), the terms of which provide that Seller agrees to deliver and sell to Purchaser, and Purchaser agrees to receive, accept and pay for branded motor fuel products, pursuant to the terms and conditions of said Contract;

   (ii)  The payments to be made and other duties to be performed by Purchaser under the terms of a certain Station Lease dated April 1, 2016 between Seller and Purchaser (the "Lease"), the terms of which provide that Seller agrees to lease to Purchaser, and Purchaser agrees to lease from Seller certain premises for the sale of branded motor fuel products, pursuant to the terms and conditions of said Lease;

   (iii)  Any and all of the obligations of Purchaser owed to Seller, including but not limited to, all obligations, responsibilities, financial requirements, indebtedness, liabilities, debit balances, letter of credit or purchase guaranty reimbursement obligations, covenants, duties and all other obligations of whatever kind or nature at any time or from time to time owing by Purchaser to Seller, or to any of Seller's affiliates, whether fixed or contingent, known or unknown, liquidated or unliquidated, present or future, no matter how or when arising under the Contract, Lease, or any other present or future related agreement, and including without limitation all obligations owed by Purchaser to third parties which are or may be assigned to Seller arising from the Contract.

(b) In the event that Purchaser fails at any time to make any part or all of its payments or perform its obligations under the Contract or Lease, whether by acceleration or otherwise, the Guarantor will pay or perform the Liabilities guaranteed, in the same manner as if they constituted the direct and primary obligation of the Guarantor.

(c) If Purchaser incorporates, reorganizes, reincorporates, liquidates, merges with another corporation, enters into a partnership or joint venture, sells or assigns the assets of its business, or otherwise effects a change in the legal entity conducting the business now conducted by Purchaser, the Liabilities of the successor to Purchaser are deemed to be Liabilities created by Purchaser and are included under this Guaranty.

(d) Guarantor shall indemnify, protect, defend, and save harmless Seller, and its respective officers, directors, employees, agents and representatives, from and against any and all losses, claims, liabilities, environmental cleanup costs, fines, penalties, suits and actions, judgments and costs, including attorneys' fees and the costs of litigation, which shall arise from or grow out of any action, nonperformance or breach by Purchaser of said Liabilities, the Contract, Lease, or any other present or future related agreement, or any breach of or failure to perform any representation, promise, agreement or warranty of Purchaser, or any wrongful acts, conduct, omission or fraud of Purchaser.

(e) There are no conditions precedent or other conditions of any kind to the effectiveness of this Guaranty, and this Guaranty is immediately effective.

**PERSONAL GUARANTY OF PERFORMANCE**  1
(Rev. Feb 2016)

Site# 2211031

    (f) This Guaranty is a continuing one and all Liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon.

    (g) This is a guaranty of payment, not collection, and shall not be subject to any offset, defense or counterclaim of Purchaser. No invalidity, irregularity or unenforceability of all or any part of the Liabilities hereby guaranteed or of any security therefor or of said Contract, Lease, or any amendment or supplement thereto or any other document existing between Seller and Purchaser shall affect, impair or be a defense to this Guaranty and its enforceability.

2.  Joint and Several Obligation.  The obligations of the Guarantor under this Guaranty and those of any other guarantor or guarantors who may now or hereafter guarantee any indebtedness or obligations of Purchaser will be joint and several, and Seller may release or settle with any one or more of such guarantors at any time without affecting the continuing liability of the Guarantors.

3.  Renewals, Extensions, and Substitutes.  The renewals, extensions and substitutions of and for indebtedness and Liabilities of Purchaser guaranteed hereunder may be made by Seller upon such terms and conditions and with such modifications and changes as Seller may see fit and made at any time and from time to time without further notice to or consent from Guarantor.

4.  Waivers of Guarantor.
    (a) Guarantor hereby waives each of the following:
        (i)    Notice of acceptance of this Guaranty of any extension of credit, advance, loan or similar accommodation by Seller to Purchaser, and of the amount of the Liabilities that may exist from time to time.
        (ii)    Presentment, diligence, demand, protest, or notice of protest, dishonor, nonpayment, or other default with respect to any of the Liabilities.
        (iii)    Any requirement that Seller marshal the security, or institute suit, or exercise or exhaust its rights or remedies against Purchaser or against any other person, guarantor, mortgage, or other securing all or any part of the Liabilities (the obligations of such mortgage or collateral being herein referred to as the "Collateral"), prior to enforcing any rights it has under this Guaranty, or otherwise against Guarantor.
        (iv)    Any and all suretyship defenses generally and including, but not limited to, the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.
        (v)    Any right of subrogation with respect to the Liabilities or the Collateral until Seller shall have received payment in full of the Liabilities.
        (vi)    Any defenses now or hereafter arising or asserted by reason of (A) the invalidity or disability, in whole or in part, at the time of its acceptance, or at any other time, of the Collateral, (B) the fact that any of the property, a part of the Collateral, may at any such time be in default or be incorrectly estimated, (C) the deterioration in market or other value, waste, loss by fire, theft, loss or substitution of any property a part of the Collateral, or (D) Seller's failure to give Guarantor notice of any sale or other disposition of any Collateral or any failure of Seller to comply with any provision of applicable law in enforcing any security interest in any Collateral, including without limitation any failure by Seller to dispose of any Collateral in a commercially reasonable manner.
    (b) Without limiting the generality of any of the foregoing or any other provision of this Guaranty, Guarantor expressly waives any and all defenses based upon any claim of laches or set-off or counterclaim of any nature or description, or any objection based on forum non conveniens or venue, and any claim for consequential, punitive or special damages.
    (c) Without limiting the generality of any of the foregoing or any other provision of this Guaranty, Guarantor expressly waives all rights and defenses that the Guarantor may have because the Liabilities or the guarantee of another guarantor are secured by real property. This means, among other things: (i) Seller may collect from Guarantor without first foreclosing on any real or personal property Collateral pledged by Purchaser or another guarantor, and (ii) If Seller forecloses on any real property

**PERSONAL GUARANTY OF PERFORMANCE**    2
(Rev. Feb 2016)

Site# 2211031

Collateral pledged by the Purchaser or another guarantor, (A) the amount of the Liabilities may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price and (B) Seller may collect from Guarantor even if Seller, by foreclosing on the real property Collateral, has destroyed any right Guarantor may have to collect from Purchaser or to obtain contribution from another guarantor.

(d) The existence of any conditions hereinabove waived shall in no way affect or release the obligations of Guarantor hereunder.

5. Rights of Seller.

(a) Seller shall have the right, without notice to Guarantor, to deal in any manner with the Liabilities and the Collateral, including, but not limited to, the following rights:

(i)    to modify or otherwise change the terms or alter any part of the Liabilities, including, but not limited to, changing the rate of interest thereon, or effecting any release, compromise or settlement with respect thereto;

(ii)    to extend or renew the Liabilities, and to forbear to take steps to enforce the payment of all or any part thereof against Purchaser;

(iii)    to forbear from calling for additional Collateral, to consent to the substitution or release of all or any part of the Collateral, whether or not of the same or different character or value than the Collateral surrendered by Seller;

(iv)    to release or to forbear to proceed against all or any part of the Collateral, or to substitute any new for any existing Collateral;

(v)    to apply any payment received by Seller from Purchaser, or from any other source other than Guarantor, to the Liabilities of Purchaser to Seller in whatever order Seller elects, and to apply any payment received from Guarantor to any obligations of Purchaser to Seller guaranteed hereunder in whatever order Seller elects; or

(vi)    to sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Liabilities hereby guaranteed or any other liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, or offset there against.

(b) The obligations of Guarantor hereunder shall not be released, discharged or affected in any way, nor shall they have any recourse against Seller by reason of any action that Seller may take or omit to take under these powers, or otherwise existing with respect to the Liabilities or the Collateral.

(c) Neither Guarantor's obligation to make payment or perform in accordance with the terms of this Guaranty nor any remedy for the enforcement of this Guaranty shall be impaired, modified, changed, released, discharged, avoided, or limited in any manner whatsoever by any impairment, modification, change, release, discharge, avoidance, or rejection of the Liabilities or Purchaser's estate in bankruptcy or of any remedy for the enforcement of Seller's rights hereunder resulting from the operation of any present or future provision of the federal Bankruptcy Code or from the decision of any court.

6. Revocation or Termination. This Guaranty shall continue until ninety (90) days after written notice of revocation signed by Guarantor has been actually received by Seller, notwithstanding a revocation by, or the death of, or complete or partial release for any cause, of any one or more of the remainder of the other guarantors or of Purchaser, or of anyone liable in any manner for the Liabilities hereby guaranteed, or for any other liabilities (including those herein) incurred directly or indirectly in respect thereof or hereof, and notwithstanding the dissolution, termination or increase, decrease or change in personnel of any one or more of the other guarantors, which may be partnerships or corporations. No revocation or termination hereof shall affect in any manner any of the rights arising under this Guaranty with respect to (i) Liabilities which shall have been created, contracted, assumed or incurred prior to or within ninety (90) days after actual receipt by Seller of written notice of such revocation or termination and all extensions, renewals and modifications of said Liabilities, or (ii) Liabilities which shall have been created, contracted, assumed or incurred more than ninety (90) days after receipt of such written notice pursuant to any

PERSONAL GUARANTY OF PERFORMANCE    3
(Rev. Feb 2016)

Site# 2211031

contract entered into by Seller prior to expiration of said ninety (90) day period.

7. <u>Acceleration.</u>  Upon the happening of any of the following events: the failure to pay, fulfill or perform any of the Liabilities when due, or any breach or failure to perform by Purchaser or Guarantor of any representation, promise, agreement or warranty to Seller, or any revocation, breach or termination by Guarantor of this Guaranty, or the death or insolvency of Purchaser or Guarantor or suspension of business of Purchaser or Guarantor or the issuance of any writ of attachment against any of the property of Purchaser or Guarantor, or the making by Purchaser or Guarantor or any assignment for the benefit of creditors, or a trustee or receiver being appointed for Purchaser or Guarantor or for any property of either of them, or any proceeding being commenced by or against Purchaser or Guarantor under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt, receivership, liquidation or dissolution law or statute - then and in any such event and at any time thereafter, Seller may, without notice to Purchaser or Guarantor, declare any or all of the Liabilities, whether or not then due, immediately due and payable hereunder by Guarantor, and Seller shall be entitled to enforce the obligations of Guarantor. All sums of money at any time to the credit of Guarantor with Seller or any of its affiliates and any of the property of Guarantor at any time in the possession of Seller or any of its affiliates may be held by or on behalf of Seller as security for any and all obligations of Guarantor notwithstanding that any of said money or property may have been deposited, pledged or delivered by Guarantor for any other, different or specific purpose. Any and all present and future indebtedness and obligations of Purchaser to Guarantor, and any and all claims of any nature which Guarantor may now or hereafter have against Purchaser are hereby subordinated to the full payment to Seller of the Liabilities, and are hereby assigned to Seller as additional collateral security therefor. If Seller so requests, any such indebtedness of Purchaser to Guarantor shall be collected, enforced and received by Guarantor as trustees for Seller and be paid over to Seller on account of the Liabilities but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

8. <u>Assignment of Liabilities.</u>  If any of the Liabilities of Purchaser guaranteed hereunder should be assigned by Seller, this Guaranty will inure to the benefit of Seller's assignee to the extent of such assignment, provided that such assignment will not operate to relieve Guarantor from any obligation to Seller hereunder with respect to any unassigned Liabilities guaranteed hereunder and further that the rights of any assignee will be subordinate to the rights of Seller under this Guaranty as to any unassigned Liabilities.

9. <u>No Credit.</u>  Guarantor acknowledges and agrees that the acceptance of this Guaranty by Seller does not constitute a commitment by Seller to extend credit to Purchaser or to permit Purchaser to incur Liabilities. All sums due from Guarantor to Seller hereunder shall bear interest from the date due to the date paid at a rate equal to the highest rate charged with respect to the Liabilities.

10. <u>Purchaser's Financial Condition.</u>  Guarantor represents and warrants Guarantor is presently informed of the status and financial condition of Purchaser and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Liabilities. Guarantor hereby covenants that Guarantor will continue to keep informed of Purchaser's status and financial condition and of all other circumstances which bear upon the risk of nonpayment. Guarantor hereby waives the right, if any, to require Seller to disclose to it any information which Seller may now or hereafter acquire concerning such status, condition or circumstances.

11. <u>No Liability.</u>  Neither Seller, nor any of its directors, officers, employees, agents, attorneys or any other person affiliated with or representing Seller shall be liable for any claims, demands, losses or damages, of any kind whatsoever, made, claimed, incurred or suffered by Guarantor or any other party through the ordinary negligence of Seller, or any of its directors, officers, employees, agents, attorneys or any other person affiliated with or representing Seller.

**PERSONAL GUARANTY OF PERFORMANCE    4**
**(Rev. Feb 2016)**

Site# 2211031

12. <u>Consent of Guarantor to Jurisdiction and Venue.</u>  Guarantor hereby agrees that all actions to enforce the terms and provisions of this Guaranty shall be brought and maintained within the State of California (the "State"), and that the validity, construction and effect of this Guaranty shall be governed by the laws of the State.  The Guarantor hereby consents to the jurisdiction of any court with proper venue within the State, and hereby consents that such service may be made by registered or certified mail, directed to Guarantor at the address hereinafter set forth.

13. <u>Expenses/Costs/Attorney Fees.</u>  In addition to any other amounts or payments to which Seller is entitled hereunder, Guarantor hereby agrees to pay unto Seller all costs and expenses (including without limitation, liquidation costs, expense payments, and attorneys' fees and other legal costs) incurred by Seller in the collection of the (a) Liabilities and the maintenance, sale or other disposition of any Collateral therefore and (b) any obligations of Guarantor hereunder and the maintenance, sale or other disposition of any Collateral therefor. Further, to the fullest extent permitted by law, the prevailing party shall be entitled to all attorneys' fees, costs of suit and reasonable expenses incurred in order to secure, defend or protect the rights inuring to the prevailing party under this Guaranty, or to enforce the terms thereof, in addition to any other relief to which the prevailing party may be entitled.

14. <u>JURY WAIVER.</u>  GUARANTOR AND SELLER (BY ITS ACCEPTANCE HEREOF) HEREBY VOLUNTARILY, KNOWINGLY, INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG GUARANTOR AND SELLER ARISING OUT OF OR IN ANY WAY RELATED TO THIS GUARANTY, THE CONTRACT, LEASE, OR ANY DOCUMENT OR OTHER AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH, OR OTHERWISE RELATING TO, THE GUARANTY, THE CONTRACT, LEASE, OR ANY RELATIONSHIP BETWEEN THE GUARANTOR AND SELLER. THIS PROVISION IS A MATERIAL INDUCEMENT TO SELLER TO ENTER INTO THIS GUARANTY.

15. <u>General Provisions.</u>
(a) The rights and remedies of Seller under this Guaranty and any other otherwise created are cumulative and may be exercised singly or concurrently, and the exercise of any one or more of them will not be a waiver of any other.  No act, delay, omission or course of dealing between Seller and Purchaser or Guarantor, or any other person, or any of them, will be a waiver of any of Seller's rights or remedies under this Guaranty, and no waiver, change, modification or discharge of this Guaranty or any obligation created hereby will be effective unless in writing signed by Seller.
(b) The rights and obligations created by this Guaranty shall inure for the benefit of and shall be binding upon the personal representatives, successors and assigns, including, but not limited to, the holders or owners of the Liabilities, of the parties hereto.
(c) If any provision or portion of this Guaranty or any supplement or amendment thereto is held to be illegal, invalid or unenforceable by a court or adjudicatory body of competent jurisdiction, said provision or portion shall be deemed to be severed and deleted and the remainder shall continue to be valid and enforceable.
(d) This Guaranty is the entire and only agreement and understanding between Guarantor and Purchaser with respect to the guarantee of the Liabilities and the subject matter of this Guaranty, and all representations, arrangements, agreements, and undertakings, oral or written, previously or contemporaneously made, which are not set forth herein, are superseded hereby. No course of dealing between the parties, no usage of the trade and no parole or extrinsic evidence of any nature shall be used or be relevant to supplement, explain or modify any term or provision of this Guaranty or any supplement or amendment thereto.

**PERSONAL GUARANTY OF PERFORMANCE**      **5**
**(Rev. Feb 2016)**

Site# 2211031

    (e) Any notice or demand to be given hereunder shall be effectively given if made in writing, delivered to Guarantor or to Seller or mailed by certified mail to any of the parties at the following addresses for each, or at such other address as any party may furnish the other in writing:

Seller:        Circle K Stores Inc.
                1130 West Warner Road
                Tempe, Arizona 85284
                Attention:

Guarantor:

Name:         Benham Bagheri
Address:      3825 Tollgate Boulevard
City, State:    Naples, Florida 34114
SSN:          _____

    (f) Guarantor acknowledges receipt of a copy of this Guaranty, and certifies that Guarantor has read all of this Guaranty, and fully understands and agrees to the same, before having signed it.

Executed this _2_ day of _March_ , 20_16_

GUARANTOR:

_____
(signature)

_Ben Bagheri_
(print name)

Witnesses: _____

**PERSONAL GUARANTY OF PERFORMANCE**    **6**
**(Rev. Feb 2016)**

Site # 2211031

# SECURITY AGREEMENT

Petro Gate, Inc., with an address of 3825 Tollgate Boulevard, Naples, Florida 34114 (hereinafter referred to as the "Debtor") hereby grants a security interest to Circle K Stores Inc., with a business address of 1130 West Warner Road, Tempe, Arizona 85284 (hereinafter referred to as the "Secured Party"), in and to all of its interest in the equipment, fixtures, gasoline and petroleum products in inventory, gasoline and petroleum accounts receivable, after acquired inventory, accounts owned by Secured Party and consigned to Debtor and contract rights more fully described in Exhibit A, attached hereto and made a part hereof (such equipment, fixtures, and contract rights referred to hereinafter as the "Collateral"). Proceeds from the sale of the Collateral are also included with the definition of Collateral.

Debtor hereby represents, warrants, covenants and agrees that:

1.      This security agreement (referred to hereinafter as the "Security Agreement") is given to secure (a) the performance by the Debtor of the covenants and agreements contained herein; (b) the performance and payments by the Debtor under the covenants and agreements contained in the Contract of Sale, dated April 1, 2016, by and between Secured Party and Debtor (the "Contract"), which is hereby expressly made a part hereof; (c) the performance and payments by the Debtor under the covenants and agreements contained in the Station Lease, dated April 1, 2016, by and between Secured Party and Debtor (the "Lease"), which is hereby expressly made a part hereof; or (d) any and all other indebtedness or obligations now or hereafter incurred or arising pursuant to the provisions of this Security Agreement, the Contract, the Lease, or any other agreement or contract between Debtor and Secured Party (all such performance, payments, and/or obligations hereinafter collectively referred to as the "Obligations"). This Security Agreement shall also secure any and all renewals or extensions of the whole or any part of the Obligations, however evidenced, with interest, if necessary, at such lawful rate as may be agreed upon, and any such renewals or extensions or any change in the terms shall not impair in any manner the validity of or the priority of this Security Agreement, nor release the Debtor from liability for the Obligations.

2.      To the extent that the Collateral, or any portion thereof, will be attached to real estate, the description of such real estate and the known owner of record of such real estate are set forth in Exhibit A attached hereto and made a part hereof. If the Collateral is attached to such real estate prior to the perfection of the security interest granted herein, the Debtor will, on demand, furnish the Secured Party with a disclaimer or disclaimers, executed by persons having an interest in such real estate.

3.      Debtor further grants to Secured Party a security interest in and to all proceeds, increases, substitutions, replacements, additions, and accessions to the Collateral and to any part of the Collateral. This provision shall not be construed to mean that Debtor is authorized to sell, lease, or dispose of the Collateral without the prior written consent of Secured Party.

4.      Debtor has, or will acquire, full and clear title to the Collateral, and, except for the security interest granted herein, will at all times keep the Collateral free from any adverse lien, security interest or encumbrance.

5.      Debtor warrants and represents that no financing statement covering all or any portion of the Collateral is currently on file in any public office.

6.      Debtor authorizes Secured Party, at the expense of Debtor, to execute and file financing statements and/or fixture filings in those public offices deemed necessary by the Secured Party to perfect and protect its security interest established hereby. Debtor will pay all filing fees for the filing of this instrument or of financing statements or fixture filings filed to perfect the security interest established hereby or in connection herewith.

7.      Debtor shall not sell or assign, or offer to sell, assign or otherwise transfer the Collateral, or any

**SECURITY AGREEMENT**
**(Rev. Feb 2016)**

1

Site # 2211031

interest therein, other than in the normal course of Debtor's business, without the prior written consent of the Secured Party. Debtor will, at all times, maintain, preserve and keep the Collateral in good repair, working order and condition and will not commit or suffer any waste thereof, reasonable wear and tear excepted. Debtor will not use the Collateral in violation of any statute or ordinance, and Secured Party will have the right to examine and inspect the Collateral at any reasonable time. Debtor will promptly notify Secured Party of any change of the address or any other place where the Collateral or records concerning the Collateral are kept.

8.    Debtor will pay promptly when due all taxes, charges, and assessments upon the Collateral or for its use or operation. Until final termination of this Security Agreement, Debtor, at Debtor's own cost and expense, will insure the Collateral with companies acceptable to Secured Party against the casualties and in the amounts that Secured Party will reasonably require, with a loss payable clause in favor of Debtor and Secured Party as their interests may appear. Secured Party is authorized to collect sums that may become due under any of the insurance policies and apply them to the obligations secured by this Security Agreement. Debtor must deliver a duplicate copy of each such policy to Secured Party.

9.    The occurrence of any one of the following events shall constitute an "Event of Default" under this Security Agreement:

    a.    Nonpayment when due of any Obligation hereby secured or failure to perform any duty or Obligation set forth herein or incorporated by reference herein;

    b.    The discovery that any statement, representation or warranty at any time furnished by the Debtor to the Secured Party is untrue in any material respect as of the date made;

    c.    Any event that results in the acceleration of the maturity of the indebtedness of Debtor to others under any indenture, agreement, or undertaking;

    d.    Death, insolvency, failure in business, general assignment for the benefit of creditors, filing of a petition in bankruptcy or for relief under the U.S. Bankruptcy Code of, by, or against Debtor, or the commencement of any other proceeding against the Debtor alleging that such Debtor is insolvent or unable to pay debts as they mature;

    e.    The loss, theft, substantial damage, destruction, sale assignment or encumbrance to or of all or any portion of the Collateral or the making of any levy, seizure, or attachment thereof or thereon;

    f.    Dissolution, merger or consolidation, or transfer of a substantial portion of the stock or assets of the Debtor corporation;

    g.    Deterioration or impairment of the Collateral, or any portion thereof, or the decline or depreciation in the value or market price thereof which causes said Collateral, in the sole judgment of Secured Party, to become unsatisfactory as to the character or value of same; or

    h.    Failure to perform any term, provision, or covenant of this Security Agreement.

10.    Upon the occurrence of an Event of Default, Secured Party shall provide Debtor with written notice thereof. Debtor shall have ten (10) days after the receipt of such notice to cure the Event of Default. If Debtor has not cured such Event of Default within said ten (10) day period, Secured Party may, at its option, and without notice or demand, declare all Obligations due and payable in full immediately, and the Secured Party may exercise any rights and remedies of a secured party under the California Commercial Code or any other applicable law. If Debtor fails to cure any Event of Default as set forth herein, Debtor will make Collateral available to the Secured Party in all respects at a place acceptable to the Secured Party that is convenient to the Debtor. Without limiting the generality of the foregoing, and in conjunction with or in addition thereto, Secured Party, at its reasonable discretion, may also use any one or more of the following remedies with respect to the Collateral encumbered hereunder:

    a.    Enter the premises wherever such Collateral may be located and take possession of, assemble and collect, any of said Collateral or to render it unusable;

    b.    Require Debtor to assemble any or all of the Collateral and make it available to Secured

**SECURITY AGREEMENT**                                    2
(Rev. Feb 2016)

Site # 2211031

Party as set forth above;

      c.    Incur reasonable attorneys' fees and reasonable expenses in exercising any of its rights and remedies upon Debtor's default, which shall become part of its reasonable expense of taking, holding, and preparing for sale, the Collateral secured hereby.

      d.    Pursue any remedy set forth in the Contract or in any other agreement or contract, the performance of which is secured by this Security Agreement.

11.    This Security Agreement shall be binding upon and inure to the benefit of the Debtor, the Secured Party, and each of their respective successors, assigns, heirs, executors and administrators.

12.    In the event any one or more of the provisions contained herein or in the Contract shall be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

13.    If any notification of disposition of all or any portion of the Collateral is required by law, such notification shall be deemed reasonably and properly given if mailed at least ten (10) days prior to such disposition, postage pre-paid to the Debtor at its latest address appearing on the records of the Secured Party.

14.    Unless otherwise prohibited by law, Secured Party shall apply the proceeds from the sale of Collateral and sums received or collected from or on account of the Collateral to:

      a.    The payment of expenses incurred in connection with the sale, transfer, or delivery of the Collateral;

      b.    The payment of other costs, charges, attorneys fees and legal expenses herein aforementioned;

      c.    The payment of Obligations in the order and manner to be determined by Secured Party, in Secured Party's discretion;

      d.    The balance to Debtor or the person entitled to up upon proper demand.

15.    Debtor waives (a) its right to require Secured Party to proceed against any person, proceed against or exhaust any collateral, or pursue any other remedy available to Secured Party and (b) any defense arising any reason.

16.    Until all Obligations covered under this Security Agreement are paid and/or performed, the power of sale and all other rights, powers, and remedies available to Secured Party shall continue to exist and may be exercised at any time, irrespective of the fact that the Obligations or any part thereof may have become barred by statute of limitations.

17.    The rights, powers, and remedies given to the Secured Party hereunder are in addition to any rights, powers, and remedies available to Secured Party under applicable law.

18.    The forbearance, failure, or delay of Secured Party in exercising any rights, powers, or remedies available to it hereunder or under applicable law shall not be a waiver of such right, power, or remedy, nor shall the exercise of such right, power, or remedy preclude its further exercise. Every right, power, and remedy available to Secured Party shall continue in full force and effect until expressly waived by a written instrument executed by an authorized representative of Secured Party.

19.    All acknowledgments, representations, warranties, debts, and obligations of performance of Debtor under this Security Agreement are made, and binding on all those signing this Security Agreement, jointly and severally as the Debtor.

**SECURITY AGREEMENT**
**(Rev. Feb 2016)**

3

Site # 2211031

20.    Debtor authorizes Secured Party to file such financing statements as Secured Party deems advisable to perfect the security interest created hereby. A carbon, photographic or other reproduction of this Security Agreement or any financing statement relating to this Security Agreement shall be sufficient to serve as a financing statement. This Security Agreement shall be effective as a fixture filing with respect to all fixtures included within the Collateral and is to be filed for record in the real estate records office of the County Recorder where the real estate containing the fixtures is situated.

21.    All exhibits, schedules, riders, and documents attached hereto (collectively, "Attachments"), are hereby incorporated herein and made a part of this Security Agreement. This Security Agreement shall be governed by and construed in accordance with the California Commercial Code and the other laws of the State of California. This Security Agreement, including any Attachments, is the entire agreement and supersedes all prior written and unwritten agreements, attachments, schedules, appendices, amendments, promises, and understandings between the parties pertaining to the matters covered under this Security Agreement, and is a final, complete and exclusive statement of the agreement between Debtor and Secured Party. THERE ARE NO ORAL UNDERSTANDINGS, REPRESENTATIONS OR WARRANTIES AFFECTING IT. Except as otherwise provided in this Security Agreement, no amendment, deletion, modification, or alteration to this Security Agreement shall have any effect unless and until made in writing and signed by an authorized representative of Secured Party and by Debtor.

22.    To the fullest extent permitted by law, the prevailing party shall be entitled to all attorneys' fees, costs of suit and reasonable expenses incurred in order to secure, defend or protect the rights inuring to the prevailing party under this Security Agreement, or to enforce the terms thereof, in addition to any other relief to which the prevailing party may be entitled.

23.    By their signatures below, each of the following represent that they have authority to execute this Security Agreement and to bind the party on whose behalf their execution is made. Debtor shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of its obligations hereunder and to carry out the intent of this Security Agreement.

Executed this _2_ day of _march_, 20 16

SECURED PARTY:                          DEBTOR:

Circle K Stores Inc.                     Petro Gate, Inc.

By: _____             By: _____
      Matt McClure                            Behnam Bagheri

Title: Vice President                    Title: President

Witness: _____                 Witness: _____

SECURITY AGREEMENT                                    4
(Rev. Feb 2016)

Facility # 2211031

### ATTACHMENT "A"
### TO STATION LEASE
### LESSEE'S EQUIPMENT

Lessor owns and retains title to all equipment on the leased premises with the exception of:

- FAST-FOOD Fixtures
- GoNDOLAS - RACKS
- Freezer in bACK Rom
- SAFE
- BAck-office equip't

KSA/ BB

Title to such items contained herein shall at all times remain with Lessee. This Attachment is not to be deemed exclusive per se and may be amended by mutual acknowledgement of the parties.